IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JAVIER AMBLER, SR., and MARITZA AMBLER, individually, on behalf of all wrongful death beneficiaries of JAVIER AMBLER, II, on behalf of the ESTATE OF JAVEIR AMBLER, II, and as next friends of J.R.A., a minor child; and MICHELE BEITIA, as next friend of J.A.A., a minor child, | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 20-1068 |
| Plaintiffs, | §<br>§ | |
| v. | §<br>§ | |
| WILLIAMSON COUNTY, TEXAS, | §<br>§ | |
| Defendant. | §<br>§ | |

## PLAINTIFFS' COMPLAINT

Plaintiffs JAVIER AMBLER, SR., MARITZA AMBLER, and MICHELE BEITIA file this 42 U.S.C. § 1983 and Americans with Disabilities Act lawsuit against Defendant WILLIAMSON COUNTY, and would show the Court and Jury the following in support thereof:

**I.**
**PARTIES**

*A. Plaintiffs*

1.      Plaintiffs JAVIER AMBLER, SR. and MARITZA AMBLER are the natural parents of JAVIER AMBLER, II, deceased. They are residents of Bell County, Texas, and sue in their capacity as statutory beneficiaries under the Texas Wrongful Death Act, on behalf of all statutory beneficiaries, and on behalf of the Estate of Javier Ambler, II pursuant to agreement of all the beneficiaries.

2.      Javier Ambler, II died intestate, and there were no probate proceedings arising from his death, as none were necessary. All potential heirs-at-law, through their legal representatives,

have agreed to resolve the distribution of any assets obtained by the Estate of Javier Ambler, II. All potential heirs, through their legal representatives, agree that Javier Ambler, Sr. will prosecute all claims on behalf of the Estate of Javier Ambler, II.

3.      Javier Ambler, II died having no surviving spouse.

4.      Javier Ambler, II died having fathered two minor children, J.R.A., and J.A.A. J.R.A. and J.A.A. are Javier Ambler, II's sole heirs.

5.      J.R.A. lives with his grandparents, Plaintiffs Javier Ambler, Sr. and Maritza Ambler, and they bring this case as J.R.A.'s next friend with agreement of his natural mother.

6.      MICHELE BEITIA is the mother of J.A.A., and brings suit as his next friend. She is a resident of Williamson County, Texas.

*B.  Defendant*

*7.*      Defendant WILLIAMSON COUNTY, TEXAS is a governmental entity in Texas. It may be served through its County Judge, Bill Gravell, Jr., at 710 S. Main St. #101, Georgetown, TX 78262. *Service is hereby requested at this time*.

8.      At all relevant times, the policymaker for the Williamson County Sheriff's Department was the elected Sheriff, Robert Chody.

9.      At all relevant times, Sheriff Robert Chody was an agent, employee, and policymaker of Williamson County and acting within his scope as such.

## II.
## JURISDICTION AND VENUE

10.      As this case is brought pursuant to 42 U.S.C. § 1983 and the Americans with Disabilities Act, this Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

11.      This Court has general personal jurisdiction over Defendant as it is located in

Williamson County, Texas.

12.     This Court has specific *in personam* jurisdiction over Defendant because this case arises out of conduct by Defendant's agents that killed Javier Ambler, II, and which occurred in Travis County, Texas, which is within the Western District of Texas.

13.     Venue of this cause is proper in the Western District pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events or omissions giving rise to Plaintiffs' claims occurred in Travis County, which is within the Western District of Texas.

### III.
### FACTS

14.     Black lives matter.

15.     Williamson County Sheriff's Deputies JJ Johnson and Zachary Camden killed Javier Ambler, II as he begged "I can't breathe," after Johnson and Camden chased his car when Ambler allegedly failed to dim his headlights. At Sheriff Robert Chody's direction, Johnson and Camden were chasing and assaulting Ambler to create a reality television program.

**A. Sheriff Chody and Williamson County's Policy of Endangering Citizens to Create Reality Television**

16.     In 2018, Sheriff Chody entered a contract to produce a television program called "Live PD."

17.     The Williamson County Commissioners' Court voted unanimously to approve this agreement.

18.     Live PD producers and camera operators ride with officers from police departments and record their activities for broadcast.

19.     Live PD is not actually "live," and the various police departments that appear on it (including Williamson County's) can selectively veto any content they do not wish to air.

20.     Live PD turns serious criminal justice matters into crass entertainment.

21.     Sheriff Chody is well-aware that Live PD is an entertainment program.

22.     Several of Sheriff Chody's officers, including Defendant Johnson, were regularly featured on Live PD.

23.     Chody regularly promoted Live PD on his social media platforms.

24.     Chody considered Live PD a "necessary tool to assist with the successful accomplishment of his core duties," including by allegedly "provid[ing] transparency and awareness to the public," by "increas[ing] recruiting efforts," by allegedly "provid[ing] an independent and unbiased visual on how the deputies are operating on the streets," by "provid[ing] a tool for creating better and more efficient protocols for finding missing persons," by allegedly "provid[ing] a tool to ensure laws, policies, rights, obligations and duties are adhered to," by allegedly "provid[ing] a tool for greater checks and balances in the officer," and by allegedly "provid[ing] a tool for protecting the employees and agency."

