IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JAVIER AMBLER, SR., and MARITZA AMBLER, individually, on behalf of all wrongful death beneficiaries of JAVIER AMBLER, II, on behalf of the ESTATE OF JAVEIR AMBLER, II, and as next friends of J.R.A., a minor child; and MICHELE BEITIA, as next friend of J.A.A., a minor child, | § § § § § § § | Civil Action No. 1:20-01068-LY |
| | § § | |
| Plaintiffs, | § § | |
| v. | § § | |
| WILLIAMSON COUNTY, TEXAS, | § § | |
| Defendant. | § § § | |

## PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS

Defendant Williamson County's Motion to Dismiss this 42 U.S.C. § 1983 and Americans with Disabilities Act wrongful death lawsuit should be denied.

### I.   SUMMARY OF THE RESPONSE

The County cherry-picks allegations in the complaint to urge dismissal, while ignoring the well-pled allegations that the County's policies, practices, customs and disability discrimination were the moving force that caused Javier Ambler, II's untimely death. When actually evaluating the complaint in its entirety, however, the motion should be denied for three reasons:

First, Plaintiffs allege the County's policymaker – Sheriff Robert Chody – personally encouraged his deputies to use excessive force to make more "entertaining" television for the reality TV program Live PD. Plaintiffs extensively allege that Sheriff Chody, who is under indictment for destroying video evidence of Ambler's death, was a major booster of the program, and wanted to ensure his deputies provided "exiting" content – even if that meant brutalizing

citizens by using excessive force. Because Sheriff Chody was the architect of this policy and practice that resulted in and directly caused violations of Ambler's constitutional rights, the County is liable for the actions of the deputies who ultimately killed Ambler.

Second, under Sheriff Chody's leadership the County slashed training and supervision requirements for its deputies, and dropped hiring requirements that blocked officers with a history of dishonesty or using excessive force from working for Williamson County. As a result, the two deputies who killed Ambler – who had previously been rejected by the County – were able to join the force, and were on the street for just a few weeks before they killed Ambler.

Third, Plaintiffs adequately state a claim for violations of the Americans with Disabilities Act. Contrary to the County's motion, the act's prohibition on "discrimination" requires more than merely treating people with disabilities as if they were able-bodied. The statute also prohibits failures to reasonably accommodate people with disabilities – which the County failed to do when its deputies repeatedly shot Ambler with a TASER though he was attempting to comply, forced him to lay face-down on the ground, and restrained him with standard handcuffs, all despite knowing he suffered from congestive heart failure and morbid obesity.[1]

## II.  FACTUAL ALLEGATIONS

Williamson County deputies killed Javier Ambler while the County produced a reality TV program, then Sheriff Chody destroyed critical evidence. Because the County's policies, practices, and customs were designed and intended to produce "exciting" television at the expense of protecting citizens' constitutional rights, Plaintiffs have stated a Fourth Amendment *Monell* claim.

---

[1] Then, to cover up these violations of the law, Sheriff Chody and the County destroyed (or permitted the destruction of) the videotape it was the County's policy to create. Doc. 1, ¶ 213.

### A. The County's Dangerous Policies, Practices, and Customs Created "Entertaining" Television by Brutalizing Citizens

The County's policymaker, Sheriff Chody, along with the County Commissioners, entered a contract with TV production company Big Fish Entertainment to create a reality television program called "Live PD." Doc. 1, ¶¶ 8, 16-18. As part of the production, Sheriff Chody "encouraged his officers to engage in dangerous, high-risk police tactics because it made for more entertaining television," to ensure his officers were not considered "boring" and their activities actually made it to broadcast. *Id*. at ¶¶ 30-31. After Ambler's death, when the County Commissioners belatedly finally tried to cut ties with Live PD, the Commissioners took the rare step of suing Sheriff Chody, alleging that "Chody seeks social media and TV exposure like a moth to a light bulb – and he's flown out of his job description to get back on TV." *Id*. at ¶ 66 (citing County's original petition in *County of Williamson v. Chody and Big Fish Entertainment*, No. 20-0752-C26 (Tex. 26th Dist. Ct., May 20, 2020)). The Commissioners' lawsuit further alleged "that [Sheriff] Chody had become a 'TV producer, reality TV star, and show business agent,' and 'jeopardized citizen protection for TV ratings and exposure' by 'prioritizing TV appearances and ratings over safety and proper police work.'" *Id*. at ¶ 67 (citing same).

Among other incidents where the County's officers violated citizens' constitutional rights as part of the policy to make "less boring" television:

- The Williamson County SWAT team broke down a suspect's door to serve an arrest warrant, when the same suspect had made a court appearance earlier that day, and could have been peacefully arrested in the courthouse. *Id*. at ¶ 32.

- The SWAT team executed a no-knock raid using flash-bang grenades to arrest a suspect wanted for possession of a small amount of drugs, even though the suspect was non-violent and could have been arrested without incident or use of any force. *Id*. at ¶ 33.

- The County's deputies routinely engaged in high-speed, dangerous police chases, pursuing low-level suspects, often for trivial offenses, as Chody put it, "until the wheels fall off." *Id*. at ¶¶ 35-46.

Most strikingly, however, from the advent of the Live PD contract, Sheriff Chody explicitly encouraged the County's officers to use excessive force when it was unnecessary while they were being filmed by Live PD. *Id*. at ¶¶ 48 & 57. Indeed, during the period Live PD was filming County deputies, the number of use of force incidents doubled. *Id*. at ¶¶ 102 & 104. Likewise, County deputies used their TASERs at almost twice the previous rate after Live PD began filming them. *Id*. at ¶ 104. Indeed, officers began using TASERs in almost half their encounters with citizens where force was used, an alarmingly high rate. *Id*. at ¶ 105.

Shockingly, Sheriff Chody's command staff, with his full knowledge, encouraged this illegal behavior by giving gift cards to steakhouses to deputies who used excessive force, and awarded them the coveted title of "WilCo Badass." *Id*. at ¶¶ 58-60. This was all part of the County's policy, practice, and custom of "get[ting] some good stuff stirred up" to "make some good TV for the boss man" (aka Chody). *Id*. at ¶ 49.

Likewise, because he was – and remains – personally indifferent to officers using excessive force (and even brutalized a Black teenager himself), Chody encouraged his officers to use excessive force. In 1998, while working for the Austin Police Department, Chody put a fifteen-year-old Black child into a choke hold until the boy suffered a seizure, though the child had done nothing wrong. *Id*. at ¶¶ 87-93. Though the City of Austin paid to settle the subsequent civil suit, to this day Chody insists he did nothing wrong, and was a "good cop" on that day. *Id*. at ¶¶ 94-95, 99. Now, because he still believes, albeit incorrectly, he was a "good cop," Sheriff Chody encourages his officers to use similarly unnecessary and excessive force in violation of the Fourth

Amendment. *Id*. at ¶¶ 99-101. As a result, the number of use of force incidents involving County deputies doubled after he became sheriff. *Id*. at ¶ 102.

