IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JAVIER AMBLER, SR., and MARITZA AMBLER, individually, on behalf of all wrongful death beneficiaries of JAVIER AMBLER, II, on behalf of the ESTATE OF JAVIER AMBLER, II, and as next friends of J.R.A., a minor child; and MICHELE BEITIA, as next friend of J.A.A., a minor child | §§§§§§§§§ | Civil Action No. 1:20-cv-1068 |
| Plaintiffs, | §§ | |
| v. | §§ | |
| WILLIAMSON COUNTY, ROBERT CHODY, JAMES "JJ" JOHNSON, ZACHARY CAMDEN, MICHAEL NISSEN, CITY OF AUSTIN, AND JASON NASSOUR | §§§§§§ | |
| Defendants. | §§ | |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

Plaintiffs JAVIER AMBLER, SR., MARITZA AMBLER, and MICHELE BEITIA file this 42 U.S.C. § 1983 and Americans with Disabilities Act lawsuit against Defendants WILLIAMSON COUNTY, Defendants Sheriff ROBERT CHODY, Sheriff's Deputies JAMES JOHNSON, ZACHARY CAMDEN of WILLIAMSON COUNTY, Defendant MICHAEL NISSEN, Defendant City of AUSTIN, and Defendant JASON NASSOUR, and would show the Court and Jury the following in support thereof:

## I.
## PARTIES

*A. Plaintiffs*

1.  Plaintiffs JAVIER AMBLER, SR. and MARITZA AMBLER are the natural parents of JAVIER AMBLER, II, deceased. They are residents of Bell County, Texas, and sue in their capacity as statutory beneficiaries under the Texas Wrongful Death Act, on behalf of all

statutory beneficiaries, and on behalf of the Estate of Javier Ambler, II pursuant to agreement of all the beneficiaries.

2.     Javier Ambler, II died intestate, and there were no probate proceedings arising from his death, as none were necessary. All potential heirs-at-law, through their legal representatives, have agreed to resolve the distribution of assets obtained by the Estate of Javier Ambler, II. All potential heirs, through their legal representatives, agree that Javier Ambler, Sr. will prosecute all claims on behalf of the Estate of Javier Ambler, II.

3.     Javier Ambler, II died having no surviving spouse.

4.     Javier Ambler, II died having fathered two minor children, J.R.A., and J.A.A. J.R.A. and J.A.A. are Javier Ambler, II's sole heirs.

5.     J.R.A. lives with his grandparents, Plaintiffs Javier Ambler, Sr. and Maritza Ambler, and they bring this case as J.R.A.'s next friend with agreement of his natural mother.

6.     MICHELE BEITIA is the mother of J.A.A., and brings suit as his next friend. She is a resident of Williamson County, Texas.

    B.  *Defendants*

7.     Defendant WILLIAMSON COUNTY, TEXAS is a governmental entity in Texas. It may be served through its County Judge, Bill Gravell, Jr., at 710 S. Main St. #101, Georgetown, TX 78262. This Defendant has been served and appeared in this litigation.

8.     At all relevant times, the policymaker for the Williamson County Sheriff's Department was the elected Sheriff, Robert Chody.

9.     At all relevant times, Sheriff Robert Chody was an agent, employee, and policymaker of Williamson County and acting within his scope as such.

10.    Defendant ROBERT CHODY was the elected Sheriff of Williamson County, Texas at all relevant times. As such, Sheriff Chody was the policymaker for the Williamson County

Sheriff's Department. He is a resident of Williamson County, Texas. At all relevant times, he was acting under color of law. He is sued in his individual capacity for damages. He may be served with process at the Williamson County Sheriff's Office, 508 South Rock St., Georgetown, TX 78626. *Service is hereby requested at this time.*

11.     Defendant JAMES JOHNSON (aka JJ Johnson) is a deputy of the Williamson County Sheriff's Department. He is employed in Williamson County, Texas. At all relevant times, he was acting under color of law. He is sued in his individual capacity for damages. He may be served with process at the Williamson County Sheriff's Office, 508 South Rock St., Georgetown, TX 78626. *Service is hereby requested at this time.*

12.     Defendant ZACHARY CAMDEN is a deputy of the Williamson County Sheriff's Department. At all relevant times, he was acting under color of law. He is employed in Williamson County, Texas. He is sued in his individual capacity for damages. He may be served with process at the Williamson County Sheriff's Office, 508 South Rock St., Georgetown, TX 78626. *Service is hereby requested at this time.*

13.     Defendant Officer MICHAEL NISSEN is an officer with the City of Austin Police Department.  At all relevant times, he was acting under color of law. He is sued in his individual capacity for damages. He may be served at the Austin Police Department, 715 East 8th Street, Austin, Texas 78701.  *Service is hereby requested at this time.*

14.     Defendant JASON NASSOUR is the General Counsel for Williamson County, including the Williamson County Sheriff's Department. At all relevant times, he was acting under color of law, as an agent of Williamson County Sheriff's Department. He is employed in Williamson County, Texas. He is sued in his individual capacity for damages. He may be served with process at 3839 Bee Caves Road, Suite 100, Austin TX 78746.

15.     Defendant CITY OF AUSTIN, TEXAS is a governmental entity in Texas. It may be served

through by serving the City Clerk, at 301 W. 2nd Street, Austin, Texas 78701. *Service is hereby requested at this time.*

## II.
## JURISDICTION AND VENUE

16.   As this case is brought pursuant to 42 U.S.C. § 1983 and the Americans with Disabilities Act, this Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

17.   This Court has general personal jurisdiction over Defendant Williamson County as it is located in Williamson County, Texas.

18.   This Court has specific *in personam* jurisdiction over Defendant Williamson County because this case arises out of conduct by Defendant's agents that killed Javier Ambler, II, and which occurred in Travis County, Texas, which is within the Western District of Texas.

19.   This Court has general personal jurisdiction over Defendants Johnson, Camden, and Nissen, Nassour, and Defendant Chody as they reside and/or work in Travis County, Texas, or Williamson County, Texas. This Court has specific *in personam* jurisdiction over Individual Defendants because this case arises out of conduct by Defendants that killed Javier Ambler, II, and which occurred in Travis County, Texas, which is within the Western District of Texas.

20.   This Court has general personal jurisdiction over Defendant CITY OF AUSTIN as it is located in Travis County, Texas, which is within the Western District of Texas.

21.   This Court has specific *in personam* jurisdiction over Defendant City of Austin because this case arises out of conduct by Defendant's agent that killed Javier Ambler, II, and which occurred in Travis County, Texas, which is within the Western District of Texas.

22.   Venue of this cause is proper in the Western District of Texas pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events or omissions giving rise to Plaintiffs' claims occurred in Travis County and Williamson County, which are within the Western

District of Texas.

## III.
## FACTS

23.   Black lives matter.

24.   Williamson County Sheriff's Deputies Defendants James "JJ" Johnson and Zachary Camden, at the behest of Defendants Williamson County and Big Fish, killed Javier Ambler, II as he begged "I can't breathe," after Johnson and Camden chased his car when Ambler allegedly failed to dim his headlights. At Defendant Sheriff Robert Chody's and Defendant Big Fish's direction, Defendants Johnson and Camden were chasing and assaulting Ambler to create a reality television program.

25.   Likewise, Defendant Michael Nissen, of the Austin Police Department, joined Johnson and Camden in using excessive force against Ambler, pursuant to the City of Austin's long-standing policy, practice, and custom of using excessive force against Black citizens, and moreover also failed to intervene to stop Johnson and Camden's use of excessive force.

### A. Sheriff Chody and Williamson County's Policy of Endangering Citizens to Create Reality Television.

26.   In 2018, Defendant Sheriff Chody entered a contract with Defendant Big Fish to produce a television program called "Live PD."

27.   The Williamson County Commissioners' Court voted unanimously to approve this agreement.

28.   Big Fish's Live PD producers and camera operators, including Kate Mika, Colin Mika, Moriarty and Tarzan, ride with officers from police departments and record their activities for broadcast.

29.   Live PD is not actually "live," and the various police departments that appear on it (including Williamson County's) can selectively veto any content they do not wish to air.

30.    Live PD turns serious criminal justice matters into crass entertainment.

31.    Defendant Sheriff Chody is well-aware that Live PD is an entertainment program.

32.    Several of Defendant Sheriff Chody's officers, including Defendant Johnson, were regularly featured on Live PD.

33.    Defendant Chody regularly promoted Live PD on his social media platforms.

34.    Defendant Chody considered Live PD a "necessary tool to assist with the successful accomplishment of his core duties," including by allegedly "provid[ing] transparency and awareness to the public," by "increas[ing] recruiting efforts," by allegedly "provid[ing] an independent and unbiased visual on how the deputies are operating on the streets," by "provid[ing] a tool for creating better and more efficient protocols for finding missing persons," by allegedly "provid[ing] a tool to ensure laws, policies, rights, obligations and duties are adhered to," by allegedly "provid[ing] a tool for greater checks and balances in the officer," and by allegedly "provid[ing] a tool for protecting the employees and agency."

35.    Defendant Chody tweeted, "The Williamson County Sheriff's Office is proud & excited to announce that we will be featured on #LivePD this weekend!" in November 2018.

36.    Defendant Chody later tweeted, "I believe having #LivePD in WilCo is a necessary tool for our office for many reasons … [and] the community at a large scale approves."

