# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | | |
|---|---|---|
| JAVIER AMBLER, SR. and<br>MARITZA AMBLER, individually,<br>on behalf of all wrongful death<br>beneficiaries of JAVIER AMBLER,<br>II, on behalf of the estate of JAVIER<br>AMBLER, II, and as next friends of<br>J.R.A. a minor child; and<br>MICHELLE BEITIA, as next friend<br>of J.A.A. a minor child,<br>*Plaintiffs*<br><br>v.<br><br>MICHAEL NISSEN and<br>CITY OF AUSTIN,<br>*Defendants* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 1:20-cv-1068-DII-SH |

## ORDER AND REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

**TO: THE HONORABLE DISTRICT COURT**

Before the Court are Defendant City of Austin's Motion for Summary Judgment (Dkt. 165) and Defendant Michael Nissen's Motion for Summary Judgment (Dkt. 167), both filed February 28, 2023, and the associated response, reply, and sur-reply briefs. The District Court referred all pending and future nondispositive and dispositive motions in this case to this Magistrate Judge for resolution or Report and Recommendation, respectively, pursuant to 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72, and Rule 1 of Appendix C to the Local Rules of the United States District Court for the Western District of Texas. Dkt. 144.

The family of decedent Javier Ambler II brings this suit on behalf of Ambler and his heirs ("Plaintiffs") against Austin Police Officer Michael Nissen and the City of Austin under the Civil Rights Act, 42 U.S.C. § 1983, and Title II of the Americans with Disabilities Act ("ADA").

## I.   Background

Shortly before 1:30 a.m. on March 28, 2019, Williamson County Sherriff's Deputy James Johnson initiated a traffic stop of Ambler's car for failing to dim the lights. Dkt. 185-2 at 3. Ambler, a 40-year-old Black man, did not pull over, and Johnson began pursuing him. Dkts. 174-8 at 6, 185-2 at 3. Williamson County Sherriff's Deputy Zachary Camden joined the chase, which lasted more than 20 minutes along an interstate highway and residential streets, at speeds exceeding 100 miles per hour. Dkt. 167-1 at 48. The chase ended when Ambler crashed into roadside trees within the Austin city limits. Dkt. 167-11.

Video evidence shows that Johnson approached Ambler's car with what appears to be his gun drawn. *Id.*at 22:35-40. As Ambler opens the door to get out of his car, Johnson orders him to "get on the ground." *Id.* Johnson appears to holster his gun and draw his Taser, which he discharges at Ambler. *Id.* at 22:40-50. Ambler falls to the ground, and Johnson and Camden try to handcuff him as Austin Police Officer Michael Nissen arrives. *Id.* at 22:50-23:11.

Video from Nissen's body-worn camera shows him approach Ambler's vehicle with his gun drawn. Dkt. 167-12 at 4:10-20. Nissen calls out to the Williamson County deputies that the car "looks clear" and then approaches the deputies, who are standing over Ambler. *Id.* at 4:20-28. One of the deputies holds a Taser to Ambler's neck and says: "Give me your hand or I'm going to Tase you again." *Id.* at 4:25-30. Ambler can be heard saying softly that he has congestive failure. *Id.* at 4:25-33. An officer then yells: "Other hand. Give me your hand." *Id.* at 4:33-40. As an officer instructs Ambler to lie "flat on your stomach," Ambler can be heard saying "I can't breathe" twice. *Id.* at 4:40-49. The officers repeatedly tell Ambler to stop resisting, to which Ambler responds: "I am not resisting." *Id.* at 4:50-5:00.

Nissen applies force to Ambler's arms and the back of his head, pushing his head onto the pavement. *Id.* at 5:00-6:10. The parties dispute how much pressure he used, which cannot be

determined from the video. During that time, one of the Williamson County Deputies says: "I think I just broke his finger." *Id.* at 5:30-38. An officer then says: "I am going to put my knee on this one to control him. Let me know when you're ready." *Id.* at 5:40-49. The officers then handcuff Ambler, who does not appear to be moving. *Id.* at 6:00-08. Less than thirty seconds later, the officers raise Ambler to a seated position and check for a pulse, which they cannot find. *Id.* at 6:31-8:20. Ambler was taken to a hospital where he was pronounced dead, and the medical examiner's report states that his manner of death was homicide. Dkt. 174-8 at 3-4.

Plaintiffs sued Williamson County, former Williamson County Sheriff Robert Chody, former Williamson County Sheriff's Deputies Johnson and Camden, Williamson County General Counsel Jason Nassour, Nissen, and the City. Dkt 1. The District Court granted Plaintiffs' motion to dismiss Williamson County, Johnson, Camden, and Nassour. Dkt. 107.

In their First Amended Complaint, Plaintiffs allege that Nissen was deliberately indifferent to Ambler's serious medical needs and violated his Fourth Amendment rights by using excessive force against him and failing to intervene. Dkt. 44. Plaintiffs also allege that the City failed to provide Ambler reasonable accommodations, in violation of Title II of the ADA, and is liable for Nissen's Fourth Amendment violation under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). Defendants move for summary judgment under Rule 56.

## II. Legal Standards

Summary judgment will be rendered when the pleadings, the discovery and disclosure materials, and any affidavits on file show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute over a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. A court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *see also Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that no evidence supports the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence and thus cannot defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation also are not competent summary judgment evidence. *Id.* The party opposing summary judgment must identify specific evidence in the record and articulate the precise manner in which that evidence supports its claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

The qualified immunity defense changes the usual summary judgment burden of proof. *Baker v. Coburn*, 68 F.4th 240, 244 (5th Cir. 2023). "Once an official pleads the [qualified immunity] defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Id.* (citation omitted). Courts also assign greater weight to the video recordings

taken at the scene. *Id.* (quoting *Betts v. Brennan*, 22 F.4th 577, 582 (5th Cir. 2022)). But a court "should not discount the nonmoving party's story unless the video evidence provides so much clarity that a reasonable jury could not believe his account." *Id.* at 250 n.9 (quoting *Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir. 2018)).

### III. Nissen's Motion for Summary Judgment

Nissen moves for summary judgment on Plaintiffs' claims for excessive force, failure to intervene, and deliberate indifference to a serious medical need. Plaintiffs do not respond to Nissen's arguments on their claim for deliberate indifference to a serious medical need. When a party fails to pursue a claim or defense beyond its initial pleading, the claim is deemed abandoned or waived. *Arias v. Wells Fargo Bank, N.A.*, 2019 WL 2770160, at *2 (N.D. Tex. July 2, 2019) ("When a plaintiff fails to defend a claim in response to a motion to dismiss or summary judgment motion, the claim is deemed abandoned."); *see also Black v. North Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) (holding that plaintiff abandoned claim when she failed to defend it in response to motion to dismiss). The Court recommends that Plaintiffs' deliberate indifference claim should be dismissed.