25.     Chody tweeted, "The Williamson County Sheriff's Office is proud & excited to announce that we will be featured on #LivePD this weekend!" in November 2018.

26.     Chody later tweeted, "I believe having #LivePD in WilCo is a necessary tool for our office for many reasons … [and] the community at a large scale approves."

27.     Chody later endorsed a t-shirt that said "Trust me. I watch Live PD, I'm basically a cop," by tweeting "I want this shirt!!!!! #LivePD #LivePDNation."

28.     Chody even let Live PD continue production during the COVID-19 pandemic, despite Williamson County's "stay-at-home" order that made reality TV crews "non-essential" workers.

29.     Chody believes that Live PD helps his department recruit officers, and has made it

an essential component of the Williamson County Sheriff's Department.

30.     Chody encouraged his officers to engage in dangerous, high-risk police tactics because it made for more entertaining television in service to Live PD.

31.     If Live PD producers considered a department "boring," its activities would not be broadcast. Thus, Chody prioritized producing "exciting" content for Live PD over the health and safety of the County's citizens.

32.     For example, Chody's deputies, with Live PD camera crews in tow, broke down the door of a suspect wanted on a warrant, when the same suspect had been at the Williamson County Courthouse the same day to appear on another charge. Rather than arrest him on the warrant during the court appearance, as Chody's deputies easily could have, Chody and Live PD sent officers in tactical gear to break down the suspect's door and invade his home because peacefully making arrests during court appearances is boring television.

33.     In another incident, Chody sent the SWAT team to arrest a suspect wanted for possession of a small amount of drugs by authorizing a no-knock warrant and the use of flash-bang grenades. Chody's deputies broke down the door of the suspect's mother's home, then fired flash bang grenades into the house, when the suspect was non-violent and could have been arrested without incident. The raid and arrest were broadcast on Live PD.

34.     Thus, among other policies and practices, Sheriff Chody's pursuit policy allowed officers to chase motorists who committed trivial traffic violations.

35.     Police chase sequences were a staple of Live PD, and are considered "not boring."

36.     Thus, more than half of nearly 100 chases initiated by Williamson County deputies in the last three years, while Live PD was filming, were for traffic violations.

37.     Upon information and belief, many of these chases were initiated or pursued for the

benefit of Live PD, at Chody's direction.

38.     Policies instated by Sheriff Chody in January of 2019, despite the continued presence of Live PD and significant increase in pursuits, did not prohibit chases of non-hazardous traffic violations or misdemeanors.

39.     Policies instated by Sheriff Chody in January of 2019, despite the continued presence of Live PD and significant increase in pursuits, failed to define for officers what constituted "a crime for which there is an immediate need for apprehension".

40.     Chody, as policymaker, acknowledges that, prior to Ambler's death, the policy in Williamson County was to "chase until the wheels fall off."

41.     In fact, the day of Ambler's death, Williamson County deputies chased two other suspects.

42.     In the year that Live PD began partnering with Chody and Williamson County, the number of police chases by Chody's department increased 54%.

43.     Chody's Williamson County deputies chased suspects at a higher rate than any other jurisdiction in Central Texas.

44.     Half of all chases in Williamson County occurred while Live PD camera crews were filming the department.

45.     Over 20% of chases in Williamson County involved Black suspects, though less than 10% of Williamson County residents are Black.

46.     Approximately 60% of Williamson County chases began due to a trivial traffic infraction, like failing to signal, expired license plates, or failure to dim headlights.

47.     Deputy Johnson was involved in multiple dangerous chases while working for Sheriff Chody, including a chase that reached 100 miles per hour that Johnson began because the

driver had his headlights off, and another whose registration sticker had expired.

48.     Sheriff Chody had also encouraged officers to use excessive force when they were being filmed by Live PD.

49.     One of Chody's officers, Jarred Dalton, tweeted in 2019, "Glad we could make some good TV for the boss man." On another occasion, again tweeting about Live PD, Dalton tweeted, "Gonna try to get some good stuff stirred up for y'all tonight."

50.     Live PD also believes that assaulting suspects is "not boring."

51.     Indeed, on June 4, 2019, shortly after Ambler's death, Live PD broadcast a traffic stop where Deputies Johnson and Camden used excessive force against a suspect stopped for a minor traffic offense.

52.     Williamson County officers electrocuted the suspect with their TASERs multiple times.

53.     Williamson County officers kicked and punched the suspect multiple times, while he was in a defensive position on the ground.

54.     Three Williamson County officers, including Johnson and Camden, sat on top of the suspect, while he was face-down on the ground and begging, "I can't breathe" – much like Ambler had earlier.