To further these policies, practices, and customs, Chody hired officers known to have been disciplined – or even fired – by other agencies for using excessive force. *Id*. at ¶ 69. This was all done to employ officers "who are chasing Hollywood lights with blue police lights," which even the former president of the Williamson County Deputies Association described as a recipe for "disaster." *Id*. at ¶ 68. Indeed, two of the dangerous officers hired under these practices were the deputies who killed Ambler – JJ Johnson and Zachary Camden – who had been rejected as candidates by the previous Williamson County sheriff. *Id*. at ¶¶ 72-74. Unsurprisingly, after Sheriff Chody hired these officers known to have checkered pasts, he then intentionally failed to train or supervise them to ensure they did not violate citizens' civil rights. *Id*. at ¶ 83.

Likewise, Chody intentionally decreased the amount of training new deputies received, to below the state minimum standard. *Id*. at ¶ 107. Johnson and Camden were among the officers who did not receive the appropriate amount of training before being unleashed on the people of Williamson County, including Ambler. *See id*. at ¶ 109.

### B. The County's "Entertaining" Television Policies Caused Javier Ambler, II's Death

Each of these policies, practices, and customs came to bear on Plaintiffs' decedent, Javier Ambler, II, and proximately caused his death.

Ambler, a 40-year-old father of two, suffered from two chronic disabilities – congestive heart failure, and obesity (as he weighed over 400 pounds). *Id*. at ¶¶ 117-118.

Johnson, while accompanied by a Live PD camera crew, decided to pull Ambler over late at night when Ambler failed to dim his high beam headlights. *Id*. at ¶¶ 121-122. Ambler failed to stop, and, to create some exiting television for Live PD, Johnson gave chase for this trivial offense.

*Id*. Due to Sheriff Chody's "chase until the wheels fall off" practice, Johnson (shortly thereafter joined by Camden), recklessly pursued Ambler as the deputies narrated the chase for Live PD. *Id*. at ¶¶ 123-133. Eventually, Ambler's car crashed. *Id*. at ¶ 137.

At gunpoint, Johnson ordered Ambler out of the crashed car. *Id*. at ¶ 143. Ambler immediately complied, holding up his hands to show he was surrendering, unarmed, and not a threat. *Id*. at ¶¶ 144-145. "At this time, Ambler had surrendered, and the scene was controlled and secure." *Id*. at ¶ 146. Around this time, Camden – also with a Live PD camera crew in tow – arrived at the scene. *Id*. at ¶ 155.

While Ambler had obviously surrendered, Johnson drew his TASER – as part of the County's practice of unnecessarily using TASERs to create "entertaining" television for Live PD. *See id*. at ¶¶ 147-148. The TASER is well known to be potentially lethal when used against people with chronic heart conditions, like Ambler. *Id*. at ¶ 149. Johnson began screaming at Ambler to "get down!" and "get on the ground!," as Ambler, despite his large size and heart condition, immediately tried to comply. *Id*. at ¶ 151.

Though entirely compliant, Ambler, due to his disabilities, was unable to move as fast as Johnson apparently wanted. Thus, Johnson inexplicably fired his TASER at Ambler, in accordance with the County's practice of excessively using the TASERs while deputies were being filmed by Live PD. *Id*. at ¶¶ 152, 104 & 228. Ambler collapsed to the ground. *Id*. at ¶ 153. While Ambler was on the ground, still attempting to comply, Johnson and Camden both shot him with TASERs, shocking him again and again. *Id*. at ¶¶ 156 & 158.

Next, pursuant to the County's dangerous policy and practice of requiring all detainees to lay on their stomach, Camden and Johnson screamed at Ambler to roll over onto his stomach. *Id*. at ¶¶ 159, 168-170, 186. Camden and Johnson forced Ambler on his stomach despite knowing that

it is dangerous to force people who are obese onto their stomach, as it compresses the body's chest cavity and inhibits breathing. *Id*. at ¶ 160. (Nonetheless, this was the County's policy and practice for all arrests. *Id*. at ¶ 228).

Ambler gasped, "I have congestive heart failure," and "I can't breathe." *Id*. at ¶¶ 161, 163, 169, 171, 175, 178. Pursuant to the County's policy and practice of ignoring detainee's who say "I can't breathe," Camden and Johnson ignored Ambler's pleas, and continued to scream at him and force him to the ground, despite Ambler's continued attempts to comply. *Id*. at ¶¶ 164-167 & 228. Ambler continued to beg – "please!" and "save me!" – which Camden and Johnson ignored. *Id*. at ¶¶ 181-185.

Camden and Johnson then used their TASER a fourth time – again pursuant to the County's policies, practices, and customs – shocking Ambler yet again as he begged and clung to life. *Id*. at ¶¶ 104-105, 187, & 228. Camden and Johnson then put a knee into Ambler's back, inhibiting his breathing, and forcing his body face-down into the pavement. *Id*. at ¶ 189.

Because de-escalating conflicts makes for bad television, Camden and Johnson never attempted to do so – despite Ambler's surrender, attempts to comply, and total lack of any threat to the deputies. *Id*. at ¶ 209-210.

Camden and Johnson then handcuffed Ambler behind his back, and left him laying face down. *Id*. at ¶ 191. Rather than accommodate Ambler's obesity, the officers used standard handcuffs, which further compressed his chest cavity and further inhibited his ability to breathe. *Id*. at ¶¶ 192-193.

Ambler then stopped breathing, and died soon thereafter. *Id*. at ¶¶ 195 & 200. An autopsy found Ambler died of "congestive heart failure and cardiovascular disease in combination with

forcible restraint." *Id*. at ¶ 201. The medical examiner deemed Ambler's death a homicide. *Id*. at ¶ 202.

Ambler's last minutes alive were filmed by Live PD. *Id*. at ¶ 211. Those recording are now missing, and believed destroyed at the instruction of Sheriff Chody (or as the County puts it, "Live PD's recording's are apparently no longer available"). *Id*. at ¶¶ 212-213 & Doc. 13, p. 6. Indeed, Sheriff Chody has been indicted for tampering with evidence for his role in the tapes' disappearance (and presumed destruction). Doc. 1, ¶ 213.