37.    Defendant Chody later endorsed a t-shirt that said "Trust me. I watch Live PD, I'm basically a cop," by tweeting "I want this shirt!!!!! #LivePD #LivePDNation."

38.    Defendant Chody even let Live PD continue production during the COVID-19 pandemic, despite Williamson County's "stay-at-home" order that made reality TV crews "non-essential" workers.

39.    Defendant Chody believes that Big Fish Entertainment and Live PD help his department recruit officers, and has made the show an essential component of the Williamson County

Sheriff's Department.

40.     Defendant Chody encouraged his officers to engage in dangerous, high-risk police tactics

        because it made for more entertaining television in service to Live PD.

41.     If Big Fish's Live PD producers considered a department "boring," its activities would not

        be broadcast. Thus, Defendant Chody prioritized producing "exciting" content for Live PD

        over the health and safety of the County's citizens.

42.     For example, Defendant Chody's deputies, with Big Fish's Live PD camera crews in tow,

        broke down the door of a suspect wanted on a warrant, when the same suspect had been at

        the Williamson County Courthouse the same day to appear on another charge. Rather than

        arrest him on the warrant during the court appearance, as Chody's deputies easily could have,

        Chody and Live PD sent officers in tactical gear to break down the suspect's door and invade

        his home because peacefully making arrests during court appearances is boring television.

43.     In another incident, Defendant Chody sent the SWAT team to arrest a suspect wanted for

        possession of a small amount of drugs by authorizing a no-knock warrant and the use of

        flash-bang grenades. Defendant Chody's deputies broke down the door of the suspect's

        mother's home, then fired flash bang grenades into the house, when the suspect was non-

        violent and could have been arrested without incident. The raid and arrest were broadcast on

        Live PD.

44.     Use-of-force reports by the Defendant Williamson County Sheriff's Office nearly doubled

        from 43 in 2017, the year before Live PD began filming in Defendant Williamson County,

        to 82 in 2019, the first year of the television contract. Defendant Williamson County

        Sheriff's deputies used force "significantly more often" during the weeks that Live PD was

        filming than in weeks that it was not.

45.     Black civilians represented 1 in 5 victims of deputies' use of force, despite making up only

10% of the Williamson County population.

46.   Many of the deputies who used force had been employed by Williamson County Sheriff's Office for less than two years.

47.   Defendant Williamson County Sheriff's deputies used Tasers in more than half of the force incidents from 2017 to 2019, an excessive rate that indicates misuse of Taser equipment and inadequate training.

48.   Nearly 75% of the use-of-force encounters studied by the Austin American-Statesman between 2017 and 2019 resulted in injuries to civilians.

49.   Among other policies and practices, Defendant Sheriff Chody's pursuit policy allowed officers to chase motorists who committed trivial traffic violations.

50.   Police chase sequences were a staple of Live PD, and are considered "not boring."

51.   Thus, more than half of nearly 100 chases initiated by Williamson County deputies in the last three years, while Live PD was filming, were for traffic violations.

52.   Upon information and belief, many of these chases were initiated or pursued for the benefit of Live PD, at Defendant Chody's direction and Big Fish's encouragement.

53.   Policies instated by Defendant Sheriff Chody in January of 2019, despite the continued presence of Live PD and significant increase in pursuits, did not prohibit chases of non-hazardous traffic violations or misdemeanors.

54.   Policies instated by Defendant Sheriff Chody in January of 2019, despite the continued presence of Live PD and significant increase in pursuits, failed to define for officers what constituted "a crime for which there is an immediate need for apprehension."

55.   Defendant Chody, as policymaker, acknowledges that, prior to Ambler's death, the policy in Williamson County was to "chase until the wheels fall off."

56.   In fact, the day of Ambler's death, Williamson County deputies chased two other suspects.

57.　　In the year that Live PD began partnering with Defendant Chody and Williamson County, the number of police chases by Chody's department increased 54%.

58.　　Defendant Chody's Williamson County deputies chased suspects at a higher rate than any other jurisdiction in Central Texas.

59.　　Half of all chases in Defendant Williamson County occurred while Live PD camera crews were filming the department.

60.　　Over 20% of chases in Defendant Williamson County involved Black suspects, though less than 10% of Williamson County residents are Black.

61.　　Approximately 60% of Defendant Williamson County chases began due to a trivial traffic infraction, like failing to signal, expired license plates, or failure to dim headlights.

62.　　Defendant Deputy Johnson was involved in multiple dangerous chases while working for Sheriff Chody, including a chase that reached 100 miles per hour that Johnson began because the driver had his headlights off, and another whose registration sticker had expired.

63.　　Defendant Sheriff Chody had also encouraged officers to use excessive force when they were being filmed by Live PD.

64.　　One of Defendant Chody's officers, Jarred Dalton, tweeted in 2019, "Glad we could make some good TV for the boss man." On another occasion, again tweeting about Live PD, Dalton tweeted, "Gonna try to get some good stuff stirred up for y'all tonight."

65.　　Big Fish's Live PD also believes that assaulting suspects is "not boring."

66.　　Indeed, on June 4, 2019, shortly after Ambler's death, Live PD broadcast a traffic stop where Defendant Deputies Johnson and Camden used excessive force against a suspect stopped for a minor traffic offense.

67.　　Defendant Williamson County officers electrocuted the suspect with their TASERs multiple times.

68.    Defendant Williamson County officers kicked and punched the suspect multiple times, while he was in a defensive position on the ground.

69.    Three Williamson County officers, including Defendants Johnson and Camden, sat on top of the suspect, while he was face-down on the ground and begging, "I can't breathe" – much like Ambler had earlier.

70.    Upon information and belief, neither Defendant Johnson nor Camden were disciplined for their role in assaulting this suspect on camera.

71.    In fact, Defendant Sheriff Chody did not exercise his veto to prohibit Live PD from broadcasting this incident because it was exactly the type of content that Defendant Chody and Defendant Big Fish hoped to create for Live PD.

72.    Indeed, Defendant Chody would actively encourage his deputies to use force when it was unnecessary.

73.    Defendant Chody's command staff, with his knowledge, awarded gift cards to steakhouses to officers who had "good" uses of force.

74.    Officers who received gift cards were also awarded the title "WilCo Badass."

75.    This practice encouraged officers to use force more frequently, to "win" more gift cards, to be "WilCo Badass," and to appear on Live PD.

76.    One of the rare Defendant Williamson County officers who was asked to resign after he used excessive force expressed surprise, saying that he thought his use of force would have earned him a gift card rather than a requested resignation.

77.    Despite the clear danger to residents of Defendant Williamson County, the County Commissioners Court renewed the contract with Live PD in 2019.

78.    However, concerned that Live PD turns the worst days of many citizens' lives into crass reality television, many jurisdictions around the country cut ties with the program.

79.    For these reasons, finally in August of 2019, the Williamson County Commissioners Court ordered Defendant Sheriff Chody to stop allowing Live PD to produce the show in Williamson County and sent a termination letter to Defendant Big Fish

80.    Defendant Sheriff Chody nonetheless ignored the Commissioners Court, and continued allowing Live PD to produce the show in Williamson County.

81.    In March 2020, Defendant Sheriff Chody and Defendant Big Fish signed a new Access Agreement to film Live PD, without authorization by the Williamson County Commissioners Court.

82.    On May 19, 2020, the Williamson County Commissioners Court then took the rare step of suing Defendant Sheriff Chody to stop production of Live PD, alleging that "Sheriff Chody can perform the core duties of sheriff without the live TV show. But he doesn't want to. Instead, Sheriff Chody seeks social media and TV exposure like a moth to a light bulb – and he's flown out of his job description to get back on TV."

83.    Instead, the County alleged that Defendant Chody had become a "TV producer, reality TV star, [and] show business agent," and, "jeopardized … citizen protection for TV ratings and exposure" by "prioritize[ing] TV appearance[s] and ratings over safety and proper police work."

84.    Defendant Sheriff Chody attempted to bring other reality televisions shows to the Williamson County Sheriff's Office, signing access agreements in 2017 and 2019 with two other production companies, but those shows never came to fruition.

85.    A former president of the Williamson County Deputies Association, Mike Klier, similarly alleged that Defendant Chody would hire deputies not based on their ability to be effective sheriff's department officers, but instead to create more exciting television. "If you are looking for guys who are chasing Hollywood lights with blue [police] lights, you're going

to get exactly what we got – and that is a disaster."

86.  In fact, Defendant Chody has hired numerous officers who had been disciplined or were about to be fired by other law enforcement agencies for being dishonest or using excessive force.

87.  Before Defendant Chody took office, the Sheriff's Department conducted thorough background checks of all potential sheriff's deputies. Chody ended this practice, and instead implemented a policy where background checks would only examine minimal information, and offenses that would have once disqualified applicants were now ignored.

88.  Former officers of the Williamson County Sheriff's Office described Defendant Chody's new hiring policies as "atrocious."

89.  Two of the officers who Defendant Chody hired based on their television abilities, rather than their actual suitability to serve as police officers, are Defendants Johnson and Camden.

90.  Defendant Chody ignored red-flags in Defendant Johnson and Defendant Camden's background to hire them. Defendants Camden and Johnson had worked together at Bastrop County Sheriff's Department before being hired by Defendant Chody.

91.  Both Defendant Johnson and Camden were turned down by Williamson County when they had applied to work for the department before Defendant Chody's tenure because of serious problems with their backgrounds as police officers.