Nissen argues that Plaintiffs did not plead a claim for failure to intervene in their First Amended Complaint and therefore cannot raise the claim on summary judgment. The Court rejects this argument because the First Amended Complaint provides notice of the claim. Dkt. 44 ¶ 324 (stating that Nissen is liable as a bystander).

### A. Video Evidence

The police chase was recorded by the dashboard camera on Johnson's vehicle, but the recording does not include Johnson's attempted traffic stop. Dkt. 167-11. Ambler's arrest also was recorded by two cameras. The dashboard camera on Johnson's vehicle captured the entire interaction but, because of the distance and angle of the camera, most of the events are difficult to

see. *Id.* The video from Nissen's body-worn camera captures the arrest after Nissen arrives at the scene. Dkt. 167-12. While this recording has clearer audio and video than the dashboard camera, the view from the camera is limited. *Id.*

## B. Qualified Immunity

Qualified immunity extends to government officials performing discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). An official who violates a federal right is entitled to qualified immunity if his or her actions were objectively reasonable. *Spann v. Rainey*, 987 F.2d 1110, 1114 (5th Cir. 1993).

To determine whether a government official is entitled to qualified immunity, a court must decide both (1) whether a plaintiff has alleged facts sufficient to establish a constitutional violation and (2) whether the right at issue was clearly established at the time of defendant's alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). A court has discretion to determine the order in which it considers those questions. *Id.* at 236. The Court first considers whether Plaintiffs have adequately alleged a constitutional violation.

## C. Nissen's Use of Force

Nissen argues that he is entitled to qualified immunity because the force he used was reasonable under the factors set forth in *Graham v. Connor*, 490 U.S. 386 (1989), and Plaintiffs have not identified clearly established law placing his use of force beyond debate. Plaintiffs respond that all the *Graham* factors weigh against the reasonableness of the force and that Fifth Circuit precedent clearly establishes that use of force against a person who is not resisting is unreasonable.

To prevail on an excessive force claim, a plaintiff must show (1) injury (2) which resulted directly and only from a use of force that was clearly excessive and (3) the excessiveness of which

was clearly unreasonable. *Hanks v. Rogers*, 853 F.3d 738, 744 (5th Cir. 2017). There is no question that Ambler, who died in the arrest, was injured. The Court thus turns to whether Nissen's use of force was "clearly excessive" or "clearly unreasonable," inquiries that are "often intertwined." *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012).

Excessive force claims are fact-intensive. *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009). The reasonableness of an officer's conduct is judged objectively, without reference to the officer's intent or motivation. *Graham*, 490 U.S. at 397. Courts must look at the facts and circumstances "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. at 396. Courts also must account for the difficult and split-second decisions that police officers must make in carrying out their duties. *Id*. at 396-97. The determination of "the reasonableness of an officer's conduct under the Fourth Amendment is often a question that requires the input of a jury." *Lytle v. Bexar Cnty., Tex.*, 560 F.3d 404, 411 (5th Cir. 2009).

### 1. *Graham* Factors

The right to make an arrest or investigatory stop "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. Determining whether force is "excessive" or "unreasonable" requires considering the totality of the circumstances, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or trying to evade arrest by flight. *Id.*

Nissen argues that the force he used on Ambler was "minimal" or "soft-hand force." Dkt. 192-1 at 3. Plaintiffs respond that Nissen was "pushing Ambler's head and neck down, pulling on Ambler's left arm, placing his left knee on Ambler's shoulder sufficient to cause hemorrhage, and further impairing Ambler's breathing." 185-1 at 20. Although the amount of pressure applied is

unclear in the videos, Plaintiffs offer evidence that the medical examiner found bruising on Ambler's head and upper extremities, as well as "hemorrhages of the neck muscles and a muscle in the upper right side of the back." Dkt. 174-8.

### a. Severity of the Crime

The first *Graham* factor is the severity of the crime at issue. Plaintiffs argue that the severity of the crime weighs against the reasonableness of the force because the original traffic stop was for Ambler's failure to dim his headlights, a violation of the Transportation Code. Plaintiffs also present evidence that Austin Police Department ("APD") officers were instructed not to pursue Ambler because it was against APD policy to engage in a pursuit for this type of offense. Dkt. 185-2 at 3.

The video shows that Ambler evaded police for 22 minutes, driving at high rates of speed on both a highway and residential streets. Dkt. 183-5; *see also* Dkt. 167-13 (APD investigative summary stating that Ambler's vehicle exceeded 100 miles per hour during the chase). Nissen also submits evidence that Ambler had three minor accidents during the chase, hitting a barrier wall and then a road sign before his car crashed into trees on the side of a road, ending the chase. Dkts. 167-9, 167-13.

Evading arrest in a motor vehicle is a felony under Texas law, TEX. PENAL CODE § 38.04, and "leading law enforcement in a high-speed chase through a heavily populated area is a serious crime that puts at risk not only the lives of Plaintiff and the officers but also those of the general public." *Salazar v. Molina*, 37 F.4th 278, 281-82 (5th Cir. 2022). It is undisputed that Nissen knew about the chase when he arrived at the scene. Nissen Tr. at 73:18-74:3, Dkt. 183-2 at 15. The Court finds that this factor weighs in favor of the reasonableness of the force he used.

### b.  Immediate Safety Threat

The second *Graham* factor is whether Ambler posed an immediate threat to the safety of the officers or others. Plaintiffs contend that any threat dissipated when Ambler "exited his vehicle, raised his hands in the air, and surrendered to the deputies' authority." Dkt. 185-1 at 13.Nissen relies on *Salazar*, 37 F.4th at 282, for the proposition that "when a suspect has put officers and bystanders in harm's way to try to evade capture, it is reasonable for officers to question whether the now-cornered suspect's purported surrender is a ploy." In *Salazar*, the plaintiff "led police on a high-speed chase through a residential neighborhood" before exiting his vehicle and lying on the ground. *Id.* When the officer reached the plaintiff, he deployed his Taser twice and then arrested the plaintiff without further incident. *Id.* There was no genuine issue of material fact that the plaintiff posed an immediate threat when the force was used. *Id.* at 282.