55.     Upon information and belief, neither Johnson nor Camden were disciplined for their role in assaulting this suspect on camera.

56.     In fact, Sheriff Chody did not exercise his veto to prohibit Live PD from broadcasting this incident because it was exactly the type of content that Chody hoped to create for Live PD.

57.     Indeed, Chody would actively encourage his deputies to use force when it was

unnecessary.

58.     Chody's command staff, with his knowledge, awarded gift cards to steakhouses to officers who had "good" uses of force.

59.     Officers who received gift cards were also awarded the title "WilCo Badass."

60.     This practice encouraged officers to use force more frequently, to "win" more gift cards, to be "WilCo Badass," and to appear on Live PD.

61.     One of the rare Williamson County officers who was asked to resign after he used excessive force expressed surprise, saying that he thought his use of force would have earned him a gift card rather than a requested resignation.

62.     Despite the clear danger to residents of Williamson County, the County Commissioners Court renewed the contract with Live PD in 2019.

63.     However, concerned that Live PD turns the worst days of many citizens' lives into crass reality television, many jurisdictions around the country cut ties with the program.

64.     For these reasons, finally in August of 2019, the Williamson County Commissioners Court ordered Sheriff Chody to stop allowing Live PD to produce the show in Williamson County.

65.     Sheriff Chody ignored the Commissioners Court, and continued allowing Live PD to produce the show in Williamson County.

66.     On May 19, 2020, the Williamson County Commissioners Court then took the rare step of suing Sheriff Chody to stop production of Live PD, alleging that "Sheriff Chody can perform the core duties of sheriff without the live TV show. But he doesn't want to. Instead, Sheriff Chody seeks social media and TV exposure like a moth to a light bulb – and he's flown out of his job description to get back on TV."

67.     Instead, the County alleged that Chody had become a "TV producer, reality TV star, [and] show business agent," and, "jeopardized … citizen protection for TV ratings and exposure" by "prioritize[ing] TV appearance[s] and ratings over safety and proper police work."

68.     A former president of the Williamson County Deputies Association, Mike Klier, similarly alleged that Chody would hire deputies not based on their ability to be effective sheriff's department officers, but instead to create more exciting television. "If you are looking for guys who are chasing Hollywood lights with blue [police] lights, you're going to get exactly what we got – and that is a disaster."

69.     In fact, Chody has hired numerous officers who had been disciplined or were about to be fired by other law enforcement agencies for being dishonest or using excessive force.

70.     Before Chody took office, the Sheriff's Department conducted thorough background checks of all potential sheriff's deputies. Chody ended this practice, and instead implemented a policy where background checks would only examine minimal information, and offenses that would have once disqualified applicants were now ignored.

71.     Former officers of the Williamson County Sheriff's Office described Chody's new hiring policies as "atrocious."

72.     Two of the officers who Chody hired based on their television abilities, rather than their actual suitability to serve as police officers, are Defendants Johnson and Camden.

73.     Chody ignored red-flags in Johnson and Camden's background to hire them.

74.     Both Johnson and Camden were turned down by Williamson County when they had applied to work for the department before Chody's tenure because of serious problems with their backgrounds as police officers.

75.     Camden's previous employer, the Bastrop County Sheriff's Department,

disciplined him three times during a five-month period, including twice for dishonesty.

76.     Bastrop County also required Camden to take additional courses on suspects' constitutional rights after he made a search of a suspect's home without legal justification.

77.     When he applied to work for Chody's department, two of Camden's references noted he was too "aggressive" when out on patrol.

78.     Williamson County Commissioner Terry Cook has been especially critical of Sheriff Chody's decision to participate in Live PD, saying the County needs to "get entertainment out of law enforcement. It doesn't belong there."

79.     Williamson County District Attorney Shawn Dick believes that Sheriff Chody's participation in Live PD has actually prevented his office from prosecuting crimes – by refusing to provide even basic information to the County. "Live PD or no Live PD, the sheriff's office has a responsibility and a duty to get us all the evidence in a case. And whoever they let into a crime scene, we better have the names of those witnesses and the evidence that they can provide. And the sheriff's department has let Live PD into [Chody's] crime scenes for the last two years, and all I've ever requested were the witnesses that were in the crime scene and the evidence they gathered while they were in the crime scene. And to date we've never gotten that kind of information."

80.     Months before Ambler's death, Dick had told Chody that he needed to preserve all video recordings made by Live PD, because they would be critical evidence in criminal prosecutions.

81.     Due to Chody's refusal to provide evidence created by Live PD, Dick has been forced to decline to prosecute criminal cases. Despite Dick informing Chody about this, Chody still refused to provide the Live PD footage, knowing that some cases would be dismissed. Clearly, Chody was more interested in making the television program than actual police work.

82.     Thus, during the controversy regarding Live PD, Sheriff Chody approved policies and practices, or, alternatively, failed to change or correct existing practices, that made for more entertaining television but endangered the safety of citizens who interacted with police.