Tragically, not even Ambler's death deterred Sheriff Chody, Camden, and Johnson from continuing to brutalize citizens of Williamson County to produce "entertaining" television for Live PD. As part of this policy, practice, and custom, Camden and Johnson – along with several other officers, including a supervising sergeant – participated in another brutal beating of a low-level suspect that was actually aired by Live PD. *Id*. at ¶ 51. As they did with Ambler, Camden and Johnson electrocuted the suspect with TASERs multiple times, kicked and punched him while he was surrendering, forced him to lay on the ground face down, and ignored his pleas of "I can't breathe." *Id*. at ¶¶ 51-54. As with Ambler, neither Camden nor Johnson was disciplined for their abuse of this suspect. *Id*. at ¶ 55. Though Chody could have vetoed the broadcast of this violation of this suspect's constitutional rights, he did not do so because it was exactly the type of content he hoped to produce for Live PD, and was actually wholly in-line with the County's policies, practices, and customs which were all designed to produce entertaining television for Live PD. *Id*. at ¶ 56. Indeed, Sheriff Chody never disciplined Camden or Johnson for their role in Ambler's death, and even later went out of his way to praise Johnson on a podcast, saying "You're doing an extremely good job and representing Williamson County very well," before he promoted Johnson to sergeant. *Id*. at ¶¶ 214-215.

### III.   ARGUMENT AND AUTHORITIES

#### A.  Standard of Review

Motions to dismiss for failure to state a claim are viewed with disfavor and rarely granted. *Calhoun v. Villa*, 761 Fed. Appx. 297, 299 (5th Cir. 2019). When reviewing a motion to dismiss, Courts are required to accept "all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Lindquist v. City of Pasadena*, 525 F.3d 383, 386 (5th Cir. 2008) (internal citations omitted). *See also Richardson v. Axion Logistics, LLC*, 780 F.3d 304, 306 (5th Cir. 2015). As such, Defendant's attempts to re-frame the case – such as by falsely stating that Ambler "continued to improperly resist," or "did not comply," or "improperly resisted" attempts to take him into custody – must be disregarded. *See*, *e.g.*, Doc. 13, pp. 2, 4.[2]

A claim is correctly pleaded when the facts go beyond "threadbare recital of the elements of a cause of action, supported by mere conclusory statements." *Patrick v. Wal-Mart, Inc.-Store No. 155*, 681 F.3d 614, 622 (5th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "[T]he pleading standard Rule 8 announces does not require detailed factual allegations," it only "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. "This standard simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements." *Morgan v. Hubert*, 335 Fed. Appx. 466, 470 (5th Cir. 2009). "All questions of fact and any ambiguities in the controlling substantive law must be resolved in the plaintiff's favor." *Covington v. City of Madisonville, Tex.*, 812 Fed. Appx. 219, 224 (5th Cir. 2020) (reversing grant of motion to dismiss).

---

[2] Plaintiffs contemporaneously move to strike the video attached to Defendants' motion as it is inauthentic, and would convert Defendant's motion into one for summary judgment prior to discovery. *See* Doc. 14.

Moreover, when the government or its agents are the defendants, as is the case here, plaintiffs will often not have access to critical information before discovery. Thus, "only minimal factual allegations should be required at the motion to dismiss stage." *Thomas v. City of Galveston*, 800 F.Supp.2d 826, 842-43 (S.D. Tex. 2011); *Sanchez v. Gomez*, 283 F.Supp.3d 524, 532 (W.D. Tex. 2017); *King v. City of Austin, Tex.*, No. A-16-CA-1020-SS, 2017 WL 1097110, *6 (W.D. Tex. Mar. 21, 2017) (Sparks, J.); *Schaeffer v. Whitted*, 121 F.Supp.3d 701, 718 (W.D. Tex. 2015) (Sparks, J.); *Crisp v. Dutton*, No. A-15-CV-0431-LY-ML, 2015 WL 7076483, *8 (W.D. Tex. Nov. 12, 2015) (Lane, Mag. J.); *Callaway v. City of Austin, Tex.*, No. A-15-CV-00103-SS, 2015 WL 4323174, *9 (W.D. Tex. July 14, 2015) (Sparks, J.). Sufficient allegations can include "misconduct that occurred in the open, multiple officials involved in the misconduct, or the specific topic of the challenged policy of training inadequacy." *Sanchez*, 283 F.Supp.3d at 532 (citing *Thomas*, 800 F.Supp.2d at 843-44).

### B.  Plaintiffs' Sufficiently Plead an Excessive Force Claim Against the County

A county is liable to § 1983 civil rights plaintiffs "when the execution of a county's policies or its customs deprives an individual of constitutional or federal rights." *Colle v. Brazos County*, 981 F.2d 237, 244 (5th Cir. 1993). *See also Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658 (1978). There are four relevant theories of § 1983 liability in this case: 1) that Camden and Johnson, at Sheriff Chody's instruction, used excessive force pursuant to a policy, practice, or custom of the County; 2) that Sheriff Chody hired Camden and Johnson despite red-flags in their background that would show they were likely to violate civil rights; 3) that the County then failed to adequately train and supervise Camden and Johnson; and 4) that Sheriff Chody ratified and approved Camden and Johnson's uses of excessive force, including the force that caused Ambler's

death. Each of these policies, practices, and customs of Williamson County were the moving forces that caused Ambler's death.

### 1). *Williamson County's Policy, Practice, and Custom of Excessive Force*

A municipality is liable for its employees' episodic acts and omissions when there is: (1) an official policy, or unofficial custom, pattern, or practice; (2) of which the policymaker has actual or constructive knowledge; and, (3) a "violation of constitutional rights whose 'moving force' is the policy or custom." *Valle v. City of Houston, Tex.*, 613 F.3d 536, 544 (5th Cir. 2010).

Plaintiffs' complaint easily satisfies each of these elements.

First, the complaint alleges that County deputies followed an official practice of using excessive force in service of Live PD. Indeed, the complaint alleges that Sheriff Chody "encouraged his officers to engage in dangerous, high-risk police tactics [to make] more entertaining television in service to Live PD," including "chase until the wheels fall off,"[3] "encourag[ing] officers to use excessive force when they were being filmed by Live PD," and "encourag[ing] his deputies to use force when it was unnecessary." *See*, *e.g.*, Doc. 1, ¶¶ 30, 40, 48, 57, & 228.