92.  Defendant Camden's previous employer, the Bastrop County Sheriff's Department, disciplined him three times during a five-month period, including twice for dishonesty.

93.  Bastrop County also required Defendant Camden to take additional courses on suspects' constitutional rights after he made a search of a suspect's home without legal justification.

94.  When he applied to work for Defendant Chody's department, two of Defendant Camden's references noted he was too "aggressive" when out on patrol.

95.  Williamson County Commissioner Terry Cook has been especially critical of Defendant

Sheriff Chody's decision to participate in Live PD, saying the County needs to "get entertainment out of law enforcement. It doesn't belong there."

96.    Defendant Williamson County District Attorney Shawn Dick believes that Defendant Sheriff Chody's participation in Live PD has actually prevented his office from prosecuting crimes – by refusing to provide even basic information to the County. "Live PD or no Live PD, the sheriff's office has a responsibility and a duty to get us all the evidence in a case. And whoever they let into a crime scene, we better have the names of those witnesses and the evidence that they can provide. And the sheriff's department has let Live PD into [Chody's] crime scenes for the last two years, and all I've ever requested were the witnesses that were in the crime scene and the evidence they gathered while they were in the crime scene. And to date we've never gotten that kind of information."

97.    Months before Ambler's death, Dick had told Defendant Chody that he needed to preserve all video recordings made by Live PD, because they would be critical evidence in criminal prosecutions.

98.    Due to Defendant Chody's refusal to provide evidence created by Live PD, Dick has been forced to decline to prosecute criminal cases. Despite Dick informing Defendant Chody about this, Defendant Chody still refused to provide the Live PD footage, knowing that some cases would be dismissed. Clearly, Defendant Chody was more interested in making the television program than actual police work.

99.    Likewise, Big Fish would regularly destroy video recordings it made that were not destined to be broadcast, specifically to avoid creating evidence that might be used in criminal prosecutions of the suspects arrested while Big Fish camerapersons were filming. Big Fish's agents and employees did this specifically to destroy evidence that might be useful to litigants, and deprive them of evidence that was in Big Fish's possession and control.

100. Thus, during the controversy regarding Live PD, Defendant Sheriff Chody approved policies and practices, or, alternatively, failed to change or correct existing practices, that made for more entertaining television but endangered the safety of citizens who interacted with police.

101. Likewise, Defendant Sheriff Chody hired officers who were unfit for actual police work, then failed to supervise them to prevent them from violating citizens' constitutional rights, to serve Live PD rather than the people of Williamson County.

102. Even after Live PD was cancelled, in large part due to the program's role in Amber's death, Defendant Chody continued to support the television program, and re-tweeted statements by the show's host, Dan Abrams.

103. At no time prior to the filing of their lawsuit for injunctive relief, did the County Commissioners Court move to remove Defendant Sheriff Chody from office for incompetency or official misconduct by petitioning the Williamson County District Court despite knowledge of Chody's ongoing policy of violating the Constitutional Rights of Williamson County residents.

**B. Big Fish produces and broadcasts Live PD and hides officers' policy violations.**

104. Live PD is a television show produced by Big Fish for A&E Network.

105. Big Fish "live" broadcasted Live PD on A&E in 3 hour blocks on Friday and Saturday nights at 9 pm EST.

106. Dan Abrams, an employee of Big Fish, hosted Live PD in studio, providing explanation or commentary about what viewers were seeing. Abrams is also the "Chief Legal Analyst" for ABC news and an avid user of Twitter with over 11,000 tweets and nearly 320,000 followers.

107. The broadcast of "live" events on Live PD had a delay of up to 25 minutes between filming and broadcast to audiences, allowing law enforcement officers, like Defendant Sheriff Chody, to "veto" certain content.

108.   Live PD averaged about 1.9 million viewers on Friday and Saturday nights.

109.   In 2019, Live PD was Big Fish's most watched program including video on demand and DVRs.

110.   In 2019, ad-tracking firm Kantar Media reported that Live PD brought in $292.6 million in advertising to A&E Network.

111.   At times, Live PD and its spin-offs accounted for 85% of A&E's daily programming for the week.

112.   Reports by media indicate that Big Fish producers worked with the law enforcement departments it filmed to censor interactions that violated the department's policies, including scenes where officers were "exciting to watch" but "a little too 'wild west,'" used racist language, or when there were "significant procedural issues with how [the officer] handled this incident."

113.   Live PD was cancelled in June 2020, two days after the *Austin American-Statesman* newspaper reported that Defendant Big Fish had destroyed its footage of Javier Ambler's death.

114.   After Live PD was cancelled, A&E's viewership dropped by nearly 50%.

115.   Officers being filmed by Live PD have been named in at least two other lawsuits alleging excessive force constitutional violations by those officers, in Bridgeport, Connecticut and Greenville, South Carolina; and one lawsuit alleging racial bias in Greenville, South Carolina. At least some part of all three incidents that were the subjects of these lawsuits were broadcast and produced by Big Fish on Live PD.

   **C.  Williamson County is aware of the Live PD Fantasy League, encouraging and rewarding unjustified officer use of force.**

116.   On Big Fish's website, www.bigfishusa.com, Live PD is described as part of the "national conversation on policing in America," that includes a "live social media component."

117.    Sophisticated social media users use "hashtags" in social media posts as a way to make it easier for other users to connect to posts that are related to a specific topic, event, theme or conversation. Often, television show marketing will include a hashtag campaign that allows disparate social media users to first associate a particular hashtag with a television show and then allows viewers of the show to congregate in the same social media space to "live tweet" the show. This allows viewers to have an ongoing conversation about the television show as it airs and after the episode ends.

118.    The Live PD television show has a Twitter account with the verified handle @OfficialLivePD. It promotes a #LivePD hashtag in its description. In various tweets, this official Twitter account used #LivePDNation to address viewers and fans of the show.

119.    Host Dan Abrams has a Twitter account with the verified handle @DanAbrams. He also often used the hashtags "#LivePD" to reference the television show and "#LivePDNation" to address Live PD's online fans.

120.    Big Fish also has a Twitter account, @bigfishusa, which promoted the hashtags #LivePD and #LivePDNation.

121.    Twitter allows users to include a user's handle in their message to make sure the person they are "tagging" sees the message. Thus, if @OfficialLivePD is "tagged" in a user's tweet, that tweet and its contents will be visible to Big Fish.

122.    At some point, agents and employees of Big Fish helped create and facilitate a Live PD social media environment that included a "Live PD Fantasy League" for viewers of the show.

123.    The show's "lineups" were the officers who would be featured on the next episode.

124.    Dan Abrams often released this lineup through his Twitter account, encouraging "#LivePDNation" to tune in.



125.    As described on Twitter, once Big Fish's agents released show "lineups," players would pick

their favorite officers. During the episode, points were assigned for certain actions, including

uses of force. At the end of the night, the people who chose the officer with the highest point

total "won." The winners were entered into drawings for small prizes.



126.    A website, Facebook page, Reddit board, and YouTube channel, all of which are now defunct

or inaccessible, would list the point totals for the night's episode. The Twitter handle @LivePdFantasyLG would also post point totals.



127.    To play the game, Twitter users were instructed to hashtag the officers' last name followed by the hashtag "#LivePDFantasyLG." Users would often tag the Twitter handles of the officers they were "choosing" for the night and would include additional hashtags as well. This included the #LivePD and the #LivePDNation hashtags.

128.    This practice included officers of the Defendant Williamson County Sheriff's Office and tagging Defendant Sheriff Chody to posts.





129.    @OfficialLivePD was often tagged in these fantasy league tweets. Dan Abrams, the public

face of Live PD, other hosts, and A&E network were also regularly tagged.





130. The Fantasy League incentivized "exciting" television over legitimate law enforcement.

131. Big Fish knew or should have known that this Fantasy game was associated with the Live PD television programming because the show's official, verified Twitter handle was being continuously tagged by viewers playing the game; its agent and employees controlled handles, including the host's official, verified Twitter handles were regularly tagged; and the hashtags Big Fish used to promote the show were also continuously being tagged by viewers as they played the game. Defendant Big Fish also promoted the show as having a "live social media component."

132. Big Fish knew or should have known that such a fantasy game would influence the behavior of featured officers while filming Live PD, and that increased constitutional violations would occur as a result of the game.

133. Defendant Sheriff Chody's Twitter handle is @sheriffchody. The current Twitter account with that handle was created in November 2020 (after Chody lost his re-election bid) and has posted a single tweet which says that that the person posting was honored to serve as Sheriff of Williamson County. The current account is not "verified," meaning Twitter will not confirm that the user is the actual person depicted by the account. Upon information and belief, Chody actually deactivated his account to delete the content, despite knowing about this litigation and that his tweets likely constituted evidence. A user with the Twitter handle @sheriffchody, believed to be Sheriff Chody prior to the initial deletion of the Twitter account, was also tagged in tweets about the fantasy league. Defendant Sheriff Chody knew

that the game was being played and would influence the behavior of his deputies while

filming Live PD, and that increased constitutional violations would occur as a result of the

game.

134.    Deputies in the Defendant Williamson County Sheriff's office were "chosen" as players in

the game by viewers. #Kennedy is Lieutenant Grayson Kennedy, whose Twitter handle was

@lt_gray. That Twitter account has since been deleted.  #Johnson is Defendant Deputy

James "JJ" Johnson. Lineups on the dates Defendant Deputies Kennedy and Johnson were

chosen by viewers to win the Fantasy League for the episode were posted on multiple

occasions.