An officer must use a "justifiable level of force in light of the continuing threat of harm that a reasonable officer could perceive." *Id.* at 283; *see also Lytle*, 560 F.3d at 413 ("[A]n exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased."). Construing the evidence in Plaintiffs' favor, Nissen knew, before arriving at the scene, that the attempted stop was for a traffic violation and Ambler had no prior criminal history. Dkts. 183-17, 185-2. When Nissen arrived, he scanned Ambler's vehicle for "obvious threats" and did not observe any people or weapons. Nissen Tr. at 226:19-227:16, Dkt. 183-2 at 58. Although Nissen testified that there were "unknowns" because neither Ambler nor the vehicle had been fully searched, there is no suggestion he believed that Ambler had a weapon or was violent.[1] *Id.* at 136:16-138:4, 222:15-22, Dkt. 167-15 at 35-36, 57. When Nissen

---

[1] That a suspect has not been searched, in the absence of other evidence that the suspect might be armed, cannot by itself characterize a suspect as an immediate threat. *Cooper v. Brown*, 844 F.3d 517, 523 n.2 (5th Cir. 2016).

approached Ambler, Ambler was lying on his stomach with two officers standing over him and a Taser pressed into the back of his neck. Dkt. 167-12 at 4:25-30. Nissen testified that he believed a Taser had been used on Ambler once before he arrived, and he heard an officer activate his Taser during the attempt to take Ambler into custody. Dkt. 183-2 at 93:1-25. Nissen also testified that he heard Ambler say he could not breathe. Other officers arrived at the scene while Nissen tried to handcuff Ambler, but Nissen testified that he did not notice them. *Id.* at 204:1-14.

Nissen argues that, after a "dangerous chase," a suspect does not regain their "full" Fourth Amendment protection until they are in handcuffs. Dkt. 192-1 at 10. He offers no support for a bright-line rule requiring that an individual be handcuffed. To the contrary, a suspect can be "subdued," requiring a reduction in use of force, without being in handcuffs if he lacks "any means of evading custody—for example, by being pinned to the ground by multiple police officers." *Austin v. City of Pasadena, Tex.*, --- F. 4th ----, No. 22-20341, 2023 WL 4569562, at *7 (5th Cir. July 18, 2023) (citing *Joseph ex rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 335 (5th Cir. 2020)).

The Court finds that Plaintiffs have raised a genuine issue of material fact as to whether a reasonable officer would believe that Ambler, who was surrounded by multiple officers with a Taser to his neck, was subdued and posed no immediate threat to safety when Nissen began helping handcuff him. *Compare Cooper v. Brown*, 844 F.3d 517, 523 (5th Cir. 2016) (holding that no reasonable officer would believe that suspect, who was suspected of committing serious but nonviolent offense and fled his vehicle on foot, was an immediate threat while lying on his stomach with his hands visible) *with Salazar*, 37 F.4th at 280 (holding that suspect posed threat seconds after exiting his vehicle because he was "unrestrained at night in the open").

### c.  Resisting or Evading Arrest

The final *Graham* factor is whether the suspect is actively resisting arrest or trying to evade arrest by flight. The Court finds that there is a genuine issue of material fact as to whether Ambler

was actively resisting arrest when Nissen used force. In *Darden*, 880 F.3d at 730, the Fifth Circuit found that a jury could conclude that the plaintiff was not resisting arrest even though he "pushed himself up on his hands, and eventually onto his knees, and he seemed to pull his arm away from the officers when they were trying to handcuff him." These "events occurred while other people in the house were loudly and repeatedly yelling that Darden had asthma and was trying to breathe." *Id.* In that case, the officers argued, as Nissen testified in his deposition, that they had no way of knowing whether these statements were true. *Id.*; Nissen Tr. at 113:3-10, Dkt. 167-15 at 30. The court determined that whether reasonable officers in that situation would have "credited the warnings" is a fact question that must be decided by a jury. *Id.*

Nissen testified that he was unaware whether Ambler had been compliant before he arrived but after he arrived it was "clear" that Ambler was not complying with commands, instead "physically resisting [Nissen's] efforts to place his hands behind his back." Nissen Tr. at 132:20-133:1-17, 235:1-11, Dkt. 167-15 at 34-35, 60. Plaintiffs contend that Ambler was not resisting but "instinctively putting one arm on the ground to try to breathe." Dkt. 185-1 at 13.

As in *Darden*, the videos "do not provide the clarity necessary to resolve the factual dispute presented by the parties' conflicting accounts." *Id.*, 880 F.3d at 730; *see also Scott v. White*, No. 1:16-CV-1287-RP, 2019 WL 122055, at *12 (W.D. Tex. Jan. 7, 2019) (holding that third factor weighed in plaintiff's favor because video did not "blatantly contradict" plaintiff's position that his movements "were protective or involuntary responses to [the officer's] uses of force"). Viewing the evidence in the light most favorable to Plaintiffs, the Court finds that there are genuine issues of material fact as to whether Ambler posed a threat at the time the force was used or was actively resisting arrest.

## 2.  Deadly Force

The Court next considers whether a reasonable jury could find that Nissen used deadly force. Plaintiffs argue that a reasonable jury could find that Nissen knew forcing Ambler's face into the pavement and the deputies' simultaneous use of force was deadly because of Ambler's visible morbid obesity, congestive heart failure, and pleas for help. Nissen responds that the video shows the Williamson County deputies were using "intermediate force," Nissen was using "minimal" or "soft-hand" force, and Ambler died because he "was the quintessential 'eggshell' suspect." Dkt. 192-1 at 3.

Claims that law enforcement used deadly force are "treated as a special subset of excessive force claims." *Aguirre v. City of San Antonio*, 995 F.3d 395, 412 (5th Cir. 2021). When an officer uses deadly force, the "objective reasonableness" balancing test is constrained. *Flores v. City of Palacios*, 381 F.3d 391, 399 (5th Cir. 2004). It is objectively unreasonable to use deadly force "unless it is necessary to prevent [a suspect's] escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Tennessee v. Garner*, 471 U.S. 1, 3 (1985). The deadly force inquiry is two-pronged: Whether the force used constituted deadly force, and whether the subject posed a threat of serious harm justifying the use of deadly force. *Timpa v. Dillard*, 20 F.4th 1020, 1032 (5th Cir. 2021), *cert. denied*, 213 L. Ed. 2d 999 (2022).