83.     Likewise, Sheriff Chody hired officers who were unfit for actual police work, then failed to supervise them to prevent them from violating citizens' constitutional rights, to serve Live PD rather than the people of Williamson County.

84.     Even after Live PD was cancelled, in large part due to the program's role in Amber's death, Chody continued to support the television program, and re-tweeted statements by the show's host, Dan Abrams.

85.     At no time prior to the filing of their lawsuit for injunctive relief, did the County Commissioners Court move to remove Sheriff Chody from office for incompetency or official misconduct by petitioning the Williamson County District Court despite knowledge of his ongoing policy of violating the Constitutional Rights of Williamson County residents.

**B.  Sheriff Chody's Indifference to Excessive Force**

86.     Sheriff Chody also has a long history of using excessive force against people of color personally, and indifference to the use of excessive force by his officers.

87.     In 1998, Chody was an Austin Police Department officer.

88.     Chody used excessive force against a teenager, Marcus Frank, then 15 years old.

89.     Frank is Black.

90.     Chody is white.

91.     Chody grabbed Frank, put him into a choke hold, and held him down against his police cruiser until Frank suffered a seizure caused by Frank's epilepsy.

92.     Even as Frank suffered the seizure, Chody did not release his grip, even as Frank's

symptoms worsened.

93.     Frank had done nothing wrong.

94.     The City of Austin paid a $30,000 settlement to resolve Frank's claims against Chody.

95.     Chody continues to insist he did nothing wrong.

96.     That same year, Chody collected $51,000,000 when he won the lottery.

97.     Chody left the Austin Police Department to run for office in Williamson County.

98.     Chody was eventually elected Williamson County Sheriff in 2016.

99.     When asked about how he brutalized Frank during the campaign for Sheriff, Chody responded that he had been a "good cop" on that day, and that he did nothing wrong.

100.    One of Chody's goals as Sheriff was to talk to his officers, to let them know "what [he] was willing to put up with."

101.    Indeed, Chody was willing to let Live PD broadcast his officers using similar levels of excessive force.

102.    The number of use of force incidents doubled between 2017 – the last year before Live PD began filming Chody's deputies – and 2019 – after Live PD had operated in Williamson County for a full year.

103.    Moreover, during the weeks the show was being filmed, deputies used force significantly more often than when they weren't accompanied by Live PD camera crews.

104.    Likewise, deputies used TASERs much more often after Live PD arrived in Williamson County. The number of incidents where TASERs were used nearly doubled from 2017 to 2019.

105.    Similarly, officers used TASERs in more than half of all use of force incidents

between 2017 and 2019, an extremely high (and dangerous) rate.

106.    Black citizens were disproportionately targeted for use of excessive force by Williamson County deputies. Though Black people make up only ten percent of Williamson County citizens, they were twenty percent of the population that Chody's deputies used force against.

107.    In 2017, Williamson County changed its training academy's academic standards without permission from the Texas agency that accredits law enforcement academies, the Texas Commission on Law Enforcement. Though police officers in Texas are required to receive five to seven months of training before working independently, in Williamson County that training period was reduced to twelve weeks at Chody's direction.

108.    As a result, numerous Williamson County deputies were put on the street without receiving appropriate training. Indeed, many of the deputies who used excessive force had been employed by the department for less than two years.

109.    Indeed, Johnson and Camden had only been working as patrol officers for a short time before they killed Ambler. Camden had only completed his training two or three weeks before Ambler's death. Johnson had been on patrol for just two or three months.

110.    A Williamson County academy instructor also resigned after calling a Black cadet a racial slur.

111.    Thus, upon information and belief, Chody is willing to "put up with" his officers using the same level of excessive force he deployed against Frank, and has approved rewarding uses of force with gift cards and the "WilCo Badass" title.

112.    Chody fails to train and supervise his officers to discourage the use of excessive force. Rather, he trains and supervises his officers that it is acceptable to use force similar to what

he did to Frank – to be "WilCo Badass."

113.    Chody, as an agent and employee of Williamson County, continues to perpetuate a policy of encouraging excessive force against people of color and especially members of the Black community.

### C.  Defendant's Officers Kill Javier Ambler, II

114.    Javier Ambler, II is Black.

115.    On March 28, 2019, at around 1:23 am, Ambler was driving home.

116.    As he was driving in suburban Williamson County, portions of Ambler's drive home were very dark.

117.    A former stand-out high school defensive tackle, Ambler, 40, worked as a caterer, and weighed approximately 400 pounds.

118.    Ambler suffered from heart conditions and obesity, which substantially impaired his mobility and the operation of his circulatory system. Among other impairments, Ambler's heart conditions and obesity impaired his ability to engage in strenuous physical activity, and his ability to move his body into certain positions.

119.    At the same time Ambler was driving home, Deputies Johnson and Camden were patrolling Williamson County in separate squad cars.