Second, in Texas, "it has long been recognized that … the county sheriff is the county's final policymaker in the area of law enforcement, not by virtue of delegation by the county's governing body but, rather, by virtue of the office to which the sheriff has been elected." *Bennett v. Pipin*, 74 F.3d 578, 586 (5th Cir. 1996) (citing *Turner v. Upton Cnty., Tex.*, 915 F.2d 133, 136 (5th Cir. 1990)). "[U]nder *Monell*, a single decision may create municipal liability *if* that decision

---

[3] That Ambler was not injured by the chase itself is immaterial – the allegations regarding the County's "chase until the wheels fall off" policy help illustrate the general county policy, practice, and custom of working with Live PD to produce "entertaining" video. *Contra* Doc. 13, p. 9. The chase allegations support the existence of this general policy, of which the chase practice was merely one component.

were made by a final policymaker responsible for that activity" – such as by Sheriff Chody. *Bennett*, 74 F.3d at 586 (county liable for rape committed by sheriff, emphasis in original).

> When a final policy maker makes the relevant decision, and when that decision is within the sphere of the policy maker's final authority, the existence of a well-established, officially-adopted policy will not insulate the municipality from liability.

*Id*. Thus, when Sheriff Chody deliberately made the County's policy encouraging use of excessive force to make more entertaining television – including by explicitly encouraging the use of force to win gift cards and be "WilCo Badass" – he incurred liability on behalf of the County for violations of the Constitution linked to his policies and practices. *See id* & *Bd. of Com'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 403-404 (1997); Doc. 1, ¶¶ 48, 57-61, 102-106. Sheriff Chody's deliberate decisions to prioritize entertaining television over citizens' constitutional rights creates liability for the County. *Bryan*, 520 U.S. at 404 & Doc. 1, ¶¶ 82 & 111. When "a municipality's … authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right," it is established that "the municipality acted culpably." *Bryan*, 520 U.S. at 405. Thus, Plaintiffs plausibly allege that "Chody … continues to perpetuate a policy of encouraging excessive force." *Id*. at ¶ 113.

Likewise, though when the policymaker himself implements an unconstitutional policy (as here) it is unnecessary to also show a pattern of unconstitutional conduct, Plaintiffs additionally allege Sheriff Chody was deliberately indifferent to the marked increase in use of force and TASER incidents. Doc. 1, ¶¶ 102-106. The complaint alleges that the number of these incidents doubled between 2017 (when Chody took office) and Ambler's March 2019 death, and that Chody was indifferent to the consequences. *See id*. at ¶¶ 102-105 & 230.[5] Thus, Sheriff Chody's culture

---

[5] Though the one additional, specific incident that Plaintiffs are presently aware of – the additional beating administered by Johnson, Camden, and others – occurred after Ambler's death, it is still

of encouraging excessive force – in addition to being his own personal decision creating county policy – also resulted in "a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Covington v. City of Madisonville, Tex.*, 812 Fed. Appx. 219, 228 (5th Cir. 2020) (citing *James v. Harris Cnty., Tex.*, 577 F.3d 612, 617 (5th Cir. 2009)).

In short, Plaintiffs allege both paths to municipal liability – (1) Chody's own, personal decisions hire dangerous, untrained officers and to license and encourage excessive force (Doc. 1, ¶¶ 48-60, 86-106); and, (2) the resulting pattern, practice, and custom led to officers routinely using excessive force, to which Chody was deliberately indifferent (Doc. 1, ¶¶ 111-113). "Official municipal policy includes decisions by a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Hicks-Field v. Harris Cnty., Tex.*, 860 F.3d 803, 808 (5th Cir. 2017) (citing *Connick v. Thompson*, 563 U.S. 51, 61 (2011)).

Third, the complaint plausibly alleges that Sheriff Chody's policies, practices, and customs were the "moving force" that caused the violations of Ambler's constitutional rights. Doc. 1, ¶ 235. When a policymaker knows of officers' conduct that violates the Constitution, "a reasonable inference can be drawn" that further constitutional violations will occur. *See Covington*, 812 Fed. Appx. at 228. Here, Plaintiffs allege a "direct causal link" between Sheriff Chody's atrocious practices and the violations of Ambler's constitutional rights. *Id.* at 225. Sheriff Chody encouraged

---

relevant to proving the pattern of illegal conduct by County officers. *See*, *e.g.*, *Shepherd v. Dallas Cnty., Tex.*, 591 F.3d 445, 457 (5th Cir. 2009) (report on jail conditions addressing "medical care that occurred shortly before, during, and shortly after" plaintiff's imprisonment relevant to show policy, practice, and custom of the county). Here, this incident is highly relevant because the deputies – and their direct supervisors – were using force techniques extraordinarily similar to what they earlier did to Ambler, *and* Sheriff Chody declined to use his veto to prevent Live PD from airing it. Doc. 1, ¶¶ 51-56.

officers to use excessive force (Doc. 1, ¶¶ 48, 57-60, 100-103, 111), knew (or should have known) officers were using TASERs inappropriately and excessively in almost half the times they used force (*id*. at ¶¶ 104-105), and were otherwise engaging in overly aggressive police tactics to promote Live PD (*id*. at ¶¶ 30-31). Ambler, who was unarmed and defenseless, died because officers recklessly used excessive force and TASERS against him while he was compliant and posed no danger to anyone, all while the deputies were filmed by Live PD. Doc. 1, ¶¶ 111-209. Thus, Chody's policies were the moving force that cause Ambler's death.

Contrary to Defendants' motion, at the Rule 12(b)(6) stage, Plaintiffs are not required to explicitly *prove* the existence of a pattern of prior incidents. *Contra* Doc. 13, p. 9. Of course, as noted above, a pattern of prior incidents is just one way Plaintiffs can allege a *Monell* claim. *See supra* at pp. 12-13. And Plaintiffs do also allege a pattern of prior conduct. *Id*. *See also* Doc. 1, ¶¶ 57-61, 101-106. The caselaw Defendant relies upon is unavailing as it all addresses *proving* at pattern of prior incidents at the summary judgment stage, not the pleading requirement that concerns us today. *Estate of Davis v. City of North Richland Hill*, 406 F.3d 375 (5th Cir. 2005) is a *summary judgment* case, not a case where the plaintiff's allegations were found insufficient for Rule 12 purposes. In *Estate of Davis*, evidence that an officer had fired his rifle inappropriately during training, "frequently exposed himself" to members of the SWAT team, and was accused of being a "psycho" by a citizen he had stopped for a prior traffic violation, was "legally insufficient" to show his supervisors were indifferent to a propensity for using excessive force – because he had no history of using excessive force (despite his other obvious flaws). 406 F.3d at 382. The allegations here are much stouter – Sheriff Chody approved, authorized, encouraged, and was otherwise aware of his officers using excessive force (including TASERs) to promote Live PD and make "entertaining" television. Doc. 1, ¶¶ 48-60 & 86-106. *See also Hicks-Fields*, 860 F.3d at 809

(affirming *summary judgment* dismissal for lack of evidence of similar constitutional violations, where the summary judgment record only contained "the events surrounding [the deceased]'s death, [one officer]'s employee history, and a report regarding conditions in the jail" issued two years before the incident in question with no other evidence regarding the conditions at the time the officer killed the deceased); *Bennett v. City of Slidell, La.*, 728 F.2d 762 (5th Cir. 1984) (reversing jury verdict).