135.  Choosing police tactics based on whether they will earn points in an online fantasy league game for a reality television show is not a legitimate law enforcement purpose.

136.  Big Fish producers, agents and employees were not present with the Williamson County deputies for legitimate law enforcement purposes; they were present to create exciting television entertainment and to engage with an online fanbase.

137.  Likewise, because he was routinely "tagged" in social media posts promoting the game, Sheriff Chody knew that his officers were winning "points" for using excessive force, but did nothing to stop it.

**D.  Williamson County and Big Fish enter into a Joint Venture to Endanger Citizens to Create Reality Television.**

138.  The relationship between Big Fish and Defendant Williamson County was formalized in an Access Agreement ("Agreement") signed by a Representative of Big Fish Entertainment and by either Defendant Sheriff Chody or Williamson County Commissioners.

139.  Access agreements were signed with Big Fish in 2018, 2019 and 2020 by Defendant Sheriff

Chody and/or Williamson County Commissioners.

140. In the Agreement, Defendant Williamson County Sheriff's Office ("WCSO") granted Big Fish producers and personnel access to WCSO offices, facilities, and vehicles along with Sheriff's stations or precincts, jail facilities, offices, patrol cars. This access included the right to make use of WCSO property as producers thought necessary.

141. The Agreements gave Big Fish the right to photograph, record, reproduce and otherwise film WCSO personnel and property including names, voice, likeness, images, trademarks, service marks, tradenames, logos, copyrighted material and/or other materials in connection with the development, production, exhibition, exploitation, and promotion of the series, related or derivative series and the "marketing, promotion, and publicity thereof in all forms of media now known or hereinafter invented."

142. Big Fish agreed not to use the rights granted to it as outlined in paragraph 111 to produce any still pictures, motion pictures, videotapes, photographs and sound recordings that would be considered obscene or defamatory to WCSO personnel and property, but explicitly excluded "third parties (e.g., statements by suspects and/or anyone else who may come in contact with the WCSO" personnel or property).

143. The Agreement was exclusive, meaning that WCSO could not authorize anyone to develop and/or produce programming of a similar format or concept that depicts the activities of WCSO in any audio-visual media.

144. The Agreement provided that WCSO would have 24 hours to review and comment on any pre-recorded segments in which WCSO was featured "for the purpose of identifying any safety or security risks by WCSO." A representative of WCSO also had the right to be present in the local control room or on the ground with the producer's crew during filming to "review material being captured and distributed" by Live PD. However, Big Fish retained

final decision-making authority over the "creative content of the series" including "themes, featured events, story line, timeline, sequence of events, etc."

145. The Agreement provided that Big Fish would retain the "sole and exclusive" ownership of "all film,, videotape, still photographs and other visual and/or audio recordings."

146. The Agreement notes that Big Fish "acknowledges and accepts that under Texas law, WCSO may have an obligation to store and retain footage, in all forms, for compliance with various laws."

### E.  Sheriff Chody's Indifference to Excessive Force

147. Defendant Sheriff Chody also has a long history of using excessive force against people of color personally, and indifference to the use of excessive force by his officers.

148. In 1998, Defendant Chody was an Austin Police Department officer.

149. Defendant Chody used excessive force against a teenager, Marcus Frank, then 15 years old.

150. Frank is Black.

151. Defendant Chody is white.

152. Defendant Chody grabbed Frank, put him into a choke hold, and held him down against his police cruiser until Frank suffered a seizure caused by Frank's epilepsy.

153. Even as Frank suffered the seizure, Defendant Chody did not release his grip, even as Frank's symptoms worsened.

154. Frank had done nothing wrong.

155. The City of Austin paid a $30,000 settlement to resolve Frank's claims against Defendant Chody.

156. Defendant Chody continues to insist he did nothing wrong.

157. That same year, Defendant Chody collected $51,000,000 when he won the lottery.

158. Defendant Chody left the Austin Police Department to run for office in Williamson County.

159.   Defendant Chody was eventually elected Williamson County Sheriff in 2016.

160.   When asked about how he brutalized Frank during the campaign for Sheriff, Defendant Chody responded that he had been a "good cop" on that day, and that he did nothing wrong.

161.   One of Defendant Chody's goals as Sheriff was to talk to his officers, to let them know "what [he] was willing to put up with."

162.   Indeed, Defendant Chody was willing to let Live PD broadcast his officers using similar levels of excessive force.

163.   The number of use of force incidents doubled between 2017 – the last year before Live PD began filming Defendant Chody's deputies – and 2019 – after Live PD had operated in Williamson County for a full year.

164.   Moreover, during the weeks the show was being filmed, deputies used force significantly more often than when they weren't accompanied by Live PD camera crews.

165.   Likewise, deputies used TASERs much more often after Live PD arrived in Defendant Williamson County. The number of incidents where TASERs were used nearly doubled from 2017 to 2019.

166.   Similarly, officers used TASERs in more than half of all use of force incidents between 2017 and 2019, an extremely high (and dangerous) rate.

167.   Black citizens were disproportionately targeted for use of excessive force by Williamson County deputies. Though Black people make up only ten percent of Williamson County citizens, they were twenty percent of the population that Defendant Chody's deputies used force against.

168.   In 2017, Defendant Williamson County changed its training academy's academic standards without permission from the Texas agency that accredits law enforcement academies, the Texas Commission on Law Enforcement. Though police officers in Texas are required to

receive five to seven months of training before working independently, in Williamson County that training period was reduced to twelve weeks at Defendant Chody's direction.

169.   As a result, numerous Defendant Williamson County deputies were put on the street without receiving appropriate training. Indeed, many of the deputies who used excessive force had been employed by the department for less than two years.

170.   Indeed, Defendants Johnson and Camden had only been working as patrol officers for a short time before they killed Ambler. Defendant Camden had only completed his training two or three weeks before Ambler's death. Johnson had been on patrol for just two or three months.

171.   A Williamson County academy instructor also resigned after calling a Black cadet a racial slur.

172.   Thus, upon information and belief, Defendant Chody was willing to "put up with" his officers using the same level of excessive force he deployed against Frank, and approved rewarding uses of force with gift cards and the "WilCo Badass" title.

173.   Defendant Chody failed to train and supervise his officers to discourage the use of excessive force. Rather, he trained and supervised his officers that it is acceptable to use force similar to what he did to Frank – to be "WilCo Badass."

174.   Defendant Chody, as an agent and employee of Williamson County, continued to perpetuate a policy of encouraging excessive force against people of color and especially members of the Black community until he lost his bid for reelection in November, 2020.

   **F. The Austin Police Department's Policy of Using Excessive Force Against People of Color, and Failing to Discipline Officers**

175.   The City of Austin's police department has a long, awful history of using excessive force against people of color.

176.   On June 9, 2005, Officer Julie Schroeder shot and killed Daniel Rocha in the back. Rocha was Hispanic. Schroeder is white. Rocha was unarmed. The City paid Rocha's family

$1,000,000 to settle their claims against the City.

177.   On June 3, 2007, Officer Michael Olsen shot and killed Kevin Brown. Brown was Black. Olsen is white. Brown was unarmed when he was shot. The City paid Brown's family $1,000,000 to settle their claims against the City.

178.   On May 11, 2009, Officer Leonardo Quitana shot Nathaniel Sanders and Sir Smith. Sanders died, and Smith survived. Sanders was Black. Smith is Black. Sanders and Smith were both unarmed. The City paid Sanders' family $750,000 to settle their claims, and $175,000 to settle Smith's claims.

179.   On May 30, 2011, Officer Nathan Wagner shot and killed Byron Carter, Jr. Carter was Black. Wagner is white. Though the City's Police Monitor and a Citizen Review Panel found the shooting was unjustified, APD never disciplined Wagner.

180.   On April 29, 2011, APD Officers Eric Copeland and Russell Rose violently assaulted Carlos Chacon. Chacon is Hispanic. Chacon had called the police to report he was the *victim* of a robbery. The officers alleged that Chacon failed to comply quickly enough with their orders to lay on the ground, and began using their TASER against him while punching his body. A jury awarded Chacon $1,000,000. APD never disciplined Copeland or Rose.

181.   On April 5, 2012, APD Officer Eric Copeland (*see id*.) shot and killed Ahmede Bradley. Bradley was Black. The City's Police Monitor found the shooting was unjustified.

182.   On June 7, 2012, APD Officer Jesus Sanchez tackled Pete Hernandez as he exited a Wal-Mart, though Hernandez had committed no crime whatsoever. Hernandez is Hispanic. A jury awarded Hernandez $877,000. APD did not discipline Officer Sanchez.

183.   On July 29, 2013, APD Officer Charles Kleinert shot and killed Larry Jackson, Jr. Jackson, Jr. was Black. Kleinart is white. The City paid Jackson, Jr.'s survivors $1,850,000 to settle their claims.

184.    On June 15, 2015, Officer Bryan Richter used excessive force against Breaion King. King is Black, and weighed just 120 pounds. Richter is white. Richter had only stopped her for speeding, but, when she exited her car, Richter slammed her into another vehicle then knocked her to the ground. While taking King to jail, another APD officer, Patrick Spradlin (also white), told King that Black people had "violent tendencies," so "it's probably going to get ugly" when APD officers interact with Black citizens. The City paid King $425,000 to settle her claims. Until King filed suit, APD had failed to discipline the officers, even after it had reviewed their conduct.