Whether a use of force is "deadly force" is a question of fact. *Flores*, 381 F.3d at 399. Deadly force is force that "carr[ies] with it a substantial risk of causing death or serious bodily harm." *Gutierrez v. City of San Antonio*, 139 F.3d 441, 446 (5th Cir. 1998). A reasonable jury can find that the restraint used by an officer amounted to deadly force. *See, e.g.*, *Timpa*, 20 F.4th at 1033 (holding that reasonable jury could find "use of a prone restraint with bodyweight force on an individual with three apparent risk factors—obesity, physical exhaustion, and excited delirium"

could constitute deadly force); *Aguirre*, 995 F.3d at 413-14 (same where maximal-restraint position was used on drug-affected individual); *Gutierrez*, 139 F.3d. at 446 (same where "hog-tying" was used on drug-affected individual). In *Aguirre*, 995 F.3d at 413-14, the plaintiffs offered sufficient evidence through expert testimony that the combination of a maximal restraint position, pressure on the back of the neck, and drug use restricted blood oxygen and ultimately resulted in fatal cardiac arrhythmia.

The medical examiner who performed Ambler's autopsy determined that his death was a homicide and found that his cause of death was "congestive heart failure and cardiovascular disease associated with morbid obesity in combination with forcible restraint." Dkt. 183-6 at 3. Plaintiffs' medical expert, Dr. Aran Kadar, opines that Ambler died from "a vicious cycle of respiratory distress from hypertensive crisis and worsening heart failure pushed to physiological extremes by subsequent tasing and forcible restraint." Dkt. 183-10 (Kadar Dec.) at 3. He explains:

- Obesity and congestive heart failure substantially impaired Ambler's ability to "breathe and survive in high intensity situations";
- Lying flat increases the work of breathing, especially among the obese, and can interfere with oxygenation of the blood even without additional pressure in obese patients; and
- The application of pressure to Ambler's neck further restrained his ability to breathe and the pressure on his back would have stopped his chest from expanding.

*Id.* at 2-3. Kadar opines that Ambler's physiological responses were amplified by the officers using Tasers on him. *Id.* at 3. He concludes: "Had the officers stopped or paused their restraint at any of the points in time when Mr. Ambler was communicating his inability to breathe," it was "more likely than not" that Ambler would not have died. *Id.* at 3-4.

Nissen knew that Ambler, who weighed 410 pounds, was obese. Nissen Tr. at 171:21-25, Dkt. 186-2 at 51; Dkt. 183-6 at 6. Ambler can be heard on the video recording from Nissen's body-worn camera saying faintly: "I have congestive heart failure." Dkt. 167-12 at 4:25-33. Although

Nissen testified that he did not hear Ambler say he had congestive heart failure, a reasonable jury could disbelieve his testimony. Nissen Tr. at 284:24-285:18, Dkt. 186-2 at 75-76. Nissen also testified that he was trained in "arresting or detaining people in different positions," one of which was the prone position, and that one of the "obvious pitfalls of that position is, you know, it could be people could be at risk for positional asphyxiation." Nissen Tr. at 61:6-23, Dkt. 183-2 at 10. The City's policies also alerted Nissen to this risk. *See* Dkt. 183-7 at 3 (APD General Orders discussing dangers of positional asphyxia). Based on this evidence, the Court finds that a reasonable jury could conclude that the use of prone restraint on an individual with obesity and congestive heart failure created a substantial risk of death or serious bodily injury.

Officers can use deadly force only if they have "probable cause to believe that the suspect poses a threat of serious physical harm." *Garner*, 471 U.S. at 11. As discussed above, fact issues preclude the Court from determining whether Ambler posed a threat, let alone a threat of serious physical harm. Nissen also concedes that the use of deadly force would not have been justified. Nissen Tr. at 108:1-8, Dkt. 183-2 at 34. The Court finds that genuine issues of material fact exist as to Plaintiffs' deadly force claim.

**D.  Clearly Established**

The doctrine of qualified immunity shields officials from civil liability as long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson*, 555 U.S. at 231 (citation and quotation marks omitted).

> "Clearly established" means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful. In other words, existing law must have placed the constitutionality of the officer's conduct beyond debate. This demanding standard protects all but the plainly incompetent or those who knowingly violate the law.

14

*D.C. v. Wesby*, 138 S. Ct. 577, 589 (2018) (cleaned up). There need not be a "case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (citation omitted). The focus of the inquiry is whether the officer had fair notice that his conduct was unlawful. *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (citation omitted).

The Court finds that *Darden*, issued more than a year before Ambler's death, provided Nissen fair notice that his actions were unreasonable. There, the police executed a no-knock narcotics warrant and the plaintiff was suspected of a serious but nonviolent offense. While arresting the plaintiff, an officer punched, kicked, choked, and "forced Darden—an obese man—onto his stomach, pushed his face into the floor, and pulled Darden's hands behind his back." *Id.*, 880 F.3d at 725. The court held that it was clearly established "the degree of force an officer can reasonably employ is reduced when an arrestee is not actively resisting." *Id.* at 733 (collecting cases). The officer's actions – while the plaintiff was not resisting and "other people in the residence were repeatedly yelling that Darden could not breathe" – were "plainly in conflict" with Fifth Circuit precedent. *Id.*

Nissen used force on Ambler, who repeatedly said he could not breathe, until he went limp. If a jury finds that Ambler was compliant and not resisting arrest, then the continued use of force, particularly after Ambler said he could not breathe, necessarily would be excessive. *See id.*; *see also Timpa*, 20 F.4th at 1038 (determining that law in 2016 clearly established that if plaintiff was "subdued and nonthreatening by nine minutes into the restraint, then the continued use of force for five additional minutes was necessarily excessive"). Because it was clearly established in March 2019 that the continued use of force against a person who is on the ground, not resisting,

and possibly unable to breathe violates the Fourth Amendment, the Court finds that Nissen is not entitled to qualified immunity.

**E. Bystander Liability**

Plaintiffs do not dispute that Nissen cannot be liable for the Williamson County deputies' actions before he arrived on the scene. The parties disagree, however, whether there is sufficient evidence to support the elements of bystander liability for the force Nissen witnessed and whether his failure to act violated clearly established law.