120.    Both Johnson and Camden were accompanied by Live PD camera crews.

121.    When Johnson passed Ambler, Ambler allegedly failed to dim his car's headlights.

122.    Johnson turned his car around to pull over Ambler. Because Ambler did not pull over, Johnson began chasing him.

123.    Sheriff Chody's permissive chase policy, and his policy of allowing Live PD to film policing activities as "entertainment," encouraged Johnson to chase Ambler for this trivial

offense.

124.    Early in the chase, Johnson was close enough to Ambler's vehicle to record his license plate so that he could attempt to arrest him later. Johnson, pursuant to Williamson County's permissive chase policy, instead recklessly continued chasing Ambler's car.

125.    Live PD's camera crews began filming the chase.

126.    Johnson began narrating the chase, for the benefit of the Live PD camera crew.

127.    Johnson told the camera operator, "I'm gonna stop this guy for failure to dim high beams."

128.    Johnson reported the chase over intradepartmental radio, and Camden joined the chase.

129.    The Live PD camera crew accompanying Camden also began filming.

130.    While Johnson and Camden chased Ambler, they narrated the chase for the Live PD camera crews, to produce an "entertaining" program.

131.    Johnson and Camden chased Ambler for over 20 minutes.

132.    There was never any discussion over the interdepartmental radio of abandoning the chase.

133.    Indeed, the chase was well within Williamson County's dangerous policy.

134.    Johnson and Camden also reported the chase over radio channels that local police departments use to communicate with each other.

135.    The Austin Police Department learned about the chase, as the vehicles passed the border between Williamson County and the City of Austin.

136.    Austin Police Department officers were ordered *not* to engage in the chase, because the chase was inherently dangerous, and Ambler was only suspected of committing a trivial offense

before the chase began.

137.    The chase ended when Ambler lost control of his car, and crashed within the City

of Austin.

138.    Johnson reported the crash over the radio.

139.    Johnson stopped his squad car near the scene of the crash.

140.    Johnson exited his squad car.

141.    The Live PD camera operator exited the car as well, and continued filming.

142.    At no time during the pursuit, was Ambler armed or a threat to the officers or others.

143.    Johnson drew his handgun, pointed it at Ambler, and ordered him to exit the car.

144.    Ambler immediately complied, and held up his hands to show he was unarmed and

not a threat.

145.    Ambler extended his hands out of the car immediately after opening the door,

clearly showing Johnson that he was unarmed and surrendering.

146.    At this time, Ambler had surrendered, and the scene was controlled and secure.

147.    Johnson holstered his handgun, and drew his TASER instead.

148.    Johnson began pointing his TASER at Ambler.

149.    The TASER is an electric shock weapon that can be lethal when used against people

with chronic heart conditions, like Ambler.

150.    Johnson began yelling "get down!" and "get on the ground!" at Ambler.

151.    Ambler worked to comply, and immediately kneeled on the ground next to the

crashed car. Due to his size and heart condition, he was not able to move quickly, or lower his

large frame to the ground.

152.    Johnson fired the TASER at Ambler despite the fact that he was compliant, not

posing a threat, and not attempting to escape the officers on foot.

153.    Ambler fell to one knee, then involuntarily rolled onto his back.

154.    Johnson yelled, "You'll get it again!" and continued to point the TASER at Ambler.

155.    Camden and his Live PD crew arrived.

156.    Camden also drew his TASER, and used its "drive stun" mode to shock Ambler in the back despite the fact that Ambler was compliant, not posing a threat, and not attempting to escape the officers.

157.    Now two Live PD camera operators were recording the incident.

158.    Camden and Johnson shocked Ambler a third time with their TASERs. Again, Ambler posed no threat, was complaint, and was not attempting to escape.

159.    Both officers screamed at Ambler to lay down on his stomach so they could handcuff him behind his back.

160.    Requiring a person who is obese to lay on their stomach can be very dangerous, as doing so can compress the body's chest cavity and inhibit breathing.

161.    Ambler gasped, "I have congestive heart failure, I have congestive heart failure."

162.    Johnson and Camden did not relent, and continued to force Ambler into the ground. One of the officers held his TASER into Ambler's neck.

163.    Ambler gasped, "I can't breathe."

164.    The officers yelled orders at Ambler.

165.    Ambler explained he was trying to comply with their orders: "I'm about to get on my knees, sir."

166.    Officers screamed at Ambler, "give me your hand!"

167.    Ambler explained he was trying to comply: "I'm about to give it to you, sir."

168.    The officers ordered Ambler to lay "flat on your stomach, flat on your stomach."

169.    Ambler explained he could not lay on his stomach, gasping, "I can't breathe."

170.    Ignoring Ambler's pleas, the officers again ordered him to lay "Flat on your stomach!"

171.    Ambler again gasped, "I can't breathe!"

172.    Officers again commanded, "Flat on your stomach!"

173.    Ambler whimpered in distress.

174.    In response, the officers yell, "Stop resisting!"

175.    Ambler responded, "I can't breathe."

176.    One of the officers told Ambler, "you need to comply."

177.    Ambler desperately explained, "I'm not resisting."

178.    Ambler again cries out, "I can't breathe!"

179.    The officers, nonetheless, force Ambler's arms behind his back.

180.    Ambler continues gasping for breath.

181.    Ambler gasps, "please!" while attempting to hold his chest off the ground with his left arm, so that he can keep breathing.