Unlike at the summary judgment stage, at the pleading stage "it is exceedingly rare that a plaintiff will have access to (or personal knowledge of) specific details regarding the existence of internal policies or training procedures prior to discovery. Accordingly, only minimal factual allegations should be required at the motion to dismiss stage." *Thomas*, 800 F.Supp.2d at 842 ("general facts which point to prior violations by the police department would allow the plaintiffs to survive the motion to dismiss phase"). Instead, allegations could include "the specific topic of the challenged policy or training inadequacy," which the Complaint abundantly provides here, as these allegations suffice to "put the municipality on fair notice of the grounds on which it is being sued." *Id*. at 844-45. Here, the complaint certainly provides fair notice of the Plaintiffs' allegations against the County.

> 2) *Sheriff Chody Hired Camden and Johnson with Indifference to their Troubling Backgrounds*

Similarly, Sheriff Chody hired deputies who he knew could not appropriately serve as peace officers due to their known histories of excessive force and dishonesty – including Johnson and Camden. Doc. 1, ¶¶ 68-77 & 228. Former Sheriff's Department officers' described Chody's hiring policies as "atrocious," as unqualified deputies were hired based on their telegenic presence rather than their ability to actually do police work – and even when Chody knew these deputies faced prior allegations of dishonesty and excessive force. *Id*. at ¶¶ 68-71. Thus, Plaintiffs (and the

County in its suit against him) allege that Sheriff Chody acted as a "show business agent" who "prioritized TV appearances and ratings over safety," by hiring deputies "looking for guys … chasing Hollywood lights with blue [police] lights." *Id*. at ¶¶ 67-68.

Thus, Plaintiffs plausibly allege Sheriff Chody knew "*this* officer was highly likely to inflict the *particular* injury suffered" by Ambler. *Bd. of Cnty. Com'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 412 (1997) (emphasis in original). "Deliberate indifference exists where adequate scrutiny on an applicant's background would lead a reasonable supervisor to conclude that the plainly obvious consequences of the decision to hire would be the deprivation of a third party's constitutional rights." *Gros v. City of Grand Prarie, Tex.*, 209 F.3d 431, 433-34 (5th Cir. 2000) & Doc. 1, ¶ 230. Indeed, under the previous Sheriff, Camden and Johnson had been turned away due to their backgrounds. Doc. 1, ¶¶ 72-74. Thus, Plaintiffs allege that the County was deliberately indifferent to the rights of citizens because it was highly likely that hiring officers known to violate civil rights – like Johnson and Camden – would result in additional constitutional violations. *Bryan Cnty.*, 520 U.S. at 412.

### 3)    Williamson County Failed to Train and Supervise Camden and Johnson

Plaintiffs have also separately alleged failure to train and supervise *Monell* theories. "[T]he failure to provide proper training may fairly be said to represent a policy for which the [municipality] is responsible, and for which the [municipality] may be held liable." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390, n.10 (1989). "Failure to properly train may be a 'policy' if 'in light of the duties assigned to specific officers or employees, the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need.'" *Morris v. Dallas Cnty., Tex.*, 960 F.Supp.3d 665, 684 (N.D. Tex. 2013) (citing *City*

*of Canton*, 489 U.S. at 389). Even for a single incident of a constitutional violation (unlike here where there is a widespread pattern of additional excessive force and use of TASERs), the Fifth Circuit has held a municipality is liable for failure to train officers when (1) the need for training "should have been obvious to" the policymaker, (2) the violation was an obvious consequence of that lack of training, and (3) the failure to train caused the constitutional violation. *Brown v. Bryan Cnty., Okla.*, 219 F.3d 450, 460 (5th Cir. 2000).[6]

Here, the complaint repeatedly alleges that Camden and Johnson received inadequate training, and were hired only when Sheriff Chody relaxed hiring standards to allow the County to employ telegenic officers with checkered pasts. The County's police training academy, under Chody's watch, "changed it['s] … academic standards without permission" to decrease the amount of pre-service training to fall below the minimum amount the State of Texas requires for police officers. Doc. 1, ¶ 107. As a result, "deputies were put on the street without receiving appropriate training," including Camden and Johnson who received inadequate training and were only on patrol only a short period of time when they killed Ambler. Doc. 1, ¶¶ 108-109. In particular, Camden and Johnson were trained: 1) to use excessive force; 2) to require all arrested suspects to lay on their stomach for restraint (regardless of disability); and, 3) to ignore suspects who beg "I can't breathe." *Id*. at ¶ 231. Of course, all these training defects became fatal for Ambler, and directly led to his death. *Id*. at ¶¶ 143-210. Thus, the complaint plausibly alleges that Chody "trains and supervises his officers that it is acceptable to use force similar to what he did to" the fifteen-year-old boy that Chody choked until he suffered a seizure. Indeed, in Chody's eyes, doing so makes an officer a "good cop," and "WilCo Badass." *Id*. at ¶ 112.

---

[6] *See also Gonzales v. Harris Cty., Texas*, No. CIV H-08-2546, 2009 WL 995709, at *4 (S.D. Tex. Apr. 14, 2009) ("A municipality's policy of failing to train its police officers can give rise to § 1983 liability."); 5ᵀᴴ Cɪʀ. Pᴀᴛᴛᴇʀɴ Cɪᴠɪʟ Jᴜʀʏ Cʜᴀʀɢᴇ 10.4 (Oct. 2016 rev.).

The level of supervisory knowledge alleged here is similar to that approved by the Fifth Circuit in *Stitt v. Klevenhagen*, 50 F.3d 1032 (5th Cir. 1995). In that case, an inmate sued a county sheriff in his individual capacity for a beating the inmate suffered from deputies—even though the sheriff was not personally involved in the assault. *Id.* The Fifth Circuit reasoned that "[s]upervisory liability can exist without overt personal involvement if the supervisor implemented a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation." *Id.* at 1032 (internal citations omitted). Because the inmate alleged the sheriff was aware of a widespread practice of excessive force in the jail, but failed to curb it, the Fifth Circuit found that he stated a § 1983 claim. *Id.* As a result, the Fifth Circuit vacated dismissal of the complaint. *Id.* Similarly, in this case, Plaintiffs have alleged extensive supervisory decisions Sheriff Chody made, or failed to make, despite knowing of the risk of substantial harm they posed to citizens like Ambler—sufficient for this case to proceed to discovery, just as in *Stitt*.