185.    After his officers assaulted King, the City's then police chief, Art Acevedo, told his commanders that the way officers treated her reflected pervasive racial bias in the department. Acevedo said, "Had that been a pretty white girl in her Sunday best dress, I don't think Richter would have responded that way."

186.    As part of King's lawsuit against the City, U.S. District Judge Sam Sparks found that a reasonable jury could find APD had a custom or practice or racial discrimination and using excessive force against people of color.

187.    On February 8, 2016, APD officer Geoffrey Freeman shot and killed David Joseph. Joseph was a 17-year-old Black child. Joseph was suffering a mental health crisis, running through a neighborhood naked, and obviously completely unarmed. The City paid Joseph's family $3,250,000 to settle their claims.

188.    On May 2, 2017, APD officer James Harvel shot and killed Jason Roque. Roque was Hispanic. Harvel is white. The City never disciplined or retrained Harvel after he killed Roque, even though Roque was unarmed when Harvel fired the fatal shot.

189.    On September 23, 2017, APD officer Joel Kuchenski electrocuted a Black teenager with his TASER, when the child had done nothing wrong. Kuchenski's use of force was reviewed by

APD, including Chief Manley, and Kuchenski was not disciplined. The City paid a settlement to resolve the teenager's claims.

190. During this same time period, a high-ranking APD commander, Justin Newsom, who is white, regularly used invidious racial slurs. Among many other disgusting comments, Newsom referred to former President Barack Obama as "n----- one," to a former Black city councilwoman as a "dumb n-----," and to a former Black assistant police chief as "a n-----, but our n-----." When Newsom's disgusting comments came to light, rather than discipline him, Chief Manley quietly allowed him to resign and keep a full package of retirement benefits.

191. Austin police are far more likely to stop people of color and arrest people of color.

192. A 2016 study by the Center for Policing Equity found the City's police officers disproportionately used force against people of color.

193. Then-Chief Acevedo said the 2016 study showed "we still have more work to do," and that "we have to continue to work in terms of our training on implicit and explicit bias for our department."

194. A 2020 analysis by the City of traffic stop data found that 15% of motorists APD officers stop, and 25% of motorists that APD officers arrest, are Black, though only 8% of the City's population is Black.

195. There are numerous other incidents where APD officers used excessive force against people of color.

196. There are numerous other incidents where APD officers use excessive force but are not disciplined.

197. In fact, Defendant Michael Nissen, an APD officer, used excessive force against Hunter Pinney in 2013. Nissen and his partners came to Pinney's apartment, looking for a former

occupant of the apartment. Pinney was never a suspect. Nissen, without any justification, used his TASER to electrocute Pinney multiple times, then kicked Pinney. The City paid Pinney $35,000 to settle his claims. Nissen was never disciplined for using excessive force against this innocent man.

### G. Defendants' Officers Kill Javier Ambler, II

198.    Javier Ambler, II is Black.

199.    On March 28, 2019, at around 1:23 am, Ambler was driving home.

200.    As he was driving in suburban Williamson County, portions of Ambler's drive home were very dark.

201.    A former stand-out high school defensive tackle, Ambler, 40, worked as a caterer, and weighed approximately 400 pounds.

202.    Ambler suffered from heart conditions and obesity, which substantially impaired his mobility and the operation of his circulatory system. Among other impairments, Ambler's heart conditions and obesity impaired his ability to engage in strenuous physical activity, and his ability to move his body into certain positions.

203.    At the same time Ambler was driving home, Deputies Johnson and Camden were patrolling Williamson County in separate squad cars.

204.    Defendant Johnson had been with the Williamson County Sheriff's Office for only three (3) months.

205.    It was Defendant Camden's second night on the street on his own, as he had been hired by the Williamson County Sheriff's Office only a month prior.

206.    Both Defendants Johnson and Camden were accompanied by Big Fish's Live PD camera crews, including Kate Mika, Colin Mika, Moriarty and/or Tarzan.

207.    When Defendant Johnson passed Ambler, Ambler allegedly failed to dim his car's headlights.

208.    Defendant Johnson turned his car around to pull over Ambler. Because Ambler did not pull over, Defendant Johnson began chasing him.

209.    Defendant Sheriff Chody's permissive chase policy, and his policy of allowing Live PD to film policing activities as "entertainment," encouraged Defendant Johnson to chase Ambler for this trivial offense with Kate Mika, Colin Mika, Moriarty and/or Tarzan.

210.    Early in the chase, Defendant Johnson was close enough to Ambler's vehicle to record his license plate so that he could attempt to arrest him later. Defendant Johnson, pursuant to Williamson County's permissive chase policy, instead recklessly continued chasing Ambler's car.

211.    At some time during the chase, Austin Police Department had a helicopter following the chase and calling out information to dispatch that was available to officers to identify and find the vehicle so that an arrest could be attempted later when it would be safe.

212.    Big Fish's Live PD camera crews, including Kate Mika, Colin Mika, Moriarty and/or Tarzan, began filming the chase.

213.    Defendant Johnson began narrating the chase, for the benefit of Big Fish's Live PD camera crew, including to Kate Mika, Colin Mika, Moriarty and Tarzan.

214.    Defendant Johnson told Big Fish's camera operators, including Kate Mika, Colin Mika, Moriarty and Tarzan, "I'm gonna stop this guy for failure to dim high beams."

215.    Defendant Johnson reported the chase over intradepartmental radio, and Defendant Camden joined the chase.

216.    Big Fish's Live PD camera crew accompanying Defendant Camden, including Kate Mika, Colin Mika, Moriarty and/or Tarzan, also began filming.

217.    While Defendants Johnson and Camden chased Ambler, they narrated the chase for the Big Fish's Live PD camera crews, including Kate Mika, Colin Mika, Moriarty and/or Tarzan, to

produce an "entertaining" program.

218. Kate Mika, Colin Mika, Moriarty and/or Tarzan encouraged and egged on the officers to continue the chase and produce an "entertaining" program.

219. Kate Mika, Colin Mika, Moriarty and/or Tarzan did not stop filming and did not request that the chase be discontinued.

220. Defendants Johnson and Camden chased Ambler for over 20 minutes.

221. There was never any discussion over the interdepartmental radio of abandoning the chase.

222. Indeed, the chase was well within Defendant Williamson County's dangerous policy.

223. Defendant Johnson and Camden also reported the chase over radio channels that local police departments use to communicate with each other.

224. The Austin Police Department learned about the chase, as the vehicles passed the border between Defendant Williamson County and the City of Austin.

225. Austin Police Department officers were ordered *not* to engage in the chase, because the chase was inherently dangerous, and Ambler was only suspected of committing a trivial offense before the chase began.

226. The chase ended when Ambler lost control of his car, and crashed within the City of Austin.

227. Kate Mika, Colin Mika, Moriarty and/or Tarzan did not stop filming and continued to record the incident for "entertainment," pursuant to the agreements between Sheriff Chody, Williamson County, and Big Fish.

228. Defendant Johnson reported the crash over the radio.

229. Defendant Johnson stopped his squad car near the scene of the crash.

230. Defendant Johnson exited his squad car.

231. Big Fish's Live PD camera operators and producers including Kate Mika, Colin Mika, Moriarty and/or Tarzan exited the car as well, and continued filming.

232.  At no time during the pursuit, was Ambler armed or a threat to the officers or others.

233.  Defendant Johnson drew his handgun, pointed it at Ambler, and ordered him to exit the car.

234.  Ambler immediately complied, and held up his hands to show he was unarmed and not a threat.

235.  Ambler extended his hands out of the car immediately after opening the door, clearly showing Defendant Johnson that he was unarmed and surrendering.

236.  At this time, Ambler had surrendered, and the scene was controlled and secure.

237.  Defendant Johnson holstered his handgun, and drew his TASER instead.

238.  Defendant Johnson began pointing his TASER at Ambler.

239.  The TASER is an electric shock weapon that can be lethal when used against people with chronic heart conditions, like Ambler.

240.  Defendant Johnson began yelling "get down!" and "get on the ground!" at Ambler.

241.  Ambler worked to comply, and immediately kneeled on the ground next to the crashed car. Due to his size and heart condition, he was not able to move quickly, or lower his large frame to the ground.

242.  Defendant Johnson fired the TASER at Ambler despite the fact that he was compliant, not posing a threat, and not attempting to escape the officers on foot.

243.  Ambler fell to one knee, then involuntarily rolled onto his back.

244.  Defendant Johnson yelled, "You'll get it again!" and continued to point the TASER at Ambler.

245.  Defendant Camden and Big Fish's second Live PD crew, including Kate Mika, Colin Mika, Moriarty and/or Tarzan, arrived.

246.  Defendant Camden also drew his TASER, and used its "drive stun" mode to shock Ambler in the back despite the fact that Ambler was compliant, not posing a threat, and not attempting to escape the officers.

247. Now two of Big Fish's Live PD camera operators, including Kate Mika, Colin Mika, Moriarty and/or Tarzan, were recording the incident.

248. Defendants Camden and Johnson shocked Ambler a third time with their TASERs. Again, Ambler posed no threat, was complaint, and was not attempting to escape.