It is established that "an officer may be liable under § 1983 under a theory of bystander liability where the officer (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Whitley v. Hanna*, 726 F.3d 631 (5th Cir. 2013) (cleaned up). To be liable, the officer must have "reasonable opportunity to realize the excessive nature of the force and a realistic opportunity to stop it in order for the duty to intervene to arise." *Malone v. City of Fort Worth, Tex.*, No. 4:09-CV-634-Y, 2014 WL 5781001, at *16 (N.D. Tex. Nov. 6, 2014) (citation omitted). This determination involves consideration of both "the duration of the alleged use of force and the location of the suspect relative to the allegedly bystanding officers." *Id.*

It was clearly established in March 2019 that "an officer could be liable as a bystander in a case involving excessive force if he knew a constitutional violation was taking place and had a reasonable opportunity to prevent the harm." *Hamilton v. Kindred*, 845 F.3d 659, 663 (5th Cir. 2017). Using a Taser on someone who is subdued and does not pose a threat can constitute excessive force. *Ramirez v. Martinez*, 716 F.3d 369, 379 (5th Cir. 2013); *Newman v. Guedry*, 703 F.3d 757, 764 (5th Cir. 2012). Nissen had fair notice that participating in another officers' use of excessive force gives rise to liability. *See, e.g.*, *Carroll v. Ellington*, 800 F.3d 154, 178 (5th Cir. 2015) (affirming denial of summary judgment where it was disputed whether officer was present

for Taser strikes of restrained individual); *Timpa*, 20 F.4th at 1039 (holding that it was clearly established in 2016 that officers who stood "mere feet away" from plaintiff during fourteen-minute restraint were subject to bystander liability).

Nissen states that he was "not present when Officer Johnson initially used his Taser on Ambler, which is believed to be the only traditional Taser deployment that occurred." Dkt. 167 at 6. Nissen testified that although he did not see the initial Taser deployment, "when I was assisting in taking him into custody, I did hear the taser cycle once. I couldn't tell you exactly when throughout the interaction that was, but it was at least once." Nissen Tr. at 93:19-25, Dkt. 183-2 at 24. Nissen also testified that he "could hear that distinctive kind of clicking noise the taser makes when it's cycling." *Id.* at 94:1-4, Dkt. 183-2 at 25.

Nissen submits an expert report from Mark Kroll supporting his contention that the two Williamson County deputies used their Tasers only in "drive stun" mode while he was present. Dkt. 167-14 at 30-32. Kroll opines the use of a Taser in "drive stun" mode "does not penetrate deeply enough to affect any human muscles or organs." *Id.* at 54. But, as stated above, Plaintiffs' expert opines that Ambler died from "a vicious cycle of respiratory distress from hypertensive crisis and worsening heart failure pushed to physiological extremes by subsequent tasing and forcible restraint." Dkt. 183-10 (Kadar Dec.) at 3. There is thus evidence that the Williamson County deputies deployed their Tasers in Nissen's presence and their Taser use may have been a contributing cause of Ambler's death.

The videos show that, after Nissen cleared Ambler's vehicle, he helped with the arrest for about 90 seconds. Dkt. 183-4 at 1:35-3:20. As stated, Plaintiffs offer evidence that Nissen heard Ambler say he had congestive heart failure and repeatedly say he could not breathe. Nissen testified that he was in such close proximity to Ambler he could hear him breathing. Nissen Tr. at 113:25-114:9,

Dkt. 167-15 at 30. Based on his proximity and how long force was used, a reasonable jury could find that Nissen had a reasonable opportunity to intervene. The Court recommends that summary judgment be denied on Plaintiffs' bystander liability claim against Nissen.

### IV. City of Austin's Motion for Summary Judgment

Plaintiffs argue that the City is liable for Nissen's use of excessive force and failure to intervene based on three policies: (1) condoning excessive force; (2) failure to enforce the City's policy of requiring officers to intervene; and (3) failure to train officers in de-escalation. The City argues that Plaintiffs' Section 1983 *Monell* claim fails because Nissen did not commit an underlying constitutional violation as either a participant or a bystander.

As discussed above, a reasonable jury could find that Nissen committed constitutional violations as a participant and a bystander. The Court therefore turns to the remaining arguments against the City's liability.

### A.  Municipal Liability

Municipalities can be sued directly under Section 1983, but they cannot be found liable on a theory of vicarious liability or respondeat superior. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978); *Webb v. Town of Saint Joseph*, 925 F.3d 209, 214 (5th Cir. 2019). "In other words, 'the unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability." *Webb*, 925 F.3d at 214 (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)). A municipality is liable under Section 1983 for its officers and employees' actions when they execute an official policy or custom. *Piotrowski*, 237 F.3d at 579. To establish municipal liability for a policy or practice under Section 1983, a plaintiff must establish (1) an official policy (2) promulgated by the municipal policymaker (3) that was the "moving force" behind the violation of the constitutional right. *Piotrowski*, 237 F.3d at 578.

"Official policy establishes culpability, and can arise in various forms." *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 847 (5th Cir. 2009). Official policy usually exists as written policy statements, ordinances, or regulations, but also may arise in the form of a widespread practice "so common and well-settled as to constitute a custom that fairly represents municipal policy." *Id.* A municipality's decision not to supervise or train its employees about their legal duty to avoid violating citizens' rights also may rise to the level of an official policy for purposes of Section 1983. *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387 (1989). A policy also can be shown in "extreme factual situations" where "the authorized policymakers approve a subordinate's decision and the basis for it," thereby ratifying the subordinate's unconstitutional actions. *Peterson*, 588 F.3d at 848 (citation omitted).

## B. Policy of Excessive Force

Municipal liability claims based on a local government's practices generally require that the plaintiff establish a pattern of conduct because "one act is not itself a custom." *Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002). To prove a pattern or practice, the plaintiff must present evidence of "sufficiently numerous prior incidents of police misconduct." *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989) (citations omitted). When prior incidents are used to prove a pattern, they "must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees." *Webster v. City of Houston*, 735 F.2d 838, 842 (5th Cir. 1984). A pattern also requires "similarity and specificity," such that the pattern "point[s] to the specific violation in question." *Peterson*, 588 F.3d at 851 (citation omitted).

The City submits evidence of its policies and practices regarding use of force at the time of Ambler's death. In his declaration, Police Chief Joseph Chacon states that APD required officers to self-report uses of force and reviewed every report. Dkt. 165-1 (Chacon Dec.) ¶ 10. APD used

a "sliding scale" to determine the extent of review required: lower levels of force were reviewed by supervisors, intermediate by the officer's chain of command and the APD Force Review Board, and more serious uses by the Internal Affairs Division and APD's Special Investigations Unit. *Id.* Incidents involving in-custody deaths were classified as "Level 1," the most serious. *Id.* ¶ 11. Every Level 1 use of force was reviewed by the Chief of Police, who determined whether the officer violated APD policy and, if so, the appropriate discipline. *Id.* ¶ 14. APD also used an algorithm to monitor use of force, which notified an officer's supervisor if the number of force incidents exceeded a threshold. *Id.* ¶ 21.