182.    Ambler cries again.

183.    Ambler gasps, "save me!" and tries to get off his stomach so he can breathe.

184.    Officers yell at Ambler to "roll over!" and "stay on your stomach!"

185.    Ambler whimpers and cries.

186.    Officers respond by screaming, "Do it now!" and order Ambler to "Stay on your stomach!"

187.    Officers then use the TASER again, shocking Ambler, while again commanding

him to "roll over" onto his stomach.

188.    While pulling back his arms, Camden chuckles, "I'm pretty sure I broke his finger."

189.    One of the officers then puts his knee into Ambler's back to hold him down, face first, into the pavement.

190.    At this point, Ambler's body is completely limp.

191.    Nonetheless, Johnson and Camden then handcuffed Ambler behind his back, and leave him laying face down on the pavement.

192.    Johnson and Camden used standard handcuffs to restrain Ambler.

193.    An obese person the size of Ambler requires the accommodation of "big boy" handcuffs, or "double" handcuffs. These special handcuffs have a longer chain. Without this accommodation, handcuffing an obese person behind their back also compresses their chest cavity, restricting their ability to breathe.

194.    Indeed, between forcing the full weight of his obese body into the ground and onto his chest, and handcuffing him with standard handcuffs behind his back, Johnson and Camden prevented Ambler from breathing.

195.    Ambler stopped breathing.

196.    For several minutes after Ambler stopped breathing, Johnson and Camden failed to summon aid or initiate CPR.

197.    Approximately ten minutes after the chase concluded, EMS arrived.

198.    Live PD continued filming until EMS took Ambler away.

199.    Ambler was taken to a local hospital.

200.    Shortly thereafter, Ambler was pronounced dead.

201.    An autopsy concluded that Ambler died of congestive heart failure and

cardiovascular disease "in combination with forcible restraint."

202.   The medical examiner classified his death as a homicide.

203.   Ambler never attempted to harm any of the officers involved.

204.   Ambler never verbally threatened any of the officers involved.

205.   Ambler was unarmed.

206.   Ambler never attempted to gain control of any of the officers' weapons.

207.   Johnson and Camden ignored Ambler's pleas for help, and killed him anyway.

208.   When Johnson and Camden's supervisors arrived on the scene, Johnson explained that he continued to used force against Ambler because even though "he was saying 'I can't breathe,' he's still talking."

209.   Johnson and Camden never attempted to de-escalate the situation, even when Ambler was offering to comply.

210.   De-escalation makes for bad television.

211.   Live PD camera operators and producers filmed Ambler's last moments alive, intending to broadcast it as entertainment, as Sheriff Chody and Williamson County wanted, and as they would continue to for months after Ambler's death.

212.   When Ambler died, however, the video recordings of Ambler's death disappeared.

213.   Sheriff Chody has been indicted by a Williamson County grand jury for destroying evidence related to the Ambler case. Upon information and belief, this evidence includes the video recordings made by Live PD.

214.   Three months after Ambler's death, Chody went on a podcast to praise Johnson, saying, "You're doing an extremely good job and representing Williamson County very well. I just wanted to say … how proud of I am not only of [Johnson], but of all the troops that are on

Live PD."

215.   Johnson has since been promoted to sergeant.

**D.  Local Leaders Agree that Ambler's Death is Appalling**

216.   Following Ambler's death, multiple local leaders have condemned Chody.

217.   Williamson County Commissioner Terry Cook said, regarding Sheriff Chody, that "The last three-and-a-half years of him at the helm are unacceptable. I have no confidence that he has the temperament, operational intelligence, administrative ability, nor the people skills to handle the job [of Sheriff]."

218.   Commissioner Cook continued: "The continued killing of Black citizens in our country under the hands of law enforcement has reached epidemic proportions, and it is horrific. Like the pandemic we've been facing, it has come to roost in Williamson County."

219.   Williamson County Commissioner Cynthia Long said, "Sheriff Chody must resign. He lacks the moral authority to be a cop."

220.   Williamson County Commissioner Russ Boles has also called on Sheriff Chody to resign.

221.   State Representative James Talarico, who represents part of Williamson County, said, "his name was Javier Ambler, and he deserves justice. I call on Sheriff Chody to resign."

222.   At no time prior, have the County Commissioners Court moved to remove Sheriff Chody from office for incompetency or official misconduct by petitioning the Williamson County District Court despite knowledge of his ongoing policy of violating the Constitutional Rights of Williamson County residents.