### 4) *Williamson County, Through Sheriff Chody, Ratified Camden and Johnson's Illegal Actions*

Sheriff Chody not only hired officers known to have dangerous propensities, then failed to appropriately train them, but also ultimately ratified Camden and Johnson's use of excessive force. "Ratification … requires that a policymaker knowingly approve a subordinate's actions and the improper basis for those actions." *Covington v. City of Madisonville, Tex.*, 812 Fed. Appx. 219, 228 (5th Cir. 2020) (reversing grant of motion to dismiss ratification claims). "When a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *Milam v. City*

*of San Antonio, Tex.*, 113 Fed. Appx. 622, 626 (5th Cir. 2004) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)) (emphasis in original). A plaintiff must show both that the policymaker was aware of the subordinate's actions, and the basis for the actions. *See Culbertson v. Lykos*, 790 F.3d 608, 622 (5th Cir. 2015). The theory is limited to "extreme factual situations." *Id.*

This is such an extreme factual situation. Sheriff Chody personally endorsed the use of excessive force for entertainment, hired deputies known to have checkered pasts, and then assisted in destroying the Live PD video of Ambler's death – for which he (and the County's general counsel) is currently under indictment. *See*, *e.g.*, Doc. 1, ¶¶ 212-213. Moreover, after Ambler's death, and the brutal beating of another suspect under similar circumstances, Sheriff Chody actually lauded Deputy Johnson, saying, "You're doing an extremely good job and representing Williamson County very well. I just wanted to say how proud I am not only of you, but of all the troops that are on Live PD." *Id.* at ¶ 214. If Sheriff Chody did not want this beating broadcast by Live PD because it did not comport with County policy, he could have vetoed it – but did not because it was exactly what he wanted his officers to do. *Id.* at ¶¶ 52-56. "[T]here were no reprimands, no discharges, and no admissions of error." *Grandstaff v. City of Borger, Tex.*, 767 F.2d 161, 171 (5th Cir. 1985). Indeed, despite killing one man, and brutally beating another, Sheriff Chody promoted Johnson – he is now a patrol sergeant. Doc. 1, ¶ 215. Endorsing an officer who, in similar fashion, killed one man and brutalized another, then promoting him to a supervisory position, demonstrates Sheriff Chody (acting as the County) approved Johnson's lethal decisions and the basis for them. *Id.* at ¶ 232. "[T]he subsequent acceptance of dangerous recklessness by the policymaker tends to prove [the policymaker's] preexisting disposition and policy." *Grandstaff*, 767 F.2d at 171.

A reasonable jury could certainly conclude that "because the officers received no reprimands or discharges from the city following such a flagrant use of excessive force, there must have been a preexisting disposition and policy of reckless disregard for life." *Barkley v. Dillard Dep't Stores, Inc.*, 277 Fed.Appx. 406, 413 (5th Cir. 2008)

### C. Plaintiffs' Sufficiently Plead an Americans with Disabilities Act Claim

The Plaintiffs' further plainly allege the necessary elements of an ADA Title II claim. To do so, they must only show that Ambler: (1) was "a qualified individual within the meaning of the ADA;" (2) was "excluded from participation in, or … denied benefits of, services, programs, or activities for which the public entity is responsible, or [was] otherwise … discriminated against by" the County; and, (3) "that such exclusion, denial of benefits, or discrimination [was] by reason of his disability." *Cadena v. El Paso Cnty., Tex.*, 946 F.3d 717, 723 (5th Cir. 2020).

Here, Ambler's obesity and heart condition were disabilities (which the County concedes for the purposes of this motion). Doc. 1, ¶¶ 117-118, 151, 160, & 161 & Doc. 13, p. 12.

The County discriminated against Ambler by denying him reasonable accommodations for his disabilities so that he could be safely taken into custody. *See* Doc. 1, ¶¶ 159-160, 170-190, 193-194, 241-242.

And the County refused obviously necessary accommodations, discriminating against Amblers "by reason of" his disability – as he continually begged "I can't breathe!" while officers repeatedly forced him into the ground, and shocked him with their TASERs. Doc. 1, ¶¶ 162-63, 168-190. *See Cadena*, 946 F.3d at 726 (reversing grant of summary judgment where "defendants continued to refuse the requested accommodation despite indications that further accommodation was necessary"). Thus, Plaintiffs have adequately pled the elements of an ADA claim.

### 1.   *The ADA Affirmatively Obligated the County to Provide Ambler Accommodations*

Failing to provide reasonable accommodations to people with disabilities is discrimination "by reason of" a disability. "In addition to th[e] prohibition[] of disability-based discrimination, … the ADA … impose[s] upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals. Where a defendant fails to meet this affirmative obligation, the cause of that failure is irrelevant." *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454-55 (5th Cir. 2005). The ADA's requirement for "affirmative obligation[s]" requires the County to provide reasonable accommodations to people with disabilities to accommodate them in the County's programs and services – *not* simply treat them the same as able-bodied people. *See*, *e.g.*, *Tennessee v. Lane*, 541 U.S. 509, 533 (2004).

> Recognizing that failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion, Congress required the States to take reasonable measures to remove architectural and other barriers to accessibility.

*Id.*, at 531-532 (discussing affirmative "duty to accommodate). *See also* 42 U.S.C. § 12101(a)(5) ("individuals with disabilities continually encounter various forms of discrimination, including … failure to make modifications to existing facilities and practices"); 28 C.F.R. § 35.130 (b)(7) ("A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability"). Thus, "the ADA … impose[s] upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals." *Cadena*, 946 F.3d at 724-25 (citing *Bennett-Nelson*, 431 F.3d at 454).