249. At this time, APD's Defendant Officer Nissen arrived at the scene.

250. All three Defendant officers screamed at Ambler to lay down on his stomach so they could handcuff him behind his back.

251. Requiring a person who is obese to lay on their stomach can be very dangerous, as doing so can compress the body's chest cavity and inhibit breathing.

252. Ambler gasped, "I have congestive heart failure, I have congestive heart failure."

253. Defendants Johnson, Camden, and Nissen did not relent, and continued to force Ambler into the ground. One of the officers held his TASER into Ambler's neck.

254. Ambler gasped, "I can't breathe."

255. The Defendant officers yelled orders at Ambler.

256. Ambler explained he was trying to comply with their orders: "I'm about to get on my knees, sir."

257. Defendant Officers screamed at Ambler, "give me your hand!"

258. Ambler explained he was trying to comply: "I'm about to give it to you, sir."

259. The Defendant officers ordered Ambler to lay "flat on your stomach, flat on your stomach."

260. Ambler explained he could not lay on his stomach, gasping, "I can't breathe."

261. Ignoring Ambler's pleas, the Defendant officers again ordered him to lay "Flat on your stomach!"

262. Ambler again gasped, "I can't breathe!"

263. Defendant Officers again commanded, "Flat on your stomach!"

264.    Ambler whimpered in distress.

265.    In response, the Defendant officers yell, "Stop resisting!"

266.    Ambler responded, "I can't breathe."

267.    One of the Defendant officers told Ambler, "you need to comply."

268.    Ambler desperately explained, "I'm not resisting."

269.    At this point, Defendant Nissen is holding Ambler's right arm, and pulling it behind his back.

270.    Ambler again cries out, "I can't breathe!"

271.    Nissen helps the other Defendant officers force Ambler's right arm behind his back.

272.    Ambler continues gasping for breath.

273.    Ambler gasps, "please!" while attempting to hold his chest off the ground with his left arm, so that he can keep breathing.

274.    Defendant Nissen then helps wrench Ambler's left arm behind his back.

275.    Ambler cries again.

276.    Ambler gasps, "save me!" and tries to get off his stomach so he can breathe.

277.    Defendant Officers yell at Ambler to "roll over!" and "stay on your stomach!"

278.    Ambler whimpers and cries.

279.    Defendant Officers respond by screaming, "Do it now!" and order Ambler to "Stay on your stomach!"

280.    Defendant Officers then use the TASER again, shocking Ambler, while again commanding him to "roll over" onto his stomach.

281.    While pulling back his arms, Defendant Deputy Camden chuckles, "I'm pretty sure I broke his finger."

282.    One of the Defendant officers then puts his knee into Ambler's back to hold him down, face first, into the pavement.

283. At this point, Ambler's body is completely limp.

284. Nonetheless, Defendants Johnson, Camden, and Nissen then handcuffed Ambler behind his back, and leave him laying face down on the pavement.

285. Defendants Johnson, Camden, and Nissen used standard handcuffs to restrain Ambler.

286. An obese person the size of Ambler requires the accommodation of "big boy" handcuffs, or "double" handcuffs. These special handcuffs have a longer chain. Without this accommodation, handcuffing an obese person behind their back also compresses their chest cavity, restricting their ability to breathe.

287. Indeed, between forcing his obese body into the ground, and handcuffing him with standard handcuffs behind his back, Defendants Johnson, Camden, and Nissen prevented Ambler from breathing.

288. Ambler stopped breathing.

289. For several minutes after Ambler stopped breathing, Defendants Johnson, Camden, and Nissen failed to summon aid or initiate CPR.

290. Approximately ten minutes after the chase concluded, EMS arrived.

291. Live PD continued filming until EMS took Ambler away.

292. Ambler was taken to a local hospital.

293. Shortly thereafter, Ambler was pronounced dead.

294. An autopsy concluded that Ambler died of congestive heart failure and cardiovascular disease "in combination with forcible restraint."

295. The medical examiner classified his death as a homicide.

296. Ambler never attempted to harm any of the officers involved.

297. Ambler never verbally threatened any of the officers involved.

298. Ambler was unarmed.

299.    Ambler never attempted to gain control of any of the officers' weapons.

300.    Defendants Johnson, Camden, and Nissen ignored Ambler's pleas for help, and killed him anyway.

301.    Kate Mika, Colin Mika, Moriarty and Tarzan ignored Ambler's pleas for help and continued to film and produce as Ambler was killed, continuing to encourage officers to continue to use force despite the fact that Ambler posed no threat.

302.    The Big Fish camera crews, including Kate Mika, Colin Mika, Moriarty, and Tarzan recorded high-quality video, suitable for television broadcast, that is much higher-quality than the videos recorded by police dash cameras or body cameras. Likewise, Kate Mika, Colin Mika, Moriarty and Tarzan were able to move around the scene in order to capture the best possible view of events, rather than the fixed-point view of a dash camera or the often-obstructed view of a body camera. Thus, the Big Fish/Live PD recordings on Ambler's death were by far the best evidence of all the officers' actions.

303.    When Johnson and Camden's supervisors arrived on the scene, Johnson explained that he continued to used force against Ambler because even though "he was saying 'I can't breathe,' he's still talking."

304.    Defendants Johnson, Camden, and Nissen never attempted to de-escalate the situation, even when Ambler was offering to comply.

305.    De-escalation makes for bad television.

306.    Live PD camera operators and producers, including Kate Mika, Colin Mika, Moriarty and Tarzan, filmed Ambler's last moments alive, intending to broadcast it as entertainment, as Defendant Sheriff Chody wanted, and as they would continue to do for months after Ambler's death.

307.    When Ambler died, however, the video recordings of Ambler's death disappeared.

308.   Defendant Sheriff Chody and Defendant General Counsel Nassour have been indicted by a Williamson County grand jury for destroying evidence related to the Ambler case. Upon information and belief, this evidence includes the video recordings made by Live PD, including Kate Mika, Colin Mika, Moriarty and Tarzan.

309.   Upon information and belief, Defendants Sheriff Chody, Nassour and Big Fish agreed to destroy the video recordings, despite knowing that the video recordings were the best evidence of how Ambler died.

310.   Upon information and belief, the video recordings were in the possession of Defendant Big Fish, and Big Fish employees actually destroyed the recordings, after Big Fish and Sheriff Chody and Nassour agreed to destroy them.

311.   Three months after Ambler's death, Defendant Chody went on a podcast to praise Defendant Johnson, saying, "You're doing an extremely good job and representing Williamson County very well. I just wanted to say … how proud of I am not only of [Johnson], but of all the troops that are on Live PD."

312.   Defendant Johnson was subsequently promoted to sergeant by Sheriff Chody.

## H.  Local Leaders Agree that Ambler's Death is Appalling

313.   Following Ambler's death, multiple local leaders have condemned Defendant Chody.

314.   Williamson County Commissioner Terry Cook said, regarding Defendant Sheriff Chody, that "The last three-and-a-half years of him at the helm are unacceptable. I have no confidence that he has the temperament, operational intelligence, administrative ability, nor the people skills to handle the job [of Sheriff]."

315.   Commissioner Cook continued: "The continued killing of Black citizens in our country under the hands of law enforcement has reached epidemic proportions, and it is horrific. Like the pandemic we've been facing, it has come to roost in Williamson County."

316. Williamson County Commissioner Cynthia Long said, "Sheriff Chody must resign. He lacks the moral authority to be a cop."

317. Williamson County Commissioner Russ Boles has also called on Defendant Sheriff Chody to resign.

318. State Representative James Talarico, who represents part of Defendant Williamson County, said, "his name was Javier Ambler, and he deserves justice. I call on Sheriff Chody to resign."

319. At no time prior, have the County Commissioners Court moved to remove Defendant Sheriff Chody from office for incompetency or official misconduct by petitioning the Williamson County District Court despite knowledge of his ongoing policy of violating the Constitutional Rights of Williamson County residents.

320. Defendant Sheriff Chody was removed from office by the voters of Williamson County, not the Williamson County Commissioners Court, when he was defeated in his reelection bid in November 2020.

## IV.
## CAUSES OF ACTION

### A. EXCESSIVE FORCE § 1983 CLAIMS AGAINST DEFENDANTS JOHNSON, CAMDEN, NISSEN AND CHODY

321. Plaintiffs incorporate by reference all of the foregoing and further allege as follows:

322. Deputies Johnson and Camden, and Officer Nissen, who were all acting under color of law, shocked Ambler with their TASERs, forced his body into the ground, restrained his arms behind his back, all while hearing Ambler beg for his life – "I can't breathe" – when Ambler was obviously no danger to anyone. Johnson, Camden, and Nissen then restrained Ambler on the ground, laying face first, as he stopped breathing, though Ambler had done nothing remotely threatening. Johnson, Camden, and Nissen never first attempted to de-escalate the situation or use non-violent means to take Ambler into custody after he compliantly exited his

car and surrendered, and obviously posed no danger to any person.

323. As a consequence, Deputies Johnson and Camden, as well as Officer Nissen's use of force against Ambler was clearly excessive to the need, objectively unreasonable in light of established law, and directly caused Ambler injury. Therefore, Officers Johnson, Camden, and Nissen's actions violated Ambler's right to be free from excessive force/unreasonable seizure.