Plaintiffs offer evidence of 25 incidents of excessive force from 2009 until Ambler's death, as well as evidence of excessive force during the May 2020 protests. Dkt. 188-1 at 7-25. Four of the incidents cited differ markedly from the events surrounding Ambler's death: Three involved individuals holding BB guns, and one involved force used in drawing blood from an individual in a restraint chair in a padded room.[2] The Court finds that these incidents and the May 2020 protests are too dissimilar to the circumstances of Ambler's death to constitute evidence of a pattern.

The Court must determine whether the 21 remaining incidents cited by Plaintiffs, along with statistical and other evidence, constitute a pattern. In *Peterson*, the plaintiff alleged that the City of Fort Worth had an unwritten policy permitting excessive force based on 27 complaints of such force between 2002 and 2005. The incidents cited by the plaintiff included alleged uses of force "that, if true, would be emphatically excessive," almost all of which arose during investigation of "small crimes." *Id.* at 851. Yet the court found that the plaintiffs failed to establish a pattern, given the size of the Fort Worth police department and the absence of contextual information about the number of arrests during that three-year period.

---

[2] The BB gun incidents involved Richard Munroe, Jason Roque, and Jawhari Smith, and the blood draw involved Caroline Callaway. Dkt. 188-1 at 12-13, 16, 19-20.

Plaintiffs offer evidence of fewer incidents of excessive force over a significantly longer time (ten years). APD also is larger than the force in *Peterson*, 588 F.3d at 850-51. Dkt. 188-1 at 64 n.359 (stating that Fort Worth employed 1,500 officers compared to 1,900 in Austin). Plaintiffs do not provide context for their evidence, such as the number of arrests or how it compares to other law enforcement departments of similar size.[3] *See Woods v. Harris Cnty.*, No. 4:18-CV-1152, 2022 WL 18396216, at *15 (S.D. Tex. May 26, 2022) (granting summary judgment for county where plaintiffs did not provide context for "fifteen incidents scattered over an eight-year period").

Plaintiffs' other evidence does not overcome this deficiency. They rely on APD's "Response to Resistance" reports from 2018 through 2020, which they argue show a pattern of APD officers using force to address resistance that was only "passive," "verbal," or "defensive," often in the presence of other officers. Dkt. 188-1 at 62. But this evidence has no information about the nature of the force used or other circumstances. The Court cannot infer from this evidence that any of these incidents involved excessive force or that the events were similar to the facts of this case.

Likewise, Plaintiffs provide insufficient context for evidence of 815 complaints of excessive force against APD between 2004 and 2015. They argue that "the sheer volume of allegations sharply distinguishes *Peterson*, 588 F.3d at 850-51, which pointed to just 27 complaints in a similarly sized department." Dkt. 188-1 at 64 n.359. But the 27 incidents in *Peterson*, 588 F.3d at 850-51, were alleged in detail sufficient for the court to infer that they arguably involved excessive force. The number of complaints alone provides no indication that excessive force was used.

---

[3] The contextualizing evidence Plaintiffs offer is misleading. They assert that "APD kills its inhabitants at the second highest rate, per capita, when compared to the fifteen largest Cities in the U.S." Dkt. 188-1 at 27. The cited evidence states that "APD has the highest per capita rate of fatal police shootings involving persons believed to be experiencing a mental health crisis." Dkt. 186-46 at 8. Because the parties do not contend that Ambler's death involved a mental health crisis, this evidence is not probative of a relevant pattern.

*Cf. Pineda*, 291 F.3d at 329 (considering only complaints for which offense reports were provided out of 500 narcotics complaints).

Plaintiffs further attempt to distinguish *Peterson* by stating that they provide "independent evidence" pointing to the custom alleged. Dkt. 188-1 at 64 n.359. Plaintiffs assert that the Office of Police Monitor ("OPM") concluded that "APD officers too often improperly escalated confrontations, resulting in the unnecessary use of force." *Id.* at 64. The OPM reports are more equivocal than Plaintiffs contend. In the 2005 Report highlighted by Plaintiffs, OPM stated only that: "It may benefit the Department to more closely examine compliance with policy and procedure and perhaps explore de-escalation tactics for use in the [downtown] Sector as well as the other Sectors that experienced increases in complaints from 2004 to 2005." Dkt. 186-37 at 3. Similarly, the 2015 Report states that, in reviewing a use of force incident, the Citizen Review Panel recommended that APD "define more effective methods to de-escalate situations such as this one" and "look for ways to apply a measured use of force and balance that with de-escalation methods." Dkt. 186-45 at 15. These recommendations are insufficient to show that the City had a pattern of condoning excessive force that was "so common and well-settled as to constitute a custom that fairly represents municipal policy." *Peterson*, 588 F.3d at 852.

Considering the entire record, the Court finds that Plaintiffs have not carried their burden to establish that the City had an unofficial custom or practice of condoning excessive force. The Court recommends that summary judgment be granted on this claim.

## C.  Failure to Enforce Intervention Policy

Plaintiffs also argue that although the City has a written policy of requiring officers to intervene when witnessing excessive force, it has not enforced this policy for ten years. In support, Plaintiffs

provide the same list of prior incidents involving the use of force,[4] noting that other officers were present but did not intervene and were not investigated. Plaintiffs also submit evidence that APD investigated the other officers present only once among the 89 times APD itself found violations of its excessive force policy. Dkts. 188-1 at 29, 188-5. This evidence is supported by the testimony of Brian Manley, APD Police Chief at the time of Ambler's death, and Jason Staniszewski, now Assistant Police Chief, who testify that APD has never disciplined or investigated an officer for failure to intervene. Manley Tr. at 191:18-25, 195:4-12, Dkt. 186-53 at 9-10; Staniszewski Tr. at 92:18-94:8, Dkt. 186-11 at 24-26.

As stated above, the City presents significant evidence of its policies and procedures governing the use of force. The record shows that when an officer reported using force, APD conducted a "review of and inquiry into every reported use of force to determine whether it comported with APD's policies." Dkt. 165-1 (Chacon Dec.) ¶ 10. The City does not provide any evidence suggesting that APD extended its investigation into other officers' responses when witnessing excessive force. Nor is there evidence that APD monitored officer's compliance with its intervention policy in any other way. The Court finds that Plaintiffs have offered sufficient evidence to show that APD's lack of investigation and discipline of officers who were potentially liable as bystanders was so uniform as to constitute an official policy.

Plaintiffs also must show that the City's failure to enforce its intervention policy constituted deliberate indifference. *James v. Harris Cnty.*, 577 F.3d 612, 617 (5th Cir. 2009). Proving deliberate indifference "ordinarily" requires the plaintiff to prove a pattern of prior constitutional violations. *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997).