## IV.
## CAUSES OF ACTION

### A.    FOURTH AMENDMENT § 1983 *MONELL* CLAIM

223.    Plaintiffs incorporate by reference all of the foregoing and further allege as follows:

224.    The conduct by the officers identified in this Count and described herein constituted excessive and deadly force in violation of the Fourth Amendment United States Constitution, as incorporated through the Fourteenth Amendment.

225.    At all material times, the Deputies acted under color of state law, as agents of Williamson County.

226.    At all material times, the Defendant Officers wore their official department uniforms and were acting within the course and scope of their duties as a Williamson County deputies at the time they retrained Ambler.

227.    Defendant's policymaker for all matters related to the activities of the Sheriff's Department was Sheriff Chody.

228.    Thus, Williamson County had or ratified the following policies and/or practices in place when Deputies Johnson and Camden killed Ambler:

- Engaging in reckless police chases, even when the suspect has only allegedly committed a trivial offense;
- Encouraging officers to perform their jobs recklessly to produce more "entertaining" video for Live PD, including encouraging officers to unnecessarily use force and excessive force;
- Using excessive force against suspects;
- Encouraging excessive force by awarding deputies gift cards and the title "WilCo Badass" for using force;
- Using excessive force against suspects to produce more "entertaining" video for Live PD;
- Requiring all suspects to lie on their stomach for restraint;
- Training officers that when a detainee says "I can't breathe" that they can continue to use force because the detainee is talking;
- Inadequate training and policies concerning de-escalation of force;
- Inadequate training and policies concerning police pursuits;
- Inadequate training and policies concerning handcuffing, TASERs, prone restraint and positional asphyxia;

- Hiring officers who were unqualified or known to be inappropriate for law enforcement;
- Failing to terminate officers despite knowledge of repeated unconstitutional, unlawful or improper conduct; and,
- Encouraging escalation rather than de-escalation.

229.   Williamson County supervisors, including Sheriff Chody, reviewed Johnson and Camden's conduct with regard to Ambler, found no problems, and took no action. Williamson County approved their conduct and the basis for it. Indeed, Johnson and Camden continued using similarly violent tactics against other suspects months later for the benefit of Live PD.

230.   Johnson and Camden, Chody's subordinates, violated Ambler's constitutional rights, when Chody failed to supervise them by encouraging them to engaging in reckless police chases, encouraged using excessive force, hired them when they were unfit to serve as armed police officers, and the other above delineated policies, all of which caused the violation of Ambler's constitutional rights. Chody was deliberately indifferent to the known and obvious consequences of these policies, practices, and customs which he was aware of, authorized, and encouraged, rather than acting to correct them. Chody was actually aware of facts from which any reasonable policymaker could draw the inference that a substantial risk of serious harm and violations of constitutional rights existed, and actually drew that inference. Chody was aware of the pattern of similar incidents that occurred before and after Ambler's death, although it was also apparent and obvious that a constitutional violation was a highly predictable consequence of the County's above delineated policies.

231.   Likewise, Chody knew or should have known that training his officers to: 1) use excessive force (and otherwise provide more entertaining television for Live PD), 2) require all suspects to lay on their stomach for restraint, and 3) tell subordinates that if a suspect is able to say "I can't breathe" that they are fine because they are talking, were all particular omissions in the County's training program that would cause County employees to violate the constitutional rights

of members of the public they encountered, like Ambler. Nevertheless, though Chody knew of these obvious deficiencies, he chose to retain this dangerously flawed training program.

232.    Rather, the Williamson County Sheriff's Department hierarchy and Sheriff Chody ratified Deputies Johnson and Camden's conduct, and continue to approve and condone Deputies Johnson and Camden's conduct.

233.    Likewise, even after Ambler's death, Sheriff Chody continued to create "entertainment" with Live PD through the above destructive policies, even defying the Williamson County Commissioners Court to do so.

234.    In any event, each of the policies delineated above was actually known, constructively known and/or ratified by Williamson County and its policymakers, including Chody, and was promulgated with deliberate indifference to Ambler's rights under the United States Constitution. Moreover, the known and obvious consequence of these policies was that Williamson County Sheriff's Department deputies would be placed in recurring situations in which the constitutional violations described within this complaint would result.  Accordingly, these policies also made it highly predictable that the particular violations alleged here, all of which were under color of law, would result.

235.    Consequently, the policies delineated above were a moving force of Ambler's constitutional deprivations and injuries, and caused him to suffer severe damages and die.

**B.    AMERICANS WITH DISABILITIES ACT CLAIM**

236.    Plaintiffs incorporate by reference all of the foregoing and further allege as follows:

237.    Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity."

42 U.S.C. § 12132.

238.    Title II of the ADA requires public entities, like the County, to reasonably accommodate people with disabilities in all programs and services for which people with disabilities are otherwise qualified.