The complaint alleges that Ambler required five reasonable accommodations: 1) "Refraining from using violence against Ambler as he had surrendered after he identified his disabilities"; 2) "Using 'big boy' or 'double' handcuffs to restrain [him]"; 3) "Not forcing Ambler to lay on his stomach" during the arrest; 4) Not "ignoring Ambler when he said 'I can't breathe,'";

and, 5) "Using de-escalation tactics when Ambler's physical disabilities left him unable to comply with [deputies'] commands." Doc. 1, p. 25, ¶ 241. Whether an accommodation is reasonable is a fact question to be resolved by a jury. *Brennan v. Stewart*, 834 F.2d 1248, 1262 (5th Cir. 1988).[7]

The County's motion states that, as a matter of law, the heavily-edited videotape[8] it attaches as an exhibit shows that it allegedly provided *one* of those accommodations – "big boy" handcuffs – to Ambler. First, the video does not conclusively show the deputies provided Ambler this single accommodation (or *when* he was provided this accommodation, as the Austin Police Department officer's body camera often has only an obscured view of Ambler's hands).[9] If the Court considers the inauthentic, heavily-edited video – though it should not – Plaintiffs ask that the motion be converted to one for summary judgment and that they be provided the opportunity to conduct discovery. FED. R. CIV. PROC. 12(d). Second, even if the County did provide "big boy" handcuffs, it still did not provide the other four necessary accommodations that Ambler also required – including "refraining from using violence," "not forcing Ambler to lay on his stomach," not

---

[7] Though *Brennan* interprets the Rehabilitation Act, not the ADA, the bodies of law interpreting the two statutes are identical. *See*, *e.g.*, *Delano-Pyle v. Victoria Cnty., Tex.*, 302 F.3d 567, 574 (5th Cir. 2002).

[8] Among other changes the County made to the publicly-available video tape before filing it with the Court, the unauthenticated version presented to the Court does not contain an audio track. Thus, Plaintiffs object to this version of the videotape as inauthentic under Federal Rule of Evidence 901 and separately move to strike it from the record. Doc. 14. Simply, the County cannot, on the one hand, tamper with evidence by assisting in the destruction of high-quality video showing exactly what happened, then, on the other hand, submit a video where it has edited out the audio to support its argument.

[9] Notably, the high-quality video that the Live PD producers were shooting likely would show if and when the handcuffs were applied – had Chody not participated in its destruction. As Plaintiffs may later be entitled to an adverse-inference instruction (or possibly more serious sanctions), it would be grossly unfair to consider an incomplete video tape now when discovery has yet to begin. *See*, *e.g.*, *Rimkus Consulting Group, Inc. v. Cammarata*, 688 F.Supp.2d 598, 618 (S.D. Tex. 2010) (Rosenthal, J.).

"ignoring Ambler when he said 'I can't breathe,'" and generally attempting to de-escalate the situation (as Ambler had already surrendered and was doing his best to comply with the officers' orders, Doc. 1, ¶¶ 145-46, 151, 156, 158, 165, & 167). Even if the Court were to consider the edited videotape in addition to the complaint (though it should not), Plaintiffs still allege four other accommodations the videotape conclusively proves were *not* provided (or, more accurately, would be shown in the video, if the video was authentic and complete).

The County's unpublished caselaw concerning Plaintiffs' ADA claims is similarly unavailing. *Nottingham v. Richardson*, 499 Fed. Appx. 368, 373 (5th Cir. 2012) is an appeal from the summary judgment dismissal of a *pro se* prisoner's complaint filed after the statute of limitations had expired, and that was barred by his failure to exhaust his administrative remedies under 42 U.S.C. § 1997e. When nonetheless reviewing the merits in dicta, the Fifth Circuit's *per curiam* order noted there was also "no evidence" in the summary judgment record that the plaintiff's allegations of being left on the floor of a transport van "had any connection to his alleged disability." *Id*. at 377. Simply (and unsurprisingly), the *pro se* plaintiff did not allege he was denied an accommodation, or explain why his disability required one, or ultimately present adequate admissible evidence to survive summary judgment – unlike here, where (at the Rule 12 stage) the Plaintiffs explicitly explain Ambler's obesity and congestive heart failure required accommodations because "[r]equiring a person who is obese to lay on their stomach can be very dangerous, as doing so can compress the body's chest cavity and inhibit breathing," that standard handcuffs further "compress[] th[e] chest cavity," and that generally Ambler could not immediately comply with the officers' orders due to his disabilities. Doc. 1, ¶¶ 160, 193, & 144-190. *See also Hay v. Thaler*, 470 Fed. Appx. 411, 418 (5th Cir. 2012) (affirming summary judgment against *pro se* prisoner whose claims were "not supported by any evidence," and did not "explain

… how his alleged disabilities made it more difficult for him to access the benefits of [the prison's] services"); *Tuft v. Tex.*, 410 Fed. Appx. 770 (5th Cir. 2011) (affirming summary judgment against *pro se* prisoner who filed unverified exhibits, failed to exhaust mandatory pre-suit remedies, and thus provided "no evidence he was discriminated against in his use of prison showers by reason on his disability"). *See contra Cadena*, 946 F.3d 717 (reversing summary judgment awarded to county jail in inmate's ADA case).

Thus, Plaintiffs have more than adequately pleaded an ADA Title II claim.

### 2. *The Narrow* **Hainze** *Exception Does Not Apply*

Finally, the narrow *Hainze* exception does not apply to the facts as plead in this case as there was no exigency after Ambler surrendered and the scene was "secure." In *Hainze v. Richards*, the plaintiff was a mentally-ill, intoxicated man yelling profanities at police officers while advancing toward them with a knife. 207 F.3d 795, 797 (5th Cir. 2000). After repeatedly ordering him to drop his weapon, officers fired on Hainze. *Id*. Hainze survived, was convicted of aggravated assault for menacing the officers, but nonetheless sued, claiming the ADA required the officers to accommodate him as he prepared to attack them. *Id*. at 800. The Fifth Circuit held that Hainze was not denied these accommodations by the police, but due to his own "assault of [the officer]." *Id*. at 801. The *Hainze* court created an exception to police officers' ADA obligations that exists only until officers have "secur[ed] the scene." *Id*. "Once the area was secure and there was no threat to human safety, [the officers] would [then] have been under a duty to reasonably accommodate Hainze's disability." *Id*. at 802.

Here, in stark contrast, after his car crashed, Ambler immediately surrendered – he did not attack the police. Doc. 1, p. 16, ¶ 146. Unlike the plaintiff in *Hainze* who threatened the officers with a knife and ignored orders from the police, Ambler "immediately complied" with the officers'

orders as best as his disabilities would allow (*id.* ¶ 144), and "held up his hands to show he was unarmed." (*Id.*) As such, Plaintiffs plausibly allege that, immediately after the crash, "the scene was controlled and secure" (*id.* at ¶ 146), triggering the County's obligations to accommodate Ambler.