324. Moreover, Johnson, Camden, and Nissen each knew that a fellow officer was violating Ambler's rights by using excessive force, had a reasonable opportunity to protect Ambler from harm, and nonetheless, chose not to act. Thus, Johnson, Camden, and Nissen are also each liable to the Plaintiffs as bystanders.

325. Sheriff Chody, likewise, knew that his officers used excessive force, and engaged in other dangerous police activities, like hazardous chases and excessive force, for the benefit of Live PD.

326. Chody encouraged and ratified the dangerous choices made by his officers, including their dangerous chases and use of excessive force.

327. Chody hired officers known to have dangerous tendencies but whom he believed were telegenic, knowing that they were likely to violate the rights of citizens, but was deliberately indifferent to the risk that these officers would violate the rights of citizens like Ambler.

328. Thus, Chody failed to supervise his officers to prevent them from using excessive force and engaging in dangerous chases. Chody was aware his officers were engaging in conduct very likely to violate the civil rights of citizens, but was deliberately indifferent to that risk, and refused to force his officers to comply with the Constitution because that would make less-entertaining television for Live PD.

329. As a direct and proximate result of Defendants' actions, Ambler died.

### B. § 1983 DELIBERATE INDIFFERENCE TO A SERIOUS MEDICAL NEED AGAINST DEFENDANTS CAMDEN, JOHNSON, AND NISSEN

330. Plaintiffs incorporate by reference all of the foregoing and further allege as follows:

331. Johnson, Camden, and Nissen were deliberately indifferent to Ambler's serious medical needs. Johnson, Camden, and Nissen each subjectively knew that Ambler was suffering a serious medical need – because he told them "I can't breathe" and "I have congestive heart failure." Johnson, Camden, and Nissen each actually drew the conclusion that Ambler was subjectively suffering a serious medical need.

332. Despite knowing that Ambler was suffering from a serious medical need, Johnson, Camden, and Nissen disregarded that risk by failing to take reasonable measures to abate it. Instead, they failed to stop using force, then delayed calling for medical assistance.

333. Johnson, Camden, and Nissen refused to treat Ambler's serious medical need, ignored his complaints, and their conduct clearly evinced a wanton disregard for Ambler's serious medical needs.

334. As a direct and proximate result of Defendants' actions, Ambler died.

### C. § 1983 *MONELL* CLAIM AGAINST WILLIAMSON COUNTY.

335. Plaintiffs incorporate by reference all of the foregoing and further allege as follows:

336. The conduct by the officers identified in this Count and described herein constituted excessive and deadly force in violation of the United States Constitution, as incorporated through the Fourteenth Amendment.

337. The conduct by Nassour and Chody identified in this Count and described herein constituted violations of Plaintiffs' rights to access the courts.
At all material times, the Defendant Deputies acted under color of state law, as agents of Williamson County.

338. At all material times, Chody and Nassour were acting under color of state law, as agents of

Williamson County.

339. At all material times, the Defendant Officers wore their official department uniforms and were acting within the course and scope of their duties as Williamson County deputies at the time they retrained Ambler.

340. Defendant's policymaker for all matters related to the activities of the Sheriff's Department was Defendant Sheriff Chody.

341. Thus, Williamson County had or ratified the following policies and/or practices in place when Defendant Deputies Johnson and Camden killed Ambler:

- Engaging in reckless police chases, even when the suspect has only allegedly committed a trivial offense;
- Encouraging officers to perform their jobs recklessly to produce more "entertaining" video for Live PD, including encouraging officers to unnecessarily use force and excessive force;
- Using excessive force against suspects;
- Encouraging excessive force by awarding deputies gift cards and the title "WilCo Badass" for using force;
- Using excessive force against suspects to produce more "entertaining" video for Live PD;
- Requiring all suspects to lie on their stomach for restraint;
- Training officers that when a detainee says "I can't breathe" that deputies can continue to use force because the detainee is talking;
- Inadequate training and policies concerning de-escalation of force;
- Inadequate training and policies concerning police pursuits;
- Inadequate training and policies concerning handcuffing, TASERs, prone restraint and positional asphyxia;
- Hiring officers who were unqualified or known to be inappropriate for law enforcement;
- Failing to terminate officers despite knowledge of repeated unconstitutional, unlawful or improper conduct; and,
- Encouraging escalation rather than de-escalation.

342. Williamson County also had a practice of destroying and/or intentionally failing to retain evidence necessary for litigants to fully access the Courts that was created by Big Fish during the filming of Live PD. This policy deprived Plaintiffs of their right to access the Courts.

343. Williamson County supervisors, including Defendant Sheriff Chody, reviewed Defendant Johnson and Camden's conduct with regard to Ambler, found no problems, and took no action. Williamson County approved their conduct and the basis for it. Indeed, Johnson and

Camden continued using similarly violent tactics against other suspects months later for the benefit of Live PD.

344.     Likewise, Sheriff Chody affirmatively participated in destroying (or alternative, failing to preserve) evidence necessary for litigants to access the courts. Chody further reviewed Nassour's conduct with regard to the destroyed evidence, found no problems, and took no action. Thus, Williamson County approved Chody and Nassour's conduct and the basis for it. Indeed, for months afterward, until the cancellation of Live PD, Chody, Nassour, and Williamson County routinely failed to preserve evidence created by Big Fish, failed to provide it to litigants (including even the Williamson County District Attorney's Office), and otherwise violated suspects' rights to access the courts.

345.     Likewise, Sheriff Chody affirmatively directed his subordinates, including Camden and Johnson, to use excessive force, to engage in dangerous police chases, and to generally perform their duties recklessly, and otherwise engage in the other policies delineated above. Chody's direct participation in these actions created the official policies of Williamson County.

346.     Defendant Johnson and Camden, Defendant Chody's subordinates, violated Ambler's constitutional rights, when Defendant Chody failed to supervise them by encouraging them to engaging in reckless police chases, encouraged using excessive force, hired them when they were unfit to serve as armed police officers, and the other above delineated policies, all of which caused the violation of Ambler's constitutional rights. Defendant Chody was deliberately indifferent to the known and obvious consequences of these policies, practices, and customs which he was aware of, authorized, and encouraged, rather than acting to correct them. Defendant Chody was actually aware of facts from which any reasonable policymaker could draw the inference that a substantial risk of serious harm and violations of

constitutional rights existed, and actually drew that inference. Defendant Chody was aware of the pattern of similar incidents that occurred before and after Ambler's death, although it was also apparent and obvious that a constitutional violation was a highly predictable consequence of the County's above delineated policies.

347.   Likewise, Defendant Chody knew or should have known that training his officers to: 1) use excessive force (and otherwise provide more entertaining television for Live PD), 2) require all suspects to lay on their stomach for restraint, and 3) tell subordinates that if a suspect is able to say "I can't breathe" that they are fine because they are talking, were all particular omissions in the County's training program that would cause County employees to violate the constitutional rights of members of the public they encountered, like Ambler. Nevertheless, though Defendant Chody knew of these obvious deficiencies, he chose to retain this dangerously flawed training program.

348.   Rather, the Defendant Williamson County Sheriff's Department hierarchy and Defendant Sheriff Chody ratified Defendant Deputies Johnson and Camden's conduct, as well as Nassour's, and continue to approve and condone Deputies Johnson and Camden's conduct as well as Nassour's conduct.

349.   Likewise, even after Ambler's death, Defendant Sheriff Chody continued to create "entertainment" with Live PD through the above destructive policies, even defying the Williamson County Commissioners Court to do so.

350.   In any event, each of the policies delineated above was actually known, constructively known and/or ratified by Williamson County and its policymakers, including Defendant Chody, and was promulgated with deliberate indifference to Ambler's rights under the United States Constitution. Moreover, the known and obvious consequence of these policies was that Williamson County Sheriff's Department deputies and other officials would be placed

in recurring situations in which the constitutional violations described within this complaint would result. Accordingly, these policies also made it highly predictable that the particular violations alleged here, all of which were under color of law, would result.

351.    Consequently, the policies delineated above were a moving force of Ambler's constitutional deprivations and injuries, and caused him to suffer severe damages and die.

### D. § 1983 *MONELL* CLAIM AGAINST THE CITY OF AUSTIN UNDER FEDERAL LAW

352.    Plaintiffs incorporate by reference all of the foregoing and further allege as follows:

353.    The City of Austin, had the following policies and/or practices in place when Officer Nissen killed Ambler:

- Using excessive force;
- Using excessive force against people of color, particularly against Black suspects;
- Failing to discipline officers who used excessive force in the past;
- Failing to supervise officers known to have used excessive force in the past;
- Inadequate training and policies concerning de-escalation of force; and,
- Encouraging escalation rather than de-escalation.

354.    Upon information and belief, APD supervisors reviewed Nissen's conduct, found no problems, and took no action.

355.    Rather, the City of Austin Police Department hierarchy and Chief Manley ratified Officer Nissen's excessive force and the basis for it, and continue to approve and condone Officer Nissen's use of excessive force. Just like they did after Nissen used excessive force against Pinney.

356.    Nissen, Manley's subordinate, violated Ambler's constitutional rights, when Manley failed to supervise him by using excessive force (including against people of color) and failing to discipline Nissen for using excessive force in the past, all of which caused the violation of Ambler's constitutional rights. Manley was deliberately indifferent to the known and obvious consequences of these policies, practices, and customs which he was aware of, authorized, and

encouraged, rather than acting to correct them. Manley was actually aware of facts from which any reasonable policymaker could draw the inference that a substantial risk of serious harm and violations of constitutional rights existed, and actually drew that inference. Manley was aware of the pattern of similar incidents that occurred before and after Ambler's death, although it was also apparent and obvious that a constitutional violation was a highly predictable consequence of the City's above delineated policies.