---

[4] The incidents involving David Joseph and Breaion King are not considered here because Plaintiffs do not allege that another officer was present at the scene to intervene. *See* Dkt. 188-1 at 15-16, 19.

The City argues that several incidents do not constitute evidence of a pattern because APD investigated them and found no policy violations. This reasoning was rejected in *Peterson*, 588 F.3d at 852. But the Court agrees that incidents in which juries found that officers did not use excessive force should be excluded.[5] The Court also finds that incidents involving individuals believed to have a gun are too dissimilar from the facts here to constitute evidence of a pattern.[6]

The Court finds that Plaintiffs submit evidence of 14 incidents describing conduct by an officer that would, as alleged, constitute failing to intervene in another officer's use of excessive force.[7] These generally involve officers needlessly escalating interactions with individuals before, during, and after their arrest while other officers stood by or participated in using force. Plaintiffs also offer evidence that the City would have been aware of several of these incidents because they resulted in lawsuits or discipline of other involved officers. *See, e.g.*, Dkts. 186-62, 186-73.

Based on this evidence, the Court finds that Plaintiffs have shown a pattern of prior incidents involving officers' failure to intervene in another officer's use of excessive force sufficient to support a finding of deliberate indifference at the summary judgment stage. *See Sanchez v. Gomez*, No. EP-17-CV-133-PRM, 2020 WL 1036046, at *15 (W.D. Tex. Mar. 3, 2020) (finding eight incidents sufficient to establish a "pattern of use of excessive force against mentally ill victims").

To prove that this policy was a "moving force" behind the alleged violation of Ambler's constitutional rights, Plaintiffs must show "direct causation." *Peterson*, 588 F.3d at 848. This means that "there must be a direct causal link" between the policy and the violation, not merely a "but for" coupling between cause and effect. *Id.* (citation omitted). "Numerous courts have held

---

[5] Byron Carter, Caroline Callaway, Grady Bolton, and Justin Scott.

[6] Nathaniel Sanders and Sir Smith, Jawhari Smith, Richard Munroe, Jason Roque, and Landon Nobles.

[7] Alan Licon, Carlos Chacon, Pete Hernandez, Hunter Pinney, Joseph Cuellar, Adrian Aguado, Armando Martinez, Gregory Jackson, Joe McDonald, Abel Soto-Torres, Joseph Figueroa, Justin Grant, Michael Yeager-Huebner, and Paul Mannie.

that a policy of lack of discipline and protection plausibly emboldens officers to engage in misconduct." *Vess v. City of Dallas*, 608 F. Supp. 3d 434, 454 (N.D. Tex. 2022) (collecting cases). To prove "moving force" causation, at a minimum, a plaintiff must provide evidence that the officer was aware of the City's policy. *James*, 577 F.3d at 618-19.

Plaintiffs rely on Nissen's deposition testimony that he could not recall any instance of another officer being investigated for failing to intervene. Nissen Tr. at 201:16-202:8, Dkt. 186-2 at 57. The Court finds that this creates a fact issue as to whether Nissen was aware of a lack of enforcement. Plaintiffs also offer Nissen's deposition testimony, in which he stated that he did not intervene because he "wouldn't want another officer telling me what force to use because ultimately I'm the one who has to decide whether or not that's reasonable, I wouldn't want to tell another officer what to do because of the same reason." *Id.* at 174:1-16, Dkt. 186-2 at 52. From this evidence, a reasonable jury could conclude that the City's failure to enforce its intervention policy was the moving force in the constitutional violation.

**D.  Failure to Train**

Plaintiffs argue that the City improperly trained Nissen to use excessive force based on the police academy's teaching techniques and its failure to teach de-escalation tactics. The City responds that Plaintiffs have not shown that the training is inadequate, the City was deliberately indifferent in adopting the training program, or the training was the moving force in the constitutional violation.

The Court agrees with the City that Plaintiffs have not met their high burden to show municipal liability for failure to train. It is undisputed that the training the City provides to its officers exceeds minimum requirements in Texas. *See Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 171 (5th Cir. 2010) (finding that compliance with state training minimums "counsels against" finding a failure to train). Although Plaintiffs assert that the City provides no training on de-escalation

tactics, the evidence they cite does not support their claim. The 2005 OPM Report does not address what de-escalation training the City had in place and so cannot support Plaintiffs' claim that OPM "recommended APD rethink its missing de-escalation training." Dkts. 188-1 at 33, 186-37 at 4. Without such evidence, Plaintiffs' failure to train claim fails. *See Roque v. Harvel*, No. 1:17-CV-932-LY, 2020 WL 6334800, at \*9 (W.D. Tex. Mar. 23, 2020) (granting summary judgment for the City on failure to train claim where it met minimum state requirements and provided specific training in areas at issue), *aff'd*, 993 F.3d 325 (5th Cir. 2021); *Hernandez v. City of Austin*, No. A-14-CV-492 LY, 2015 WL 7301180, at \*6 (W.D. Tex. Nov. 17, 2015), *R. & R. adopted sub nom. Hernandez v. Sanchez*, 2015 WL 12670886 (W.D. Tex. Dec. 21, 2015) (finding that recommendation City revise aspects of use of force policy does not show training is inadequate).

Nor does Plaintiffs' evidence of a "toxic" culture at the police academy establish that the training was inadequate. Dkt. 188-1 at 2. In 2020, the City retained Kroll Associates, Inc. to review and evaluate the extent to which racism, bigotry, and discrimination are present in APD protocols, practices, and behaviors. Dkt. 186-32 at 4. Plaintiffs highlight Kroll's findings that the training academy "remains a predominantly paramilitary training model" that often taught cadets a "warrior mentality." *Id.* at 7, 28.

Proof that an injury "could have been prevented if the officer had received better or additional training cannot, without more, support liability." *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005). The City's decision to commission the Kroll Report undermines any claim that it was deliberately indifferent in adopting its training; instead, it suggests that the City sought to improve its training through Kroll's review and recommendations. Accordingly, the Court recommends that the District Court grant summary judgment for the City on Plaintiffs' failure to train claim.

**E.  Ratification**

Plaintiffs briefly argue that the City ratified Nissen's conduct because the City has taken the position Nissen violated no APD policies. It is established that "a policymaker who defends conduct that is later shown to be unlawful does not necessarily incur liability on behalf of the municipality." *Peterson*, 588 F.3d at 848; *see also Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 169 (5th Cir. 2010) ("Good faith statements made in defending complaints against municipal employees do not demonstrate ratification."). And the Fifth Circuit has limited the ratification theory to "extreme factual situations" far worse than those here. *See Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985).

**F.  Americans with Disabilities Act**

The City argues that it is entitled to summary judgment on Plaintiffs' ADA claim because the exigent circumstances exception set forth in *Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2000), applies. The City also contends that there is no evidence the alleged discrimination was intentional, and that under recent Sixth Circuit precedent, the City cannot be vicariously liable for an agent's violation of the ADA. Plaintiffs respond that summary judgment is inappropriate because the scene was secure and therefore the exigent circumstances exception does not apply, Nissen intentionally discriminated against Ambler by failing to accommodate his disability despite his knowledge that his conduct would be deadly, and the City can be held vicariously liable.

**1.  Exigent Circumstances Exception**

The City argues that this case falls within the exigent circumstances exception because the incident occurred on a public street, "presenting a danger to the APD officers on the scene as well as the public at large," and that Nissen's decision to assist was "a quick discretionary decision made for the safety of those at the scene." Dkt. 165 at 21.

Title II of the ADA "does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents prior to the officer's securing the scene and ensuring that there is no threat to human life." *Hainze*, 207 F.3d at 801. Officers need not consider whether their actions will comply with the ADA "prior to securing the safety of themselves, other officers, and any nearby civilians." *Id.* at 801. Once an area is secure and there is no safety threat, officers have a duty to reasonably accommodate disability. *Id.* at 802.

Courts consistently find that a scene is not secure where officers have reason to believe that the plaintiff is armed and still a threat. *See, e.g.*, *Munroe v. City of Austin*, 300 F. Supp. 3d 915, 931 (W.D. Tex. 2018) (finding that exception applied when plaintiff was "waiving" an "exact replica of a real handgun" in officers' direction); *DeLeon v. City of Alvin Police Dep't*, No. H-09-1022, 2010 WL 4942648, at *4 (S.D. Tex. Nov. 30, 2010) (same where victim was bleeding from knife wound and stated that plaintiff would attack again unless she was arrested). In contrast, the court found a genuine issue of material fact as to whether circumstances presented "any serious threat, let alone threat of human life," or there was a need to secure the scene in *Hobart v. City of Stafford*, 784 F. Supp. 2d 732, 741 (S.D. Tex. 2011). In that case, an officer responded to a parent's 911 call saying that her adult son was "violent" and "delusional," but lacked access to any weapons. After entering the house, the son ran toward the officer "flailing" his arms, striking the officer on his arms. *Id.* at 742.

Considering all the evidence, the Court finds that there are genuine issues of material fact as to whether the scene was secure once Ambler was out of his vehicle and surrounded by multiple officers.

### 2. Intent

Although intent is a necessary element of a damages claim under the ADA, the Fifth Circuit "has hesitated to delineate the precise contours of the standard for showing intentionality. But the

cases to have touched on the issue require something more than 'deliberate indifference,' despite most other circuits defining the requirement as equivalent to deliberate indifference." *Cadena v. El Paso Cnty.*, 946 F.3d 717, 724 (5th Cir. 2020*)* (cleaned up). For example, intentional discrimination has been found when a county deputy knew that a hearing-impaired suspect could not understand him, rendering his chosen method of communication ineffective, and the deputy did not try to adapt. *Delano-Pyle*, 302 F.3d at 575-76.

As stated, Ambler's obesity was apparent, and Plaintiffs submit evidence that and Ambler informed the officers he had congestive heart failure and could not breathe. Plaintiffs also submit evidence that APD's restraint policies permit officers to use alternatives to handcuffing an arrestee behind the back "in the case of advanced age, injury, physical disability, or other circumstances where arrested persons are incapable of placing their hands behind their back," and Nissen was trained to consider these alternatives. Dkt. 186-7 at 2; Stanizsewski Tr. at 119:2-120:3, Dkt. 186-11 at 34-35. The Court finds that Plaintiffs' evidence that Nissen knew of Ambler's disability and did not alter his behavior establishes a question of fact on the element of intent.

### 3. Vicarious Liability

The City's argument that it cannot be held vicariously liable for the actions of its agent is foreclosed by Fifth Circuit precedent that a "public entity is liable for the vicarious acts of any of its employees" because the ADA "specifically encompasses any agent of an employer covered by the statute." *Delano-Pyle*, 302 F.3d at 574-75 (citing 42 U.S.C. § 12111 (1995)). The Sixth Circuit case on which the City relies, *Jones v. City of Detroit*, 20 F.4th 1117, 1121 (6th Cir. 2021), is not persuasive.

### G. Spoliation

Finally, Plaintiffs argue that an adverse inference should be drawn against the City because it failed to preserve video evidence from the camera crew that recorded Ambler's arrest for the

television show Live PD. A party seeking an adverse inference based on spoliation of evidence must show:

> (1) the party with control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the evidence was destroyed with a culpable state of mind; and (3) the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

*Doe v. Northside I.S.D.*, 884 F. Supp. 2d 485, 496 (W.D. Tex. 2012).

Plaintiffs have not shown that the City ever had control over the evidence. As Plaintiffs allege in their Complaint, former Defendant Williamson County contracted with a private entity to produce Live PD and there is no evidence the City was involved. Dkt. 44 ¶ 26. The Court recommends that Plaintiffs' request for an adverse inference against the City at trial be denied.

## V.    Recommendation

For these reasons, this Magistrate Judge **RECOMMENDS** that the District Court **GRANT IN PART and DENY IN PART** Michael Nissen's Motion for Summary Judgment (Dkt. 167). The Court recommends that the District Court **GRANT** the motion as to Plaintiffs' deliberate indifference to a serious medical need claim and **DENY** it in all other respects. If the Court accepts this recommendation, Plaintiffs' claims against Nissen for excessive force as a participant and a bystander will remain for trial.

The Court further **RECOMMENDS** that the District Court **GRANT IN PART and DENY IN PART** Defendant City of Austin's Motion for Summary Judgment (Dkt. 165). The Court recommends that the District Court **GRANT** the motion as to Plaintiffs' claims that the City is liable for Nissen's Fourth Amendment violation based on its policy of condoning excessive force and failing to train its officers and **DENY** the motion as to Plaintiffs' claims for failure to enforce its intervention policy and violation of the Americans with Disabilities Act.

### VI.     Warnings

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report and, except on grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

### VII.     Order

The Court **GRANTS** Plaintiffs' Unopposed Motion for Leave to File Sur-Reply in Opposition to the City's Motion for Summary Judgment, filed June 2, 2023 (Dkt. 198). The Clerk is **ORDERED** to file Dkt.198-1 on the docket.

**SIGNED** on July 31, 2023.

SUSAN HIGHTOWER
UNITED STATES MAGISTRATE JUDGE