239.    Policing is a program and service provided by Williamson County for ADA purposes. Here, Johnson, Camden, and Nissen were providing the service of taking Ambler into custody safely.

240.    Ambler is a qualified individual with a disability within the meaning of the ADA in that he had physical impairments that substantially limited one or more major life activities – here, the operation of his circulatory system due to his chronic congestive heart failure and obesity, and his mobility, due to his obesity.

241.    Johnson and Camden violated Title II of the ADA by intentionally failing to provide Ambler the reasonable accommodations that were needed and available to allow Ambler to receive the benefits of Williamson County's programs and services. The County's officers should have accommodated Ambler by:

- Refraining from using violence against Ambler as he had surrendered after he identified his disabilities;

- Using "big boy" or "double" handcuffs to restrain Ambler;

- Not forcing Ambler to lay on his stomach;

- Ignoring Ambler when he said "I can't breathe;" and,

- Using de-escalation tactics when Ambler's physical disabilities left him unable to comply with their commands.

242.    Failure to provide these reasonable accommodations was intentional and illegal discrimination under the ADA, entitling Plaintiffs to compensatory relief.

**V.**

**DAMAGES**

243.    Javier Ambler, II's life mattered.

244.    Plaintiffs' incorporate by reference all of the foregoing and further allege as follows:

245.    The actions and omissions of Defendant, its agents, employees, and/or representatives caused and/or were the moving force of the injuries and damages to the Plaintiffs and were the moving force causing Javier Ambler, II's wrongful death. Plaintiffs thus assert claims for compensatory damages under the ADA, Rehabilitation Act, and § 1983 against Defendant.

246.    Plaintiff Javier Ambler, Sr., in his capacity as the agreed representative of the Estate of Javier Ambler, II, asserts a survival claim on behalf of the estate. The Estate has incurred damages including, but not limited to, the following:

    a.    Conscious pain and mental anguish; and,

    b.    Funeral and burial expenses.

247.    Plaintiffs, in their capacities as wrongful death beneficiaries, assert claims on their own behalves, for the minor children (and for any other unknown wrongful death beneficiaries). Plaintiffs and all other wrongful death beneficiaries have incurred damages including, but not limited to, the following:

    a.    Past and future mental anguish;

    b.    Past and future loss of companionship and society;

    c.    Past and future medical expenses; and,

    d.    Past and future pecuniary loss, including loss of care, maintenance, support,

services, advice, counsel, and reasonable contributions of a pecuniary value.

248.     Plaintiffs, for themselves and all wrongful death beneficiaries, and the Estate, are also entitled to recover attorneys' fees and expenses (including expert expenses) pursuant to the ADA and Rehabilitation Act (42 U.S.C. § 12205 and 29 U.S.C. § 794a), 42 U.S.C. § 1988, and as otherwise allowed by law.

## VI.
## JURY DEMAND

249.     Pursuant to Federal Rule of Civil Procedure 48, Plaintiffs hereby request a jury trial.

## VII.
## PRAYER FOR RELIEF

250.     Accordingly, Plaintiffs asks that judgment be awarded against Defendant for

1)      compensatory damages;

2)      attorneys' fees, including reasonable and necessary expenses including expert fees, pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 12205;

3)      costs of court;

4)      judgment at the highest rate allowable under the law; and

5)      all other relief to which Plaintiff is justly entitled.

Respectfully submitted,

**EDWARDS LAW**
1101 East 11th Street
Tel.  512-623-7727
Fax.  512-623-7729

By____/s/ Jeff Edwards_____
       JEFF EDWARDS
       State Bar No. 24014406
       jeff@edwards-law.com
       SCOTT MEDLOCK
       State Bar No. 24044783
       scott@edwards-law.com
       DAVID JAMES
       State Bar No. 24092572
       david@edwards-law.com

**ATTORNEYS FOR PLAINTIFFS JAVIER AMBLER, SR., MARITZA AMBLER, AND J.R.A.**

By    /s/ Antonio M. Romanucci

Antonio M. Romanucci *(pro hac pending)*
(Illinois ARDC No. 6190290)
Bhavani Raveendran *(pro hac pending)*
(Illinois ARDC No. 6309968)
Ian P. Fallon *(pro hac pending)*
(Illinois ARDC No. 6332303)
**ROMANUCCI & BLANDIN, LLC**
321 N. Clark Street, Suite 900
Chicago, Illinois 60654
Tel:    (312) 458-1000
Fax:    (312) 458-1004
aromanucci@rblaw.net
braveendran@rblaw.net
ifallon@rblaw.net

Ben Crump *(pro hac pending)*
(Washington, D.C. Bar No. 1552623)
Ben Crump Law
717 D Street N.W., Suite 310
Washington, D.C. 20004
Phone: 800-859-9999
Fax: 800-770-3444
ben@bencrump.com

**ATTORNEYS FOR PLAINTIFF MICHELE BEITIA, FOR J.A.A.**