More recently, in *Wilson v. City of Southlake*, 936 F.3d 326, 331 (5th Cir. 2019) – not cited by the County – the Fifth Circuit affirmed how narrow the *Hainze* exception actually is, and that it only applies during "exigent" arrests. Though *Wilson* also involved an arrest, the eight-year-old arrestee was only "armed" with a jump rope which he allegedly "twirled" in a "threatening manner" at the officer who proceeded to manhandle him. Despite *Wilson* also involving an arrest of a person with a "weapon," the Fifth Circuit held "[b]ecause there was no exigent circumstance, the *Hainze* exception does not apply." 936 F.3d at 331. *See also Windham v. Harris Cnty., Tex.*, 875 F.3d 229, 235 n. 4 (5th Cir. 2017) (declining to apply exception during "non-exigent" arrest). The same is true here – the exigency had ended when Ambler surrendered and the scene was secured. Doc. 1, ¶¶ 144-46.

Moreover, as Judge Ho noted in *Wilson,* the *Hainze* "exigent circumstance" exception "appears nowhere in the text of either [statute]," "[s]o it is not surprising that every circuit to opine on this issue has … rejected [the Fifth Circuit's] approach." *Wilson*, 936 F.3d at 333 (Ho, J., concurring) (citing *Gray v. Cummings*, 917 F.3d 1, 16-17 (1st Cir. 2019); *Sheehan v. City & Cnty. of San Francisco, Calif.*, 743 F.3d 1211, 1232 (9th Cir. 2014) *rev'd on other grounds*, 135 S.C.t 1765 (2015); *Seremeth v. Bd. of Cnty. Comm'rs Frederck Cnty., Md.*, 673 F.3d 333, 339 (4th Cir. 2012); *Bircoll v. Miami-Dade Cnty., Fla.*, 480 F.3d 1072, 1085 (11th Cir. 2007)). "Our obligation to apply binding precedent faithfully does not require us to extend it where it doesn't belong." *Wilson*, 936 F.3d at 333 (Ho., J. concurring). And it does not belong here.

*3.*

### D.  In the Alternative, Plaintiffs Should be Granted Leave to Amend if Necessary

Plaintiffs have adequately pleaded their complaint; however, if this court is inclined to grant Defendant's Motion to Dismiss, Plaintiffs request leave to amend to provide additional factual allegations and further clarify their claims.

Federal Rule of Civil Procedure 15, states that "a party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served." FED. R. CIV. P. 15(a). Courts have repeatedly held that leave to amend should be "freely given," unless it will unfairly prejudice the Defendants or cause "undue delay." *See, e.g.*, *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 553 (2010). In *Foman v. Davis*, the Supreme Court held that "[i]n the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. – the leave sought should, as the rules require, be freely given." 371 U.S. 178, 182 (1962). "This rule reflects an underlying policy that disputes should be determined on their merits, and not on the technicalities of pleading rules." *Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc.*, 989 F.Supp. 1237, 1241 (N.D. Cal. 1997).

Plaintiffs filing an Amended Complaint would not impose any undue prejudice upon Defendant. *Foman*, 371 U.S. at 182. In addition, there would be no undue delay by Plaintiffs in amending their complaint. Since, the time of filing, Plaintiffs have continued their investigation resulting in additional allegations relating to their ADA and *Monell* claims. If allowed to amend, Plaintiffs would add allegations and details regarding the following topics, further reinforcing denial of Defendant's Rule 12(b)(6) motion:

(1) That policymakers, including Sherriff Chody, knew that Officers and Supervisors from the Williamson County Sheriff's Office knowingly participated in a "Fantasy League Game" regarding their actions during arrests and interactions with subjects on Live PD.

(2) That policymakers, including Sherriff Chody, knew that Officers and Supervisors were tagged by Twitter users when they were picked for a "Fantasy League."

(3) That policymakers, including Sherriff Chody, were aware that officers were publicly making racist comments on Twitter, including that Black Lives Matter is a "terrorist organization" and reposting images of the KKK.

(4) That policymakers, including Sherriff Chody, knew that officers knew they would receive "points" in the Fantasy League for using force, including points received for a tackling a subject, handcuffing a subject, etc.

(5) That policymakers, including Sherriff Chody, knew that officers were encouraged to use force for the sake of "entertainment" in the "Fantasy League," and not for any legitimate law enforcement purposes.

(6) That policymakers, including Sherriff Chody, knew that Dan Abrams (the Live PD host) posted pictures of its officers on Twitter to engage the "Fantasy League," including but not limited to deputies and lieutenants, including Deputy Johnson on multiple occasions.

(7) That Ambler required the additional reasonable accommodation of not being shot with the TASERs due to his heart condition, which are well-known to cause severe complications for patients with heart conditions.

(8) That Sheriff Chody knew officers were over-using TASERs.

(9) The Sheriff Chody and his staff had actually approved of Camden and Johnson's use of force against Ambler.

Accordingly, should this Court grant Defendant's Motion to Dismiss, Plaintiffs respectfully request the opportunity to amend their Complaint to allege these facts, and any others that may become apparent through continued investigation.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion should be denied in its entirety. In the alternative, Plaintiffs' should be given leave to file an amended complaint to correct any deficiencies identified by the Court.

Respectfully submitted,

**EDWARDS LAW**
1101 East 11th Street
Tel.  512-623-7727
Fax.  512-623-7729

By /s/ Jeff Edwards
JEFF EDWARDS
State Bar No. 24014406
jeff@edwards-law.com
SCOTT MEDLOCK
State Bar No. 24044783
scott@edwards-law.com
DAVID JAMES
State Bar No. 24092572
david@edwards-law.com

**ATTORNEYS FOR PLAINTIFFS JAVIER AMBLER, SR., MARITZA AMBLER, AND J.R.A.**

Ben Crump *(pro hac pending)*
(Washington, D.C. Bar No. 1552623)
Ben Crump Law
717 D Street N.W., Suite 310
Washington, D.C. 20004
Phone: 800-859-9999
Fax: 800-770-3444
ben@bencrump.com

Antonio M. Romanucci *(pro hac pending)*
(Illinois ARDC No. 6190290)
Bhavani Raveendran *(pro hac pending)*
(Illinois ARDC No. 6309968)
Ian P. Fallon *(pro hac pending)*
(Illinois ARDC No. 6332303)
**ROMANUCCI & BLANDIN, LLC**
321 N. Clark Street, Suite 900
Chicago, Illinois 60654
Tel:    (312) 458-1000
Fax:    (312) 458-1004
aromanucci@rblaw.net
braveendran@rblaw.net
ifallon@rblaw,net

**ATTORNEYS FOR PLAINTIFF MICHELE BEITIA, FOR J.A.A.**

## CERTIFICATE OF SERVICE

By my signature below, I certify that a true and correct copy of the above and foregoing legal instrument has been served on all counsel of record through the Court's electronic filing system.

*/s/Scott Medlock*
SCOTT MEDLOCK