357.    Likewise, Manely knew or should have known that training his officers to: 1) not use de-escalation tactics instead of force, 2) require all suspects to lay on their stomach for restraint (or fail to train that placing some suspects with disabilities on their stomachs can be dangerous), 3) that they had an affirmative duty to intervene to stop others from using excessive force, and 4) tell subordinates that if a suspect is able to say "I can't breathe" that they are fine because they are stalking, were all particular omissions in the City's training program that would cause City employees to violate the constitutional rights of members of the public they encountered, like Ambler. Nevertheless, though Manley knew of these obvious deficiencies, he chose to retain this dangerously flawed training program.

358.    Indeed, the City approves numerous similar excessive uses of force by APD officers each year.

359.    Particularly, the City knows that officers use excessive force disproportionately against people of color, like Ambler, every year, but approves and condones these illegal uses of excessive force.

360.    In any event, each of the policies delineated above was actually known, constructively known and/or ratified by the City of Austin and its policymakers and was promulgated with deliberate indifference to Ambler's rights under the United States Constitution. Moreover, the known and obvious consequence of these policies was that City of Austin police officers would be placed in recurring situations in which the constitutional violations described within this

complaint would result.  Accordingly, these policies also made it highly predictable that the particular violations alleged here, all of which were under color of law, would result.

361.   Consequently, the policies delineated above were a moving force of Ambler's constitutional deprivations and injuries, and caused him to suffer severe damages.

### E.   AMERICANS WITH DISABILITIES ACT CLAIM AGAINST DEFENDANTS WILLIAMSON COUNTY AND CITY OF AUSTIN

362.   Plaintiffs incorporate by reference all of the foregoing and further allege as follows:

363.   Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132.

364.   Title II of the ADA requires public entities, like the City of Austin and Williamson County, to reasonably accommodate people with disabilities in all programs and services for which people with disabilities are otherwise qualified.

365.   Policing is a program and service provided by Williamson County and the City of Austin for ADA purposes. Here, Defendants Johnson and Camden, and Austin PD Officer Nissen were providing the service of taking Ambler into custody safely.

366.   Ambler is a qualified individual with a disability within the meaning of the ADA in that he had physical impairments that substantially limited one or more major life activities – here, the operation of his circulatory system due to his chronic congestive heart failure and obesity, and his mobility, due to his obesity.

367.   Defendants Johnson, Camden, and Nissen violated Title II of the ADA by intentionally failing to provide Ambler the reasonable accommodations that were needed and available to allow Ambler to receive the benefits of Williamson County's programs and services. The City and County's officers should have accommodated Ambler by:

- Refraining from using violence against Ambler as he had surrendered after he identified his disabilities;
- Using "big boy" or "double" handcuffs to restrain Ambler;
- Not forcing Ambler to lay on his stomach;
- Ignoring Ambler when he said "I can't breathe;" and,
- Using de-escalation tactics when Ambler's physical disabilities left him unable to comply with their commands.

368. Failure to provide these reasonable accommodations was intentional and illegal discrimination under the ADA, entitling Plaintiffs to compensatory relief.

### F.   DENIAL OF ACCESS TO COURTS AGAINST DEFENDANTS CHODY, WILLIAMSON COUNTY, AND NASSOUR

369. Plaintiffs incorporate by reference all of the foregoing and further allege as follows:

370. By intentionally destroying and intentionally failing to preserve the video recordings of Ambler's death they had access to, Defendants Chody, Nassour, and Williamson County conspired to, and in fact did, deny Plaintiffs the opportunity to present to the judiciary allegations and evidence concerning violations of Ambler's fundamental constitutional rights.

371. By intentionally destroying and intentionally failing to preserve the video recordings of Ambler's death (or by directing or allowing the destruction), Defendants Chody, Nassour, and Williamson County deprived Plaintiffs of an adequate, effective, and meaningful opportunity to present all the available evidence regarding their claims.

372. Plaintiffs ability to bring their claims has been prejudiced by Defendants Chody, Nassour, and Williamson County's intentional destruction of the evidence (or directing or allowing the evidence to be destroyed). Depriving the Plaintiffs of this evidence deprived them of the ability to present their best possible case to the Court, and deprives the Court of relevant evidence.

373. Defendants Chody, Nassour, and Williamson County were deliberately indifferent to the right of litigants to all relevant evidence necessary for litigants to access the courts.

Defendants Chody, Nassour, and Williamson County knew that relevant evidence existed – both in this matter and numerous other criminal prosecutions as potential *Brady* material – but did nothing to preserve this evidence though they were legally obligated to and had the ability to ensure it was preserved.

374. Defendants Chody, Nassour, and Williamson County spoliated evidence they had a duty to preserve, they intentionally breached that duty by either destroying the evidence or making it unavailable, and that breach has prejudiced the Plaintiffs.

375. No compelling state interest justified depriving Plaintiffs of this evidence.

376. Chody, Nassour, and Williamson County's actions directly and proximately caused violations of Plaintiffs' rights.

377. This claim is brought pursuant to 42 U.S.C. § 1983.

## V.
## DAMAGES

378. Javier Ambler, II's life mattered.

379. Plaintiffs incorporate by reference all of the foregoing and further allege as follows:

380. The actions and omissions of Defendants, their agents, employees, and/or representatives caused and/or were the moving force of the injuries and damages to the Plaintiffs and were the moving force causing Javier Ambler, II's wrongful death. Plaintiffs thus assert claims for compensatory damages under the ADA, Rehabilitation Act, and § 1983 against Defendants.

381. Plaintiff Javier Ambler, Sr., in his capacity as the agreed representative of the Estate of Javier Ambler, II, asserts a survival claim on behalf of the estate. The Estate has incurred damages including, but not limited to, the following:

   a.  Conscious pain and mental anguish; and,

   b. Funeral and burial expenses.

382.   Plaintiffs, in their capacities as wrongful death beneficiaries, assert claims on their own behalves, for the minor children (and for any other unknown wrongful death beneficiaries). Plaintiffs and all other wrongful death beneficiaries have incurred damages including, but not limited to, the following:

  a. Past and future mental anguish;

  b. Past and future loss of companionship and society;

  c. Past and future medical expenses; and,

  d. Past and future pecuniary loss, including loss of care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value.

383.   Plaintiffs, for themselves and all wrongful death beneficiaries, and the Estate, are also entitled to recover attorneys' fees and expenses (including expert expenses) pursuant to the ADA and Rehabilitation Act (42 U.S.C. § 12205 and 29 U.S.C. § 794a), 42 U.S.C. § 1988, and as otherwise allowed by law.

384.   Plaintiffs are further entitled to punitive damages against Defendants Chody, Johnson, Camden, Nassour, and Nissen. Chody, Johnson, Camden, Nissen, and Nassour's conduct involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and Chody, Johnson, Camden, Nissen, and Nassour were actually, subjectively aware of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, and welfare of others.

**VI.**
**JURY DEMAND**

385.   Pursuant Federal Rule of Civil Procedure 48, Plaintiffs hereby request a jury trial.

**VII.**
**PRAYER FOR RELIEF**

386.   Accordingly, Plaintiffs asks that judgment be awarded against Defendants for

1)   compensatory damages;

2)   attorneys' fees, including reasonable and necessary expenses including expert fees, pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 12205;

3)   punitive damages against Defendants Chody, Johnson, Camden, Nassour, and Nissen. Chody, Johnson, Camden, Nissen, and Nassour

4)   costs of court;

5)   judgment at the highest rate allowable under the law; and

6)   all other relief to which Plaintiffs are justly entitled.

Respectfully submitted,

**EDWARDS LAW**
1101 East 11th Street
Tel.  512-623-7727
Fax.  512-623-7729

By_____/s/ Jeff Edwards_____
        JEFF EDWARDS
        State Bar No. 24014406
        jeff@edwards-law.com
        SCOTT MEDLOCK
        State Bar No. 24044783
        scott@edwards-law.com
        DAVID JAMES
        State  Bar  No.  24092572
        david@edwards-law.com

**ATTORNEYS   FOR   PLAINTIFFS   JAVIER
AMBLER,   SR.,   MARITZA   AMBLER,   AND
J.R.A.**

By /s/ Antonio M. Romanucci
 Antonio M. Romanucci *(pro hac)*

(IL No. 6190290)
Bhavani Raveendran *(pro hac)*
(IL No. 6309968)
Ian P. Fallon *(pro hac)*
(IL No. 6332303)
**ROMANUCCI & BLANDIN, LLC**
321 N. Clark Street, Suite 900
Chicago, Illinois 60654
Tel:         (312) 458-1000
Fax:        (312) 458-1004
aromanucci@rblaw.net
braveendran@rblaw.net
ifallon@rblaw.net

Ben Crump *(pro hac pending)* (Washington,
D.C. Bar No. 1552623) Ben Crump Law
717 D Street N.W., Suite 310
Washington, D.C. 20004
Phone: 800-859-9999
Fax: 800-770-3444
ben@bencrump.com

**ATTORNEYS FOR PLAINTIFF MICHELE
BEITIA, FOR J.A.